UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 08 CV 2056

---------------------------------------------x
                          :

PETERCAM S.A./N.V.,              :    No. 08 Civ. _____

               Plaintiff,   :    Jury Trial Demanded

                          :

       - v. -              :

VIVENDI, S.A., JEAN-MARIE MESSIER  :
and GUILLAUME HANNEZO,        :

                          :

            Defendants.  :

                          :
---------------------------------------------x

FEB 29 2008
U.S.D.C. S.D. N.Y.
CASHIERS

## **COMPLAINT**

Lawrence A. Sucharow (LS-1726)
Eric J. Belfi (EB-8895)
Mark S. Arisohn (MA-2364)
Anthony J. Harwood (AH-1006)
Javier Bleichmar (JB-1104)
Jesse Strauss (JS-0212)
LABATON SUCHAROW LLP
140 Broadway
New York, New York 10005
Telephone: 212-907-0700
Facsimile: 212-818-0477

*Attorneys for Plaintiff Petercam S.A./N.V.*

## TABLE OF CONTENTS

I.      NATURE OF THE ACTION ................................................................................1

II.     JURISDICTION AND VENUE .........................................................................7

III.    THE PARTIES ...................................................................................................14

IV.     FACTUAL BACKGROUND AND THE FRAUDULENT SCHEME................17

        A.      Vivendi's Extraordinary Growth Prior to and Through the Merger ...........17

        B.      Vivendi's Continuing Acquisitions Following the Merger .............................20

        C.      Vivendi's Improper Accounting Methods and Practices................................21

                1.      Accounting Rules Applicable to Vivendi as a Foreign Issuer............21

                2.      Vivendi's Failure to Timely Write Down Impaired Goodwill...........24

                        a.      Canal Plus .........................................................................26

                        b.      U.S. Filter..........................................................................32

                        c.      Other Entities ...................................................................33

                3.      Vivendi's Improper Consolidation of Cegetel
                        and Maroc Telecom in its Financial Statements .............................33

                4.      Defendants' Improper Recognition of Revenue .............................38

                5.      Defendants' Improper Inflation of Canal Plus's Assets ...................41

                6.      Defendants' Improper Manipulations
                        of Vivendi's Reported EBITDA ........................................................42

                        a.      Second Quarter of 2001 (Cegetel) ...................................43

                        b.      Third Quarter of 2001 (UMG)........................................44

                7.      Defendants' Failure to Properly
                        Report Pro Forma Accounting Metrics ............................................45

                8.      Defendants' Failure to Disclose Vivendi's
                        2% Interest in Elektrim Telekomunikacja ......................................46

        D.      Defendants' Concealment of Vivendi's Growing Liquidity Crisis ...............47

                1.      Defendants' Failure to Disclose Vivendi's Inability to Generate
                        Expected Cash Flows From Acquired Companies .............................48

2. Defendants' Failure to Disclose the
Insufficiency of Vivendi's Working Capital.................................48

3. Defendants' Failure to Disclose
Certain Off-Balance Sheet Liabilities....................................49

4. Defendants' Failure to Disclose Material
Commitments Concerning Cegetel and Maroc Telecom ......................51

    a. The Cegetel Current Account .........................................52

    b. The Maroc Telecom Side Agreement ...................................53

5. Defendant's Failure to Disclose
Vivendi's 2001 Stock Buy-Backs........................................54

6. The Magnitude of the Undisclosed Liquidity Crunch ...................55

V. THE TRUTH EMERGES, CAUSING HARM TO
PLAINTIFF AND OTHER VIVENDI INVESTORS ..................................58

VI. DEFENDANTS' MATERIALLY FALSE
AND MISLEADING STATEMENTS...........................................66

VII. ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER ........................107

VIII. PRESUMPTION OF RELIANCE ..............................................114

IX. INAPPLICABILITY OF STATUTORY SAFE HARBOR ..............................115

X. LOSS CAUSATION ........................................................115

XI. TOLLING OF THE STATUTE OF LIMITATIONS .................................117

XII. CLAIMS FOR RELIEF.....................................................119

COUNT I Violations of Section 11 of the Securities Act of 1933
(Asserted Against All Defendants) ......................................119

COUNT II Violations of Section 12(a)(2) of the Securities Act of 1933
(Asserted Against All Defendants) ......................................120

COUNT III Violations of Section 15 of the Securities Act of 1933
(Asserted Against Defendants Messier and Hannezo) .....................122

COUNT IV Violations of Section 10(b) of the Securities
Exchange Act of 1934 and Rule 10b-5 Promulgated Thereunder
(Asserted Against All Defendants) ......................................123

COUNT V Violations of Section 18 of the
Securities Exchange Act of 1934
(Asserted Against All Defendants) ................................................................................125

COUNT VI Violations of Section 20(a) of the
Securities Exchange Act of 1934
(Asserted Against Defendants Messier and Hannezo) ............................................126

COUNT VII For Common Law Fraud and Deceit
(Asserted Against All Defendants) ................................................................................127

COUNT VIII For Common Law Negligent Misrepresentation
(Asserted Against All Defendants) ................................................................................129

COUNT IX For Common Law Unjust Enrichment
(Asserted Against All Defendants) ................................................................................130

XIII.    PRAYER FOR RELIEF ............................................................................................130

XIV.    JURY DEMAND ..........................................................................................................131

Plaintiff Petercam S.A./N.A. ("Petercam"), by its undersigned attorneys, alleges the following upon personal knowledge as to it and its own acts, and upon information and belief as to all other matters. Plaintiff's information and belief is based upon an investigation made by and through its attorneys, which included, among other things, the review and analysis of (i) public filings by Vivendi Universal, S.A., now known as Vivendi, S.A. ("Vivendi" or the "Company") with the Securities and Exchange Commission (the "SEC") and the Commission des Opérations de Bourse (the "COB") (now part of the Autorité des marchés financiers (the "AMF")), the principal French securities regulation and enforcement agency; (ii) press releases issued by Vivendi; (iii) analyst reports concerning Vivendi and its securities; (iv) other public statements made by or on behalf of Vivendi and the other named Defendants; (v) pleadings in litigation in which Vivendi is a named defendant, including *In re Vivendi Universal, S.A. Securities Litigation,* No. 02 Civ. 5571 (RJH) (S.D.N.Y.) (the "Securities Class Action") and *SEC v. Vivendi Universal, S.A.,* No. 03 Civ. 10195 (PKC) (S.D.N.Y.) (the "SEC Action"); and (vi) other public information, including press and media reports, concerning Vivendi, its securities, and the other named Defendants. Many of the facts supporting the allegations herein are known only to Defendants or are exclusively within their possession, custody and control. Plaintiff believes that further substantial evidence supporting its allegations will be uncovered after a reasonable opportunity for discovery.

## I.    **NATURE OF THE ACTION**

1.    Plaintiff brings this federal securities action against Vivendi, Jean-Marie Messier ("Messier"), the Company's former Chief Executive Officer and Chairman, and Guillaume Hannezo ("Hannezo"), the Company's former Chief Financial Officer (collectively, "Defendants"). During the Core Period of October 30, 2000 through August 14, 2002, Vivendi, Messier (until he was forced to resign on July 3, 2002), and Hannezo (until he resigned on July 9, 2002) issued numerous materially false and misleading statements concerning Vivendi's financial condition. These statements were filed with the SEC or otherwise publicly disseminated, in violation of the federal securities laws and common law.

2.    The company now known as Vivendi was originally founded in France in the 1800s as a water utility. Before and during the Core Period, Messier caused Vivendi to embark on a massive, $77 billion acquisition program that quickly transformed Vivendi from a small water company into an enormous global media and telecommunications conglomerate. In pursuing this acquisition spree and growing the Company at an extraordinary rate, Defendants falsely reported strong revenue and earnings, and portrayed Vivendi as a corporation that was generating sufficient cash flow and earnings to satisfy its debt obligations on the $21 billion in debt that the Company had amassed in financing its vast acquisition program. As a result of Defendants' repeated upbeat (and false) earnings announcements and assurances concerning the Company's growth and its ability to meet its massive debt obligations, the prices of Vivendi's ordinary shares traded on the EuroNext Paris, S.A. (the "Paris Bourse"), and Vivendi's American Depository Shares ("ADSs") traded on the New York Stock Exchange (the "NYSE"), were artificially inflated during the Core Period.

3.    As Defendants knew but did not disclose, Vivendi's financial condition and the state of the Company's operations were dramatically worse than what their public statements portrayed. For example, immediately prior to and during the Core Period, Vivendi (using its increasingly inflated common stock as currency to finance many of its acquisitions) bid aggressively for several large companies, and substantially overpaid for them. Subsequent events (unbeknownst to investors) confirmed to Vivendi, Messier and Hannezo that these acquired entities could not generate sufficient cash flow to justify their high acquisition costs. As a result, Vivendi's balance sheet was bloated with tens of billions of dollars of inflated "goodwill" whose value had been materially impaired and should have been written down consistent with generally accepted accounting principles. Vivendi's failure to generate earnings in line with its publicly touted estimates threatened the Company's liquidity and its ability to generate the massive cash flow necessary to satisfy its obligations on more than $21 billion-worth of debt.

4.    To conceal the deteriorating state of Vivendi's newly built international conglomerate, Defendants engaged in a variety of fraudulent and otherwise improper asset and revenue-inflating practices during the Core Period that enabled the Company to artificially inflate its reported assets, revenue, income and earnings per share ("EPS"), thereby rendering Vivendi's publicly filed financial statements and other communications regarding its financial performance materially false and misleading.

5.    Vivendi's improper accounting (as further alleged in detail in Section IV.C below) included, *inter alia*, failing to take timely write-offs of more than €29 billion in goodwill associated with Vivendi's acquisitions, including its acquisitions of U.S. Filter Corp. ("U.S. Filter") and Canal Plus S.A. ("Canal Plus," sometimes referred to as "Canal+"). Defendants' failure to take timely write-offs for impaired goodwill in violation of U.S. generally accepted accounting principles ("U.S. GAAP") caused Vivendi to delay, improperly, recognition of offsetting charges of more than €29 billion against the Company's earnings during the Core Period. As a result, Vivendi's reported earnings and EPS were inflated under U.S. GAAP by tens of billions of dollars during the Core Period.

6.    In addition to its failure to account properly for goodwill, Vivendi engaged in a variety of improper revenue recognition and expense-deflating practices, and other related misconduct, to overstate its reported financial performance during the Core Period. These practices included, *inter alia*, (i) reporting and consolidating into its own reported financial statements billions of dollars of revenue from entities such as Cegetel and Maroc Telecom (defined below) in which Vivendi held only a minority stake and which Vivendi did not control, in violation of U.S. GAAP (as alleged in Section IV.C.3 below); (ii) recognizing 100% of the revenue "upfront" (*i.e.*, in contract year one) on billions of dollars of multi-year contracts in a practice known as "booking backlog," even though Vivendi had not yet performed its obligations under those multi-year contracts and U.S. GAAP required that the revenue on such contracts be recognized ratably over time while Vivendi actually performed the contracted-for

services (as alleged in Section IV.C.4 below); (iii) improperly inflating Canal Plus's assets (as alleged in Section IV.C.5 below); (iv) improperly manipulating Vivendi's reported EBITDA (as alleged in Section IV.C.6 below); (v) failing to properly report pro forma accounting metrics (as alleged in Section IV.C.7 below); and (vi) failing to disclose a 2% interest in Elektrim Telekomunikacja (as alleged in Section IV.C.8 below).

7.    These improper accounting practices not only allowed Vivendi to keep its stock price artificially high, but also facilitated Defendants' fraudulent efforts to conceal the Company's worsening liquidity problems.  For example, on December 6, 2001, Messier assured the investing public that "Vivendi Universal is in a very strong position, with solid performance in virtually every business."  Just weeks later—after having announced that the Company would raise $2.5 billion by selling a $1.5 billion interest in British Sky Broadcasting Plc ("BSkyB") and a $1.06 billion interest in Vivendi Environnement—Vivendi stated that these asset sales would give Vivendi "room to manoeuvre" for additional acquisitions and enable it "to cover any eventual needs from different opportunities for strategic partnerships."  Then, on December 17, 2001, Vivendi announced that it would acquire USA Networks, Inc. for approximately $10 billion.

8.    Unbeknownst to investors, however, Vivendi's business at that time was anything but "very strong" and had precious little "room to manoeuvre."  To the contrary, as *The Wall Street Journal* later reported, the Company was then facing a potentially catastrophic liquidity crisis:

> On Dec. 13 last year [2001], Guillaume Hannezo sent Jean-Marie Messier, chairman of Vivendi Universal SA, a desperate handwritten plea.
>
> ***"I've got the unpleasant feeling of being in a car whose driver is accelerating in the turns and that I'm in the death seat,"*** wrote Mr. Hannezo, the company's chief financial officer.  ***"All I ask is that all of this not end in shame."***
>
> That very day, unknown to investors and the Vivendi board, the company had narrowly averted a downgrade by credit-rating agencies, which would have made it difficult to borrow money and plunged the

company into a cash crisis.  Mr. Hannezo (pronounced AN-ZO) implored his boss and longtime friend to take serious steps to reduce Vivendi's ballooning debt.

When the company's board met the next day to consider whether to approve a roughly $10 billion acquisition of USA Networks Inc.'s TV and film businesses, Mr. Messier made no mention of the close call with the rating agencies.  Instead, when a director asked about Vivendi's financial profile, Mr. Messier said the company had no problem, according to two directors who were there.

The board endorsed the USA Networks deal, buying Mr. Messier's pitch that it would help complete Vivendi's transformation from a onetime water utility into an entertainment giant. . . .

But Vivendi was already in dire financial straits. . . .

As new management struggles to salvage the French conglomerate, it has become clear that Vivendi came close to financial disaster far earlier than previously thought.  That picture is starkly at odds with the one repeatedly presented by Mr. Messier to investors and his board.

John Carreyrou and Martin Peers, *How Messier Kept Cash Crisis At Vivendi Hidden for Months: Media Giant Was At Risk Well Before Investors Knew,* Wall St. J., Oct. 31, 2002, at A1 (emphases added).

9.     Without publicly disclosing the adverse material facts facing the Company—and while affirmatively and materially misrepresenting the truth concerning the Company's actual prospects, financial performance, improper accounting practices and liquidity situation—Defendants took advantage of the market's ignorance of the truth by causing Vivendi to purchase numerous companies during the Core Period using artificially inflated Vivendi stock as currency.  By maintaining an artificially inflated price for Vivendi's common stock, Defendants were able, in essence, to purchase tens of billions of dollars worth of stock of The Seagram Company Ltd. ("Seagram"), Canal Plus, and other entities at a deep discount, because Vivendi was paying for its interests in those companies with a currency (Vivendi's own stock) that actually was worth only a fraction of its publicly traded price.

10.    The multinational giant Messier and Hannezo built was a house of cards and eventually collapsed of its own weight.  In June 2002, Vivendi suffered a severe and immediate cash shortage that

threatened the Company's ability to stay in business. Plaintiff did not begin to learn the truth about Defendants' deception until July 2, 2002, when a credit rating agency downgraded Vivendi's debt. According to published reports, this "sparked near-panic selling in Paris that caused Vivendi shares to plunge 25% for the day, to a new 15-year trading low of €17.8." The credit agency report also disclosed that Vivendi's financial obligations in 2002 could be as much as $3 billion more than—or *twice* as large as—what most analysts had expected. The situation was so dire that, although not known by the public at the time, Goldman Sachs had privately presented several scenarios for Vivendi's future to a group of Vivendi Board members on June 24, 2002. One of those scenarios showed Vivendi going bankrupt in as little as just three or four months, *i.e.*, in September or October 2002.

11. On July 3, 2002, Vivendi's Board of Directors fired Messier. The Board obtained Hannezo's resignation a few days later. Messier stubbornly refused to admit any wrongdoing, stating on the day that he was ousted from the Company that there were "no underestimated liabilities" and "no overvalued assets" on Vivendi's financial statements, and that its previously reported financial results were all "true, genuine and complete." The Company's new management, however, was soon forced to disclose that the Company would have to secure bridge and long-term financing immediately to avoid default on its largest credit obligations. During a hearing before the French parliament in September 2002, Vivendi's new Chairman, Jean-René Fourtou ("Fourtou"), admitted that had Messier remained CEO beyond July 3, 2002, Vivendi undoubtedly would have gone bankrupt "within 10 days."

12. On August 14, 2002, Vivendi reported that it had suffered a huge loss of approximately $12 billion for the first half of 2002, and that it would have to sell approximately $10 billion in assets in an effort to reduce its debt. Fourtou, the new Chairman, candidly admitted that "[w]e are facing a liquidity problem." The same day, Standard & Poor's further cut its ratings on Vivendi's long-term corporate debt to "junk" status.

13.     Although Messier and Hannezo succeeded in their dream of transforming Vivendi from a small water company to a diversified global conglomerate, the Company and its shareholders have paid an enormous price for Defendants' unchecked ambition, hubris, and falsehoods.  As alleged in greater detail below, the revelation of Defendants' frauds resulted in devastating drops in the prices of Vivendi's ordinary shares traded on the Paris Bourse and ADSs traded on the NYSE; the Company's de-listing from the NYSE; an onslaught of civil litigation; investigations by the U.S. Department of Justice and French regulatory authorities; and the imposition of a massive civil fine by the SEC.

14.     The disclosure of Defendants' fraud caused a precipitous decline in the trading prices of Vivendi securities.  On August 14, 2002, Vivendi's ordinary shares plunged 25% (in addition to the 25% drop in early July) to as low as €11.89.  Overall, the Company's ADSs lost 85% of their value from the high during the Core Period of $75.50, and its ordinary shares fell 83.9% from their Core Period high of €86.50.  These price declines, which resulted from the fraud alleged herein, caused Plaintiff to suffer substantial damages in connection with its purchases and acquisitions of Vivendi ordinary shares and during the Core Period.

## II.    **JURISDICTION AND VENUE**

15.     The claims asserted herein arise under Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77*l*(a)(2) and 77*o;* Sections 10(b), 18 and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78r and 78t(a); Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.l0b-5; and common law.

16.     This Court has jurisdiction over the subject matter of this action and personal jurisdiction over the Defendants pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v; Section 27 of the Exchange Act, 15 U.S.C. § 78aa; and 28 U.S.C. §§ 1331, 1337(a), and 1367.

17.     In connection with the acts and course of conduct alleged in this Complaint, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce,

including the United States mails, interstate telephone communications, and the facilities of national securities markets.

18.    Venue is proper in this District pursuant to Section 22 of the Securities Act, Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b), (c) and (d).  Many of the acts, practices, and conduct complained of herein occurred in substantial part and/or had an effect in this District, including the dissemination of materially false and misleading statements and the creation and implementation of manipulative and deceptive devices and contrivances.  Defendants conducted substantial business and had substantial contacts within this District during the Core Period.  Offers and sales of Vivendi securities at issue in this action occurred in this District.

19.    Pursuant to the judicially prescribed "effects test" for asserting extraterritorial jurisdiction, this Court can properly exercise subject matter jurisdiction over Plaintiff's claims because Defendants' improper conduct had an impact upon the NYSE, the U.S. market on which Vivendi sold ADSs and which was fully integrated with the market on which Plaintiff purchased ordinary shares. Defendants' improper conduct, including that which was carried out in the United States, artificially inflated the price of Vivendi securities and affected the integrity of prices paid for Vivendi securities in the United States and on the Paris Bourse.  Vivendi ordinary shares listed on the Paris Bourse, and ADSs listed on the NYSE, traded in tandem.  This single, worldwide market was defrauded by Defendants' conduct, causing substantial effects in the U.S. and abroad.

20.    This Court can also properly exercise subject matter jurisdiction over the claims of foreign purchasers of Vivendi ordinary shares traded on foreign exchanges, including the Paris Bourse, under the "conduct test" articulated by the United States Court of Appeals for the Second Circuit, which provides that a federal court has subject matter jurisdiction if (i) the defendant's activities in the United States were more than "merely preparatory" to a securities fraud conducted elsewhere, and (ii) these activities or culpable failures to act within the United States "directly caused" the plaintiff's losses.

The facts alleged herein show that Defendants' conduct within the United States was not "merely preparatory," but rather was substantial and in furtherance of the alleged fraudulent and other misconduct, and directly caused Plaintiff's losses.

21.    Vivendi actively marketed and sold securities in the United States whose prices were artificially inflated owing to material misstatements in financial reports, a Form F-4 Registration Statement filed with the SEC on October 30, 2000, and Company press releases. Numerous Vivendi press releases shared a New York dateline. Vivendi also regularly filed false and misleading annual and current reports with the SEC on Form 20-F and Form 6-K, as alleged in detail herein.

22.    Further, Vivendi organized and participated in meetings in New York with financial and securities industry participants, including Wall Street analysts, to review and report on Vivendi's financial results, and issued materially false and misleading statements during those meetings.

23.    Defendants engaged in substantial business activities in the United States to further their fraud and the fraudulent scheme alleged herein was centralized in large part in this District, where Messier and Hannezo orchestrated the fraud and where Defendants maintained the Company's U.S. headquarters. As described further below, a primary objective of Vivendi's expansion plan from the late 1990s through July 2002 was to expand into the United States by acquiring American companies. Vivendi had to go to the financial markets to raise the money needed for such acquisitions, and used its securities (both ADSs and ordinary shares) and borrowed cash against future earnings to purchase significant equity positions in a number of U.S. companies. Defendants carried out their fraudulent scheme and course of conduct by using Vivendi's falsified financial statements to raise billions of dollars of new capital in the United States and elsewhere, while making false statements about Vivendi's financial condition and prospects in order to inflate the value of the shares it would use as consideration to acquire numerous businesses. By such fraudulent means, Vivendi was able to acquire and conduct significant operations and activities in the United States.

24.    Defendant Vivendi was formed as a result of a 2000 merger among Vivendi, S.A.; Seagram, which owned the U.S. company Universal Studios; and Canal Plus (the "Merger"). Before and during the Core Period, Vivendi acquired such American companies as USA Networks Inc. (for $10.3 billion); U.S. Filter Corp. (for $6.2 billion); Houghton Mifflin Co. (for $2.2 billion); EchoStar Communications Corp. (for $1.5 billion); MP3.com, Inc. (for $400 million); Uproar, Inc. (for $128 million); Waste Management, Inc. (for €103.5 million); and EMusic.com (for $24 million).

25.    According to a Vivendi press release dated February 16, 2001, the percentage of Vivendi's securities owned by United States shareholders had more than doubled over a 12-month period, demonstrating that the Company was truly "international."

26.    As alleged in the Securities Class Action, in a February 27, 2001 interview on "Market Call," Messier reiterated his ambitions for Vivendi to have a deep and lasting presence in the U.S. capital markets and among the investing public in the United States:

> I'm enthusiastic about doing and continuing and persuading this education job [for American investors and Wall Street analysts]. Since the merger, the level of U.S. investors in all capital has jumped from less than 10 percent to more than 25 percent. I have a very simple goal in mind. I want the level of U.S. investors, within Vivendi Universal, to reach as quickly as possible 50 percent of all capital . . . I will take any necessary step to convince and educate Wall Street and U.S. investors.

27.    Not only did Vivendi maintain substantial offices in New York during the Core Period, but Messier and Hannezo themselves moved to New York in September 2001 in order to better direct the Company's operations and to promote misleading perceptions about the Company on Wall Street and to U.S. investors. As alleged in the Securities Class Action, Messier explained why he moved to New York during a February 17, 2002 interview on CNN:

> Moving to New York, yes there [were] very simple reasons. The first one Vivendi Universal has 50,000 U.S. employees. They have a boss. Where is the boss? The boss is in the U.S. He's working there. I can meet with them. I can spend time with them. He is really the boss.

The second goal was Vivendi International is a new group for many U.S. investors in the media field. We need and I needed to spend more time with the U.S. Universal community to explain the Vivendi Universal story, to go through all reasons of performances of prospects, and I think that it's just better to do it being an American, than being outside.

28.    According to the Company's Form 20-F Annual Report for the fiscal year ended December 31, 2001, filed with the SEC on May 28, 2002 (the "2001 Form 20-F"), more than 54% of Vivendi's long-lived assets, valued at €53.5 billion, were located in the United States. The 2001 Form 20-F also states that Vivendi had more than €7 billion in U.S. revenues for 2001. According to the Securities Class Action, at a luncheon in Los Angeles on January 19, 2002, Messier stated that Vivendi was "[f]orty percent within the United States, sixty percent out of the states," and in the CNN interview referenced above, Messier stated that the Company "has 50,000 U.S. employees."

29.    Near the end of the Core Period, as news came to light of Vivendi's near-collapse into bankruptcy, the SEC commenced an investigation of Vivendi in this District. On or about September 24, 2003, the SEC obtained an Order from this Court requiring Vivendi to place $23 million into a judicial interest-bearing escrow account, representing the payment Vivendi might otherwise have been required to pay to Messier under a lucrative termination agreement he entered into with the Company just prior to his termination in early July 2002. The SEC also obtained an Order from this Court preventing Messier from executing a judgment that he had obtained from the New York State Supreme Court, New York County, confirming a $23 million arbitration award to Messier on his claim for compensation under his termination agreement with Vivendi.

30.    The SEC also brought an enforcement action in this District against Vivendi, Messier and Hannezo for violations of the federal securities laws, alleging fraudulent conduct in the United States, including the dissemination of materially false and misleading statements to investors in the United States. The SEC asserted that certain of the alleged securities law violations occurred within this District. The SEC also alleged that the Court could exercise subject matter jurisdiction because Vivendi

conducted business and maintained offices within this District, and that Messier and Hannezo both lived in this District during the Core Period. As part of the resolution of the SEC action, Defendants executed a consent decree entered in this Court.

31.    The United States Attorney's Office for the Southern District of New York has also conducted a criminal investigation of Defendants' fraudulent conduct in this District.

32.    This Court, in the Securities Class Action, has already exercised subject matter jurisdiction over federal securities claims substantially similar to those Plaintiff asserts here. *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158 (S.D.N.Y. 2003) (Baer, J.). The Court denied Defendants' motion to dismiss pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, concluding that the Court, under the "conduct test," had subject matter jurisdiction over claims brought by foreign class members who acquired Vivendi ordinary shares traded on foreign markets. *Id.* at 169-70. The Court found that Defendants' conduct within the United States was not merely preparatory, but rather "was a substantial or significant contributing cause of foreign investors' decisions to purchase Vivendi's stock abroad." *Id.* at 170 (internal quotations omitted). The Court noted that Defendants did not dispute that (i) Messier and Hannezo had relocated to the United States in September 2001, (ii) Vivendi filed Forms 20-F and 6-K with the SEC during the Core Period, (iii) Defendants disseminated other materials to investors in the United States, and (iv) Vivendi made numerous acquisitions in the United States. *Id.* at 169-70.

33.    As alleged in the Securities Class Action, Defendants' conduct within the United States that formed sufficient grounds for the exercise of subject matter jurisdiction over the claims of foreign investors included Vivendi's acquisition of well-known U.S. entertainment and publishing companies such as Universal Studios, Houghton Mifflin, and USA Networks, and that Vivendi, in order to successfully accomplish this program, took on $21 billion in debt while assuring investors "through false

and misleading reports filed with the SEC and news releases that it had sufficient cash flow to manage its debts." *Id.* at 169.

34.     In addition to these U.S. acquisitions, and significant to the Court, was the fact that Messier and Hannezo, Vivendi's two senior most officers and the alleged principal actors in the fraudulent scheme, spent roughly half of their time in the United States from September 2001 through the end of the class period (which is the same as the Core Period herein), specifically for the purpose of increasing investments by U.S. investors in Vivendi and, allegedly, to "better direct corporate operations and more effectively promote misleading perceptions on Wall Street." *Id.* at 170.  The Court also found that it was reasonable to infer from the decision by Messier and Hannezo to move to the United States during the class period that the alleged fraud on the NYSE was a "substantial" or "significant contributing cause" of foreign investors' decisions to purchase Vivendi stock abroad.  *Id.*

35.     The Court, after a reassignment of judges, subsequently declined to reconsider its opinion denying Defendants' motion to dismiss in the Securities Class Action.  *In re Vivendi Universal, S.A. Sec. Litig.,* No. 02 Civ. 5571 (RJH), 2004 WL 2375830 (S.D.N.Y. Oct. 22, 2004) (Holwell, J.).  In this decision, the Court confirmed that it had subject matter jurisdiction over foreign investors' claims against Defendants because, among other things, (i) allegedly false and misleading statements were disseminated from and within the U.S.; (ii) Messier and Hannezo, Vivendi's two top executives, moved to and ran Vivendi from the U.S., allegedly to better carry out their fraudulent scheme; and (iii) Messier and Hannezo acted significantly within the U.S. in furtherance of the alleged fraud and as controlling persons of Vivendi.  The decision on reconsideration specifically stated that "this Court concurs with Judge Baer's opinion finding jurisdiction over this dispute pursuant to the conduct test." *Id.* at *7.  The Court also found Messier's and Hannezo's alleged presence and conduct within the U.S., together with Vivendi's alleged false statements to Wall Street analysts, of "crucial importance" to the issue of jurisdiction.  *Id.*

III.    **THE PARTIES**

36.    Plaintiff is a privately-held asset management company founded in 1968 and based in Brussels, Belgium. Plaintiff mamages assets woth approximately 16 billion euros, as of December 31, 2006. Petercam purchased Vivendi's ordinary shares on the open market in or about the Core Period.

37.    Defendant Vivendi is a société anonyme organized under the laws of France with its principal place of business at 42, avenue de Friedland, 75008 Paris, France. Vivendi has offices in this District located at 800 Third Avenue, New York, New York 10022. Between October 30, 2000 and April 20, 2006, Vivendi was known as Vivendi Universal, S.A.

38.    During the Core Period, Defendant Vivendi described itself as a global conglomerate engaged in business focused primarily on two core areas: "Media & Communications" and "Environmental Services." Vivendi's Media & Communications business was divided into five segments: (i) Music (conducted through Universal Music Group, which produces, markets, and distributes recorded music throughout the world in all major genres); (ii) Publishing (purportedly Europe's premier publisher of information, which provides content across multiple platforms, including print, multimedia, on the wired Internet and to PDAs (Personal Digital Assistants) via WAP (Wireless Application Protocol) technology); (iii) TV and Film (which produces, distributes and licenses motion picture, television and home video/DVD products worldwide, owns and operates a number of cable and pay TV channels, and operates theme parks and retail stores around the world); (iv) Telecoms (which provides a range of telecommunications services, including mobile and fixed telephone, Internet access, and data services and transmission, principally in Europe); and (v) Internet (which manages strategic Internet initiatives and new online ventures). Vivendi Environnement, a subsidiary of Vivendi, operated the Company's worldwide environmental services business, including its water utility operations.

39.     Defendant Vivendi is the entity created by the Merger, and is named as a Defendant herein in its own right and as the successor entity and successor-in-interest to pre-Merger Vivendi, S.A., Seagram, and Canal Plus.  At all times relevant to this Complaint, Vivendi sold ADSs on the NYSE and ordinary shares on the Paris Bourse.

40.     Defendant Jean-Marie Messier ("Messier") was Chief Executive Officer and Chairman of the Board of Directors of Vivendi throughout the Core Period until he was forced to resign on July 3, 2002.  Messier received compensation of $4.8 million in 2001 despite the Company's record losses, as well as various other perquisites, including the use of a $17.5 million penthouse apartment the Company acquired for him on Park Avenue in New York.  Messier was a "control person" of Vivendi within the meaning of Section 15 of the Securities Act and Section 20(a) of the Exchange Act.

41.     Defendant Guillaume Hannezo ("Hannezo") was Vivendi's Chief Financial Officer throughout the Core Period until his resignation on July 9, 2002.  According to the Associated Press, Hannezo was a "close collaborator" of Messier.  Hannezo was a "control person" of Vivendi within the meaning of Section 15 of the Securities Act and Section 20(a) of the Exchange Act.

42.     It is appropriate to treat Defendants Messier and Hannezo as a group for pleading purposes and to presume that the materially false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of these Defendants.  Both Messier and Hannezo, who held top positions of control and authority as officers and/or directors of the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company and its business operations, products, growth, financial statements, and financial condition, as alleged herein.  Both Messier and Hannezo were involved in the drafting, preparation and/or dissemination of the various public, shareholder and investor reports and other communications alleged herein, were aware of, or recklessly

disregarded, that materially false and misleading statements were being issued regarding the Company, and approved and ratified these statements, in violation of the federal securities laws.

43.     Because of their Board memberships and/or executive positions with Vivendi, both Messier and Hannezo had access to the adverse non-public information about the business, operations, finances, markets, financial statements, and present and future business prospects of Vivendi particularized herein via access to internal corporate documents, conversations and communications with other corporate officers and employees, attendance at management and/or Board of Directors and Board committee meetings, and via reports and other information provided to them.

44.     The statements made by Messier and Hannezo, as particularized below, were materially false and misleading when made. The true financial and operating condition of the Company, which was known or recklessly disregarded by Messier and Hannezo, remained concealed from the investing public throughout the Core Period. Both Messier and Hannezo, who were under a duty to disclose material facts, instead misrepresented and concealed them during the Core Period. As officers or directors, and controlling persons, of a publicly held company whose ADSs were, at all times during the Core Period, registered with the SEC pursuant to the Exchange Act, traded on the NYSE, and governed by the provisions of the federal securities laws, Messier and Hannezo both had a duty to promptly disseminate accurate and truthful information with respect to such matters as Vivendi's financial condition and performance, financial statements, business and earnings, and to correct any previously issued statements that had become materially misleading or untrue. Messier's and Hannezo's misrepresentations and omissions during the Core Period violated these specific requirements and obligations.

45.     Both Messier and Hannezo, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company and issued during the Core

Period.  Messier and Hannezo were both provided with copies of the documents alleged herein to be materially misleading prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance and to cause them to be corrected.  Because of their positions and access to material non-public information, both Messier and Hannezo knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, Plaintiff and the public and that the representations concerning the Company complained of herein were materially false and misleading.  Accordingly, both Messier and Hannezo are responsible for the accuracy of the public reports and releases detailed herein and are therefore primarily liable for the material misrepresentations and omissions contained therein.

46.    Both Messier and Hannezo are liable as direct participants in a fraudulent scheme and course of business that operated as a fraud and deceit on Plaintiff by disseminating materially false and misleading statements and concealing material adverse facts.  The scheme: (i) deceived the investing public regarding (among other things) Vivendi's business, operations, and management and the intrinsic value of Vivendi ordinary shares and ADSs; (ii) enabled the Company to complete numerous acquisitions in its multi-billion dollar buying spree; (iii) permitted Vivendi to maintain relatively favorable credit ratings so that Vivendi could accumulate more and more debt to make acquisitions on favorable terms; and (iv) caused Plaintiff to purchase and acquire Vivendi ordinary shares at artificially inflated prices.

## IV.    FACTUAL BACKGROUND AND THE FRAUDULENT SCHEME

### A.    Vivendi's Extraordinary Growth Prior to and Through the Merger

47.    Vivendi originated in 1853 as a French water company called Compagnie Générale des Eaux ("CGE").  Messier became CGE's Chairman in June 1996.  At that time, CGE was still principally

a water company, and its stock was trading in the €27 to €29 range.  Messier changed CGE's name to Vivendi in April 1999.

48.    After becoming Chairman, Messier embarked on an ambitious plan to expand and remake Vivendi into a diversified conglomerate and one of the world's largest media companies. Between 1998 and the start of the Core Period, Vivendi acquired the following companies (with the Company's preexisting ownership interest, if any, shown in parentheses):

| Company Acquired | Closing Date | % Acquired |
| --- | --- | --- |
| Quotidien Sante | 04/09/98 | 100% |
| Linjebuss AB | 04/15/98 | 66.7% (33% owned) |
| Havas SA/Old | 06/02/98 | 70% (30% owned) |
| Cia de Saneamento do Parana | 06/08/98 | 41.38% |
| Ediciones Doyma SA | 06/25/98 | 50% |
| l'Etudient | 11/10/98 | 100% |
| ScVK | 11/18/98 | 43.17% |
| OVP-Vidal | 11/23/98 | 100% |
| Vivendi Universal | 12/15/98 | 10.5% |
| ALPINA GmbH | 01/05/99 | 100% |
| Cendant Software | 01/12/99 | 100% |
| Pathe | 01/26/99 | 19.6% (5% owned) |
| FCC | 03/05/99 | 28% |
| Aique | 04/20/99 | 100% |
| U.S. Filter Corp. | 04/30/99 | 100% |
| SL Tunnelbanan AB | 05/04/99 | 60% |
| MediMedia | 05/12/99 | 100% |
| 18 Litre Water Division | 05/20/99 | 100% |
| Sani Gestion Inc. | 06/11/99 | 100% |
| MUSIDISC | 06/30/99 | 99.02% |
| Canal Plus | 07/22/99 | 15% (34% owned) |
| British Sky Broadcasting Plc | 07/22/99 | 4% (20.5% owned) |
| Aqua Alliance Inc | 08/24/99 | 17% (83% owned) |
| Pathe | 09/30/99 | 80.2% (19.8% owned) |
| Superior Services Inc. | 11/11/99 | 100% |
| 23 GPU In. Power plants | 11/24/99 | 100% |
| Elektrim Telekomunikacja | 12/09/99 | 49% |

| Company Acquired | Closing Date | % Acquired |
|---|---|---|
| Daesan Power Plant | 12/17/99 | 100% |
| The StayWell Company | 02/29/00 | 100% |
| Three V Health Inc. | 02/29/00 | 100% |
| Haniel Rohr; Kanal Service & Haneil Industrie Reinigung | 03/28/00 | 100% |
| Prize Central Network | 03/29/00 | 100% |
| KD Offshore | 05/30/00 | 100% |
| Quod Bonum BV | 08/17/00 | 80% |
| Prelude et Fugue | 09/20/00 | 100% |
| Poland.Com SA | 09/21/00 | 55.01% |

49.     Messier's rapid growth strategy required the Company to finance its acquisitions, which caused the Company to accumulate large amounts of debt.  For example, in early 1999, Vivendi financed its $6.2 billion acquisition of U.S. Filter by raising approximately €5.7 billion through a convertible bond offering.  Similarly, in late 1999, Vivendi increased its equity investment in Elektrim Telekomunikacja ("Elektrim"), a Polish conglomerate, to $1.2 billion (or 49% of Elektrim's equity), by investing an additional $250 million in cash and converting an earlier $615 million loan into Elektrim shares.

50.     By June 2000, Vivendi had significantly expanded and diversified its holdings, and announced the massive, €29.5 billion three-way Merger among Vivendi, Seagram, and Canal Plus to create Vivendi Universal, S.A. (the "Merger").  Vivendi paid $36 billion in stock for Seagram and $12 billion in stock for Canal Plus.  The Merger closed on December 8, 2000.  As the Company announced in its 2000 Annual Report:

> As a result of the Merger Transactions, we are one of the world's leading media and communications companies, with assets that include the world's largest recorded music company, one of the largest motion picture studios and film libraries in the world and leading businesses in the global telecommunications, television, theme park, publishing and Internet industries.  We believe that we will become a fully integrated global media and communications company capable of providing a diverse array of entertainment and information over wired and wireless access devices using cable, Internet, satellite and broadcast networks.

51.    According to *The New York Times,* the Merger "transformed the Company into the second-largest global media empire after AOL Time Warner." *Vivendi Provides Critics Some Revenue Numbers to Chew On,* N.Y. Times, Feb. 12, 2002.

**B.    Vivendi's Continuing Acquisitions Following the Merger**

52.    Within just sixteen months after the enormous Merger, Vivendi continued its acquisition strategy by acquiring significant equity positions (or added to its existing equity positions) in the following companies, several of which Vivendi acquired outright:

| Company Acquired | Closing Date | Industry | % Acquired |
|---|---|---|---|
| Maroc Telecom | 12/21/00 | Telecom services | 35% |
| MUSIDISC | 01/31/01 | Multimedia | 0.98% (99.02% owned) |
| Medicine Publishing | 02/01/01 | Publishing | 100% |
| HCCOM | 02/19/01 | Publishing | 100% |
| Uproar, Inc. | 03/23/01 | Internet connectivity | 100% |
| GetMusic LLC | 04/25/01 | Internet content | 50% (50% owned) |
| Editions Juris Service | 04/25/01 | Multimedia | 100% |
| EMusic.com, Inc. | 06/14/01 | E-commerce | 100% |
| RMM Records & Video | 06/25/01 | Music | 100% |
| Scoot Europe NV | 07/27/01 | Broadcast server | 50% (50% owned) |
| Houghton Mifflin Co. | 08/03/01 | Publishing | 100% |
| MP3.com | 08/28/01 | Internet content | 100% |
| Elektrim Telekomunikacja | 09/04/01 | Telecom services | 2% (49% owned) |
| Mediabright | 09/12/01 | Software applications | 100% |
| Studio Canal | 10/12/01 | Motion picture services | 14.8% (85.20% owned) |
| Multithernatiques | 12/17/01 | Cable TV | 27% |
| EchoStar Communications | 01/22/02 | Satellite telecom | 10% |
| Koch Group Recorded Music | 02/15/02 | Music | 100% |
| USA Networks Inc. | 05/07/02 | Cable TV | 93% |

53.    The vast majority of these post-Merger acquisitions were paid for either by using Vivendi stock as currency or by borrowing against future earnings. Thus, in order to sustain its growth by acquisition strategy, it was crucial for Defendants to continue to report favorable financial results in order to keep Vivendi's stock price high and to maintain its favorable credit ratings and access to additional debt financing.

### C.    Vivendi's Improper Accounting Methods and Practices

54.    During the Core Period, Vivendi, Messier and Hannezo utilized a variety of improper accounting methods and practices whose purpose and effect was to materially misstate Vivendi's reported financial results, as more fully alleged below.

### 1.    Accounting Rules Applicable to Vivendi as a Foreign Issuer

55.    During the Core Period, Vivendi filed financial statements with the SEC that were represented to have been prepared in conformity with GAAP in France ("French GAAP"). The SEC allows foreign issuers, such as Vivendi, to prepare their primary financial statements in accordance with a comprehensive body of GAAP other than U.S. GAAP, provided that an understanding of such financial statements is facilitated via a reconciliation to U.S. GAAP. In particular, Item 17 of the Instructions to Form 20-F requires that foreign issuers' financial statements "shall disclose an information content substantially similar to financial statements that comply with U.S. generally accepted accounting principles and [SEC] Regulation S-X."

56.    The SEC requires that each annual financial statement filed by a foreign issuer on Form 20-F, and each annual and interim financial statement included in an SEC registration statement, be reconciled to U.S. GAAP. Vivendi represented that its consolidated annual financial statements for 1999, 2000 and 2001, filed with the SEC on Form 20-F, were prepared in conformity with French GAAP and purportedly reconciled to U.S. GAAP. Vivendi's 2001 Form 20-F also represented that

beginning in 2002 the Company's financial information would be reported on a U.S. GAAP basis and reconciled to French GAAP.

57.    GAAP are those fundamental rules and principles that are recognized by the accounting profession as essential and that define accepted accounting practice at a particular time.  As set forth in Financial Accounting Standards Board ("FASB") Statement of Financial Accounting Concepts ("Concepts Statement") No. 1, *Objectives of Financial Reporting by Business Enterprises,* one of the fundamental objectives of financial reporting is that financial statements provide accurate and reliable information concerning an entity's financial performance during the period being presented.  Concepts Statement No. 1, ¶ 42 states:

> Financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance.

58.    SEC Regulation S-X, 17 C.F.R. § 210.4-01(a)(1), also states that financial statements filed with the SEC that are not prepared in conformity with GAAP are presumed to be misleading and inaccurate.  The representations by Defendants that Vivendi's financial statements were reconciled to U.S. GAAP were materially false and misleading because the financial statements materially inflated and distorted the Company's true financial performance, as described herein.

59.    Vivendi's financial statements for fiscal years 1999, 2000 and 2001 (ending December 31) did not fairly and accurately represent the Company's financial position and operations, and were materially false and misleading because, as alleged in greater detail below, Vivendi, Messier and Hannezo falsified, manipulated and distorted those financial results through accounting methods and practices that violated at least the following basic GAAP principles:

(a)      The concept that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (Concepts Statement No. 1, ¶ 34);

(b)      The concept that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (Concepts Statement No. 1, ¶ 40);

(c)      The concept that financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (Concepts Statement No. 1, ¶ 42);

(d)      The concept that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (Concepts Statement No. 1, ¶ 50);

(e)      The concept that financial reporting should be reliable in that it represents what it purports to represent.  That information should be reliable as well as relevant is a notion that is central to accounting (Concepts Statement No. 2, ¶¶ 58, 59);

(f)     The concept of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (Concepts Statement No. 2, ¶ 79);

(g)     The concept that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered.  The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (Concepts Statement No. 2, ¶¶ 95, 97);

(h)     The concept that revenues and gains generally should not be recognized until realized or realizable, and that revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues (Concepts Statement No. 5, ¶ 83); and

(i)     The concept that the costs of services be matched with, *i.e.,* recognized contemporaneously with, the recognition of revenues that resulted from the same transactions (Concepts Statement No. 6, ¶ 145).

### 2.     Vivendi's Failure to Timely Write Down Impaired Goodwill

60.     Vivendi's financial statements during the Core Period were materially misstated and presented in violation of U.S. GAAP and SEC regulations because Defendants failed to timely record an impairment in the value of Vivendi's reported goodwill.

61.     "Goodwill" is an accounting term that reflects the portion of the market value of a business entity that is not directly attributable to its assets and liabilities.  When one company purchases another for more than its book value, *i.e.,* the fair value of its assets minus its liabilities, the acquiring company (or the surviving company in a merger) must record goodwill as an asset in its financial statements and present it as a separate line-item on its balance sheet.

62.    As noted above, before and during the Core Period, Vivendi engaged in an acquisition spree in which the Company acquired interests in other companies valued in the aggregate at more than $77 billion.  Vivendi used the "purchase method" of accounting for these acquisitions.  The purchase method, as set forth in U.S. GAAP's Accounting Principles Board ("APB") Opinion No. 16, *Business Combinations,* ¶ 11,[1] sets the amount of goodwill to be recorded:

> The acquiring corporation records at its cost the acquired assets less liabilities assumed.  A difference between the cost of an acquired company and the sum of the fair values of tangible and identifiable intangible assets less liabilities is recorded as goodwill.

63.    Accordingly, for purposes of accounting for an acquisition, the acquiring entity records the acquired assets (both tangible assets and identifiable intangible assets) and liabilities assumed at their respective fair values.  The difference between the cost of the acquired entity and the fair values of the acquired tangible and intangible assets, less liabilities, is recorded as goodwill.  Under APB Opinion No. 16, the cost of the acquired entity for accounting purposes is determined by the fair value of the consideration acquired or issued, whichever is more objectively determinable.

64.    Paragraphs 74-75 of APB Opinion No. 16 set forth the requirements for valuing stock used to effect an acquisition for purposes of determining the "cost of the acquired entity":

> The fair value of securities traded in the market is normally more clearly evident than the fair value of an acquired company.  Thus, the quoted market price of an equity security issued to effect a business combination may usually be used to approximate the value of an acquired company.
>
> *          *          *
>
> If the quoted market price is not the fair value of the stock . . . the consideration received should be estimated even though measuring directly the fair values of the assets received is difficult.

---

[1] APB Opinion No. 16 has been superseded by FASB's Statement of Financial Accounting Standard ("SFAS") No. 141. However, SFAS No. 141 carries forward, without reconsideration, the guidance in APB Opinion No. 16 (and certain of its amendments and interpretations) related to the application of the purchase method.

65.    Purporting to apply these principles, Vivendi reported that it recorded €12.544 billion of goodwill in connection with its acquisition of Canal Plus and €4.577 billion in connection with its acquisition of U.S. Filter.  Vivendi violated U.S. GAAP by not timely writing down impaired goodwill in connection with these acquisitions when circumstances indicated that the carrying amount of these two assets would not be recoverable to a substantial extent.

### a.    Canal Plus

66.    In the Merger, Vivendi valued the cost of Canal Plus at €12.537 billion.  Vivendi recorded more than 100% of this cost, or €12.544 billion, as goodwill.  Under the purchase method of accounting, Vivendi's reporting of €12.544 billion of goodwill on Canal Plus, when the cost of Canal Plus was €12.537 billion, indicated that the fair value of Canal Plus's liabilities exceeded its assets by approximately €7 million.

67.    In the fourth quarter of 2001, Vivendi recorded a €6.0 billion charge for an impairment in the value of Canal Plus's goodwill under French GAAP.  This was followed by an additional €3.8 billion charge under French GAAP for an impairment in the value of Canal Plus's goodwill during the quarter ended June 30, 2002.  Accordingly, by June 2002, Vivendi had written off €9.8 billion, or approximately 78%, of the total €12.537 billion cost to acquire Canal Plus, under French GAAP.

68.    While Vivendi had recognized a €6.0 billion impairment to goodwill (*i.e.,* had written off €6.0 billion in goodwill) under French GAAP by the end of 2001, Vivendi did not recognize *any* impairment to goodwill under U.S. GAAP until the first quarter of 2002.  The Company purported to explain this disparate accounting treatment in its 2001 financial statements:

> *Goodwill Impairment Charge and Impairment of Other Long-Lived Assets.*  As required under both French and US GAAP [see SFAS No. 121], Vivendi Universal reviews the carrying value of long-lived assets, including goodwill and other intangible assets, for impairment at least annually or whenever facts, events or changes in circumstances, both internally and externally, indicate that the carrying amount may not be recoverable.  Under French GAAP, measurement of any impairment is based on fair value.  In 2001, following the recent market decline,

particularly in the Internet, media and telecommunications industries, our annual review resulted in a non-cash, non-recurring goodwill impairment charge of €12.9 billion (€12.6 billion after €0.3 billion minority interest). Under US GAAP, measurement of any impairment is based on the provisions of Statement of Financial Accounting Standards (SFAS) No. 121, *Accounting for the Impairment of Long-lived Assets and for Long-Lived Assets to Be Disposed Of* (SFAS 121). **SFAS 121 requires that an impairment loss be recognized whenever the sum of the undiscounted future cash flows estimated to be generated from the use and ultimate disposal of an asset are less than the net carrying value of the asset. On this basis no impairment was indicated and accordingly the goodwill impairment charge was reversed.[2]** [Emphasis added.]

69.    SFAS No. 142, *Goodwill and Other Intangible Assets,* requires intangible assets, such as goodwill, to be reviewed for impairment in accordance with SFAS No. 121, *Accounting for the Impairment of Long-lived Assets and for Long-Lived Assets to Be Disposed Of.* SFAS No. 121 states that an impairment loss shall be recognized if the carrying amount of an intangible asset is not recoverable and if its carrying amount exceeds its fair value. SFAS No. 121 specifically provides:

4.    An entity shall review long-lived assets and certain identifiable intangibles to be held and used for impairment **whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable.**

5.    The following are examples of events or changes in circumstances that indicate that the recoverability of the carrying amount of an asset should be assessed:

a.    A significant decrease in the market value of an asset

b.    A significant change in the extent or manner in which an asset is used or a significant physical change in an asset

---

[2]  Vivendi's 2001 financial statements also stated:

On January 1, 2002, Vivendi Universal will adopt SFAS 142, which provides new measurement techniques for goodwill and other intangible assets resulting from business combinations. While its evaluation is not yet complete, Vivendi Universal expects to record a non-recurring, non-cash charge of approximately €15 billion in the first quarter of 2002 to US GAAP net income. The impairment reflects the overall market decline which has occurred since the Vivendi, Seagram and Canal Plus merger was announced in June 2000. The charge will be recorded as a cumulative effect of change in accounting principle and will have no affect on Vivendi Universal's operations.

c.    A significant adverse change in legal factors or in the business climate that could affect the value of an asset or an adverse action or assessment by a regulator

d.    An accumulation of costs significantly in excess of the amount originally expected to acquire or construct an asset

e.    A current period operating or cash flow loss combined with a history of operating or cash flow losses or a projection or forecast that **demonstrates** continuing losses associated with an asset used for the purpose of producing revenue.  [Emphases added.]

70.    SFAS No. 121 expressly requires a goodwill impairment to be recognized if the future cash flows expected to be generated by an asset are less than the carrying amount of an asset.  The goodwill impairment taken under French GAAP in 2001 should have caused the Company to take a similar, contemporaneous impairment under U.S. GAAP, which it failed to do.

71.    By not taking any write-offs for impaired goodwill under U.S. GAAP in 2000 or 2001, Vivendi indicated to investors that the cash flows the Company expected to receive from Canal Plus equaled or exceeded its carrying value.  However, Defendants knew (or recklessly ignored) that Vivendi did not expect to receive cash flows from Canal Plus equal to (or exceeding) its carrying value long before Vivendi recognized goodwill impairments.  Thus, Defendants violated SFAS No. 121 by failing to write down goodwill for Canal Plus before the first quarter of 2002.

72.    More specifically, long before the first quarter of 2002, Defendants knew or recklessly disregarded that the value of Canal Plus's "smart cards," used to control access to digital television signals, had been severely compromised by known piracy that had begun no later than March 1999.  Because the smart cards were a key asset of Canal Plus, the compromise of the smart cards significantly reduced Canal Plus's value.

73.    On March 11, 2002, Canal Plus commenced a civil action against NDS Group PLC ("NDS") in the United States District Court for the Northern District of California, *Groupe Canal+ S.A.,*

*et al. v. NDS Group PLC, et al.,* No. C 02-1178 VRW (N.D. Cal.). Canal Plus alleged that since March

1999, NDS, by publishing certain Canal Plus proprietary software code on a website called DR7.com,

had permitted and facilitated the production of counterfeit smart cards that enabled users to circumvent

the security measures built into Canal Plus's digital television access system, causing Canal Plus to suffer

losses exceeding a billion dollars. Canal Plus's complaint alleged in part:

> Canal+ seeks redress in this action for the damage caused by its competitor, NDS. Through the calculated expenditure of millions of dollars for specialized equipment and other resources, NDS sabotaged C+ [Canal Plus] Technologies' previously unbroken security system for access to digital television signals. In apparent disregard for both the law and its own reputation, NDS caused the development of counterfeit "smart cards", permitting a theft of digital television on a massive scale. **Canal+ estimates that Defendants' illegal conduct has caused it harm in excess of $1,000,000,000.**

> \*      \*      \*

> C+ Technologies has spent substantial time and money developing countermeasures to combat each type of pirate smart card that resulted from the publication caused by NDS. These countermeasures are created by a team of C+ Technologies engineers and then tested and broadcast by the digital television operators to stop unlawful television viewing by counterfeit card consumers. The countermeasures, however, are quickly made obsolete by new versions of software for the counterfeit cards that pirates make available after analyzing the countermeasures. Counterfeiters are able to quickly and effectively respond to each new countermeasure because they have access to the UserROM code published on DR7.com. C+ Technologies cannot stop this counterfeiting without implementing a fundamental change in the design of the smart card. At enormous expense, C+ Technologies is currently developing a new smart card design and will soon transition its existing network to the new design. This transition will be time-consuming and expensive because each and every legitimate smart card will have to be exchanged.

> The mass production of counterfeit C+ Technologies smart cards **has damaged not only Groupe Canal+'s direct revenue through its digital television operators, but has also hurt the sales efforts of C+ Technologies and Canal+ USA.** Conditional access system competitors, especially NDS, use the existence of counterfeit C+ Technologies cards as a competitive weapon in the sales process among content providers and system operators. For example, Canal+ has encountered competitors, including NDS, pointing out to customers

and potential customers in the United States and elsewhere throughout the world, the breach of C+ Technologies' security schemes as evidence that Canal+ cannot guarantee the integrity of its systems.

*As a result of the counterfeiting, Canal Plus has lost sales opportunities and has lost customers to its competitors.* NDS has also used the counterfeiting to attempt to disrupt Canal Plus' relationships with existing customers.

Another loss occasioned by NDS to Groupe Canal+ is the loss of pay per view subscriptions. One common type of counterfeit access is a modification of a legitimate smart card. These cards, commonly referred to as "MOSC" cards (*i.e.* "Modified Official Smart Cards"), are legitimate cards, sometimes with valid basic subscriptions, that have been altered so they grant their owners rights that they have not purchased. Some MOSC cards grant free access to upgraded packages or to every subscription channel; others have a number of pay per view television "credits" for which the owner has not paid. These cards did not exist before the publication on DR7.com and but for that publication they would not have been produced. *The widespread use of MOSCs has caused Group Canal+ and pay television operators from the Canal Plus group to lose revenues from premium programs.* [Emphases added.]

74.    This known piracy of Canal Plus's technology confirms that Vivendi's goodwill was overstated long before the end of 2001, when Vivendi first recorded a €6.0 billion impairment in the value of goodwill on its acquisition of Canal Plus under U.S. GAAP.

75.    Similarly, according to a sworn declaration filed in Canal Plus's litigation against NDS on May 16, 2002, Jean-Marc Racine, Canal+ Technologies' Director of Marketing and former CEO, testified:

[J]ust as Canal+ was getting a foothold in the U.S., the piracy of our conditional access system became known and Canal+'s efforts to gain U.S. market share, based out of Milpitas and later Cupertino, were negatively impacted. *A company's reputation, as well as market perception of the quality of its product, is important in order to win new business, and the piracy of Media Guard had a negative impact on Canal+.*

I had several experiences with Canal+ customers that to me evidence the impact of the piracy of MediaGuard on Canal+'s Northern California operations. For example, Canal+ Technologies, Inc. expended a great deal of resources trying to win a contract with

Cablevision in New York. We lost this contract to NDS, and Cablevision told us that it was choosing NDS because NDS knew how to combat piracy better than Canal+. In another instance, I believe that NDS actively flaunted the hacking of Canal+'s conditional access system when it was in competition with Canal+ to win a full end-to-end system contract from RCN, an over-builder based in Princeton, New Jersey, which has significant operations in major U.S. cities, including San Francisco. Canal+ Technologies, Inc.'s only real competition for the RCN business was NDS. Several times, RCN, which was in contact with NDS at the time, mentioned the piracy of MediaGuard that had occurred after our codes were published on DR7. On May 29, 2001, RCN asked us to comment on several articles and other information contained on web sites regarding the hacking and counterfeiting of Canal+'s smart cards. . . . This set of articles is extensive and had to take more than a few hours to prepare. It was sent by an RCN engineer who I believe was also in contact with NDS in this competition with Canal+. RCN asked us to justify why there was a piracy problem with our smart cards and told us that NDS had a much better solution and no piracy problem in Europe. RCN postponed their decision on selecting a supplier for a new end-to-end system, but I believe that the piracy problem caused confusion and created doubts at RCN about the performance and quality of Canal+'s products.

Since then, Canal+ Technologies, Inc. has successfully won only one contract in the United States, WinFirst in Sacramento. As the piracy of MediaGuard became known, we have put management time and efforts into reassuring the customer. We had to set up a Security Committee and explain to the customer how to fight piracy, the legal actions taken in Europe, and the engineering steps that we would use and were using to combat piracy. These efforts would not have been needed if MediaGuard had remained secure. ***The security problems associated with our conditional access system[s] have had a negative impact on the sales efforts in the United States of Canal+ Technologies, Inc. based in Cupertino.*** [Emphases added.]

76.    Despite the foregoing, when Vivendi reported its results for the quarter ended March 31, 2002, the Company disclosed:

Canal+ Premium Channel revenue fell 3% in the quarter because of lower advertising revenue and lower subscription revenue owing to lower average analogue subscribers.

In truth and in fact, Canal Plus premium channel revenue was materially adversely affected by the undisclosed piracy of Canal Plus's technology noted above. By failing to write down Canal Plus's goodwill under U.S. GAAP until the first quarter of 2002, Defendants represented that this known

piracy had no effect on the Company's value and anticipated cash flow when this plainly was false. Defendants accordingly violated SFAS No. 121 by continuing to represent publicly that Canal Plus was as valuable after the piracy—which Canal Plus itself estimated to cause harm exceeding $1 billion—as Canal Plus was before this theft.

77.     Moreover, in March 2002, Defendants announced a goodwill write-down totaling €16.6 billion under U.S. GAAP.  Defendants hid their own wrongdoing in failing to take this write-down sooner by attributing it to the June 2001 adoption of a new U.S. GAAP accounting standard, SFAS No. 142, that changed the practice for goodwill accounting.[3]  By hiding behind the adoption of a new accounting standard, Defendants concealed their improper failure to write down Canal Plus's goodwill at the time Vivendi took its write-down under French GAAP, as was required under SFAS No. 121.

78.     Tellingly, after Messier and Hannezo were forced out of the Company, Vivendi recorded an additional €3.8 billion impairment in the value of Canal Plus's goodwill at the end of the first half of 2002 under French GAAP—even though Canal Plus had actually reported revenue *growth* of 8% during that period.  The fact that Vivendi's new management took additional write-offs of Canal Plus's goodwill during a period when Canal Plus's business was actually improving further establishes that the impairment should have been taken earlier.

### b.    U.S. Filter

79.     Just as it did with Canal Plus, Vivendi also overstated its reported goodwill and violated GAAP on its 1999 acquisition of U.S. Filter.  When Vivendi acquired U.S. Filter, it paid approximately 46 times U.S. Filter's 1998 earnings.  As a result, Vivendi recorded approximately €4.6 billion in goodwill on the U.S. Filter acquisition.  However, as Defendants knew or recklessly ignored, Vivendi's reported goodwill on U.S. Filter was materially inflated during the Core Period because, among other things,

---

[3] Prior to the June 2001 adoption of SFAS No. 142, companies were required to amortize goodwill over a period not to exceed forty years.  SFAS No. 142 prohibited the amortization of goodwill and required companies to carry goodwill on their balance sheets as an asset.

Vivendi was overstating U.S. Filter's operating results by improperly recognizing up front all of the projected revenue on multi-year contracts, as alleged more fully in Section IV.C.4 below. These events and circumstances confirmed that U.S. Filter's goodwill was impaired under U.S. GAAP prior to the fourth quarter of 2001. In the end, Vivendi recorded a staggering €2.6 billion impairment in the value of U.S. Filter's assets, but, in violation of U.S. GAAP, did not record this impairment until the end of the fourth quarter of 2001.

c.    <u>Other Entities</u>

80.    After Vivendi's Board ousted Messier and Hannezo, Vivendi's new management also implicitly admitted that the goodwill impairments that prior management had recognized for entities other than Canal Plus and U.S. Filter were also insufficient. For example, on August 14, 2002, Vivendi reported additional goodwill impairments (exclusive of those pertaining to Canal Plus) totaling €7.2 billion on a French GAAP basis for the three months ended June 30, 2002. In contrast, the Company's financial statements for the three months ended March 31, 2002 (prepared on a French GAAP basis) showed that no charge for goodwill impairment was recognized during the quarter ending March 31, 2002.

3.    **Vivendi's Improper Consolidation of Cegetel
and Maroc Telecom in its Financial Statements**

81.    Vivendi also overstated its 1999, 2000 and 2001 revenues and operating income in violation of U.S. GAAP by improperly consolidating certain investments in which the Company possessed less than a 50% ownership interest.

82.    Although Vivendi held only a minority interest in the shares of the French telecommunications company Cegetel Group ("Cegetel") and the Moroccan telecommunications company Maroc Telecom S.A. ("Maroc Telecom"), Vivendi included Cegetel's complete financial results in its 1999, 2000 and 2001 consolidated financial statements, and included Maroc Telecom's complete financial results in its 2001 consolidated financial statements. In particular, in the footnotes to its 1999,

2000 and 2001 financial statements filed with the SEC on Form 20-F, Vivendi disclosed the full

consolidation of the following companies:

| Ownership Interest | | | |
|---|---|---|---|
| Name | 1999 | 2000 | 2001 |
| Cegetel & Subsidiaries | 44% | 44% | 44% |
| Maroc Telecom | - | - | 35% |

83.    U.S. GAAP permits consolidation of related entities onto a company's balance sheet

when specific requirements are met.  Accounting Research Bulletin ("ARB") No. 51 provides:

> The purpose of consolidated statements is to present, primarily for the
> benefit of the shareholders and creditors of the parent company, the
> results of operations and the financial position of a parent company and
> its subsidiaries essentially as if the group were a single company with
> one or more branches or divisions.  There is a presumption that
> consolidated statements are more meaningful than separate statements
> and that they are usually necessary for a fair presentation when one of
> the companies in the group directly or indirectly has a ***controlling***
> financial interest in the other companies.  [Emphasis added.]

84.    U.S. GAAP also limits the circumstances under which consolidation is appropriate.

Majority control is generally a prerequisite for consolidation.  ARB No. 51, as amended by FASB's SFAS

No. 94, also provides:

> The usual condition for a controlling financial interest is ownership of a
> ***majority voting interest,*** and, therefore, as a general rule ownership by
> one company, directly or indirectly, of over fifty percent of the
> outstanding voting shares of another company is a condition pointing
> toward consolidation.  [Emphasis added.]

85.    Although majority control is generally required for consolidation, FASB's Emerging

Issues Task Force ("EITF") has issued Abstract No. 96-16, which provides guidance for when minority

shareholders possessing certain rights can, under limited circumstances, overcome the presumption that

consolidation requires a majority voting interest.  EITF No. 96-16 provides in pertinent part:

> The Task Force believes that minority rights (whether granted by
> contract or by law) that would allow the minority shareholder to
> effectively participate in the following corporate actions should be
> considered substantive participating rights and would overcome the

presumption that the investor with a majority voting interest should consolidate its investee:

1.    Selecting, terminating, *and* setting the compensation of management responsible for implementing the investee's policies and procedures; and

2.    Establishing operating *and* capital decisions of the investee, including budgets, in the ordinary course of business.

The Task Force considered the above to be illustrative of substantive participating rights, not necessarily all-inclusive.   The Task Force believes that the rights noted above are participating rights because, in the aggregate, the rights allow the minority shareholder to effectively participate in decisions that occur as part of the ordinary course of the investee's business and are significant factors in directing and carrying out the activities of the business.   Individual rights, such as the right to veto the termination of management responsible for implementing the investee's policies and procedures, should be assessed based on the facts and circumstances to determine if they are substantive participating rights in and of themselves.   However, minority rights that appear to be participating rights but that by themselves are not substantive . . . would not overcome the presumption of consolidation by the investor with a majority voting interest in its investee.   The likelihood that the veto right will be exercised by the minority shareholder should *not* be considered when assessing whether a minority right is a substantive participating right.

86.    Moreover, APB 18, *The Equity Method of Accounting for Investments in Common Stock,*

provides special rules for accounting for an entity where the company owns between 20% and 50% of

the entity and has the ability to exercise significant influence over that entity.   APB 18 provides:

In order to achieve a reasonable degree of uniformity in application, the Board concludes that an investment (direct or indirect) of 20% or more of the voting stock of an investee should lead to a presumption that in the absence of evidence to the contrary an investor has the ability to exercise significant influence over an investee.   **Under the equity method, an investor recognizes its share of the earnings or losses of an investee in the periods for which they are reported by the investee in its financial statements.**   An investor's share of earnings or losses from its investment is ordinarily shown in its income statement as a single amount.   The Board recognizes that determining the ability of an investor to exercise such influence is not always clear and applying judgment is necessary to assess the status of each investment. [Emphasis added.]

87.     Given that Vivendi held only a 44% interest in Cegetel, and only a 35% interest in Maroc Telecom, Vivendi violated U.S. GAAP by consolidating the results of Cegetel into its financial statements for 1999, 2000 and 2001 and the results of Maroc Telecom into its financial statements for 2001.  Vivendi should have accounted for Cegetel and Maroc Telecom under the equity method.

88.     Vivendi also violated SFAS No. 95, *Statement of Cash Flows,* by improperly consolidating entities whose cash it could not access.  Paragraph 5 of SFAS No. 95 provides:

> The information provided in a statement of cash flows . . . should help investors, creditors, and others to (a) assess the enterprise's ability to generate positive future net cash flows; (b) assess the enterprise's ability to meet its obligations, its ability to pay dividends, and its needs for external financing . . . .

89.     Vivendi's disclosures concerning its cash flows did not help investors to assess its ability to generate positive future cash flows and its ability to meet its obligations.  Rather, Vivendi presented a materially false and misleading disclosure of its financial position by including cash on its balance sheet that it had no right to access.

90.     Additionally, under French GAAP, exclusive control and the power to direct the financial and operational policies of an enterprise is required in order to consolidate results.  French GAAP states that enterprises are **excluded** from consolidation where severe and long-lasting restrictions substantially call into question the control or influence exercised over the enterprise.  *See* Regulation 99-02, Section 1002, 101.

91.     Vivendi did not possess controlling financial interests in, at least, its Cegetel and Maroc Telecom subsidiaries, and therefore should not have consolidated Cegetel's and Maroc Telecom's financial statements into its own.

92.     In its Form 20-F for 2000, Vivendi stated that:  "The Company consolidates Cegetel . . . in which it owns less than 50% of the voting shares.  The Company has a direct and indirect ownership

interest in Cegetel totaling 44%. Cegetel is consolidated because, through a shareholders agreement, the Company has a majority of the shareholder voting rights."

93.    This Shareholder Agreement, however, contained a key clause that blocked Vivendi from making operating and capital decisions in the ordinary course of Cegetel's business:

> If all of BT, Mannesmann and Transtel dissent, we [Vivendi] cannot cause Cegetel Group to:
>
> -    create or acquire shares in any entity in which Cegetel Group or companies it controls hold less than 100% of the shares and voting rights; or
>
> -    subject to some exceptions, acquire, dispose of, lease or loan a material amount of assets or significantly reduce or cease any material business operation.

94.    With respect to Maroc Telecom, Vivendi stated its Form 20-F for 2001 that:

> In the course of the partial privatization of Maroc Telecom, Vivendi Universal was chosen to be a strategic partner in the purchase of an interest in Morocco's national telecommunications operator for approximately €2.4 billion. The transaction was finalized in April 2001, at which time Maroc Telecom began to be consolidated in the accounts of Vivendi Universal, as we obtained control through majority board representation and share voting rights. As a leader in Moroccan telecommunications, Maroc Telecom operates 1.2 million fixed lines, has 3.7 million GSM clients and generated revenues of approximately €1.4 billion in 2001.

95.    Vivendi also stated in the 2001 Form 20-F that no other shareholder or groups of shareholders exercise substantive participatory rights, which would allow them to vote or block decisions taken by the Company.

96.    This disclosure and the consolidation of Maroc Telecom's 2001 results were false and misleading because Vivendi only owned 35% of Maroc Telecom, and because the remaining 65% was held by a single entity: the Moroccan government. The Moroccan government did not conduct its operations based on the views of Vivendi.

97.    These improper consolidations caused Vivendi to materially misstate its financial results. As a result of the improper consolidation of Cegetel's financial statements, Vivendi's reported revenues were overstated by €3.9 billion, €5.1 billion and €6.4 billion for 1999, 2000, and 2001, respectively.  As a result of the improper consolidation of Maroc Telecom's financial statements, Vivendi's reported revenues were overstated by €1.4 billion for 2001 (in addition to the €6.4 billion overstatement for the same year caused by consolidating Cegetel).

98.    This €16.8 billion in aggregate additional revenue impacted and misrepresented other financial metrics relied upon by Vivendi investors, including Plaintiff, namely, revenue growth and EBITDA.  Thus, Vivendi's consolidation of Cegetel and Maroc Telecom in its financial statements caused the Company to overstate its reported revenue, operating income, EBITDA, operating cash flow, and reported growth rates for 1999, 2000 and 2001.

99.    When asked about the liquidity of the Company, Vivendi's CEO, Jean-René Fourtou (who replaced Messier after he was fired), admitted in a June 26, 2002 conference call that "we do not have access to Cegetel and Maroc Telecom."  In an August 14, 2002 conference call with investors, Fourtou conceded further that "Vivendi cannot acce[ss] the cash flow generated by the companies it owns less than 50 percent of."

100.    Tellingly, on December 3, 2002, after the Core Period, Vivendi announced that it would purchase sufficient number of shares to give it a majority stake in Cegetel, finally giving Vivendi the necessary financial control over Cegetel's cash flow.

### 4.    Defendants' Improper Recognition of Revenue

101.    In addition to failing to write down impaired goodwill on a timely basis and improperly consolidating Cegetel and Maroc Telecom, Defendants improperly recognized revenue from, at least, its U.S. Filter subsidiary in violation of U.S. GAAP.

102.    Among the most basic accounting maxims, embodied in U.S. GAAP, is that revenue should not be recognized until it is both realized (or realizable) and earned.  FASB Concepts Statement No. 5, ¶ 83.  As this Concept Statement indicates, the conditions for revenue recognition ordinarily are met when persuasive evidence of an arrangement exists, delivery has occurred or services have been rendered, the seller's price is fixed or determinable, collectibility of the sales price is reasonably assured, and when the entity has substantially performed the obligations that entitle it to the benefits represented by the revenue.  Generally, revenue should not be recognized until the earnings process is complete.  *See* SEC Staff Accounting Bulletin ("SAB") No. 101; Concept Statement Nos. 2 and 5; SFAS No. 48; ARB No. 43; APB Opinion No. 10; and SOP ("Statement of Position") 97-2.

103.    In fact, the SEC's SAB No. 101 specifically provides that:

> Supply or service transactions may involve the charge of a nonrefundable initial fee with subsequent periodic payments for future products or services.  The initial fees may, in substance, be wholly or partly an advance payment for future products or services.  In the examples above, the on-going rights or services being provided or products being delivered are essential to the customers receiving the expected benefit of the up-front payment.  Therefore, the up-front fee and the continuing performance obligation related to the services to be provided or products to be delivered are assessed as an integrated package.  In such circumstances, ***the staff believes that up-front fees, even if nonrefundable, are earned as the products and/or services are delivered and/or performed over the term of the arrangement or the expected period of performance and generally should be deferred and recognized systematically over the periods that the fees are earned.***  [Emphasis added; footnotes omitted.]

104.    In its Form 20-F for the year ended December 31, 2001, the Company, consistent with these rules, stated the following with respect to its revenue recognition policy:

> Revenues on public service contracts are recognized as services are provided.  Amounts billed and collected prior to services being performed are included in deferred revenues.

105.    In violation of GAAP and its publicly stated revenue recognition policy, Vivendi, throughout the Core Period, improperly recognized anticipated revenue from multi-year public service

contracts upon signing the contracts.  In so doing, Vivendi materially overstated its reported operating results during the Core Period in violation of U.S. GAAP and its publicly disclosed policy of revenue recognition.

106.    As alleged in the Securities Class Action, a former officer of U.S. Filter states that Vivendi Environnement, through its U.S. Filter subsidiary, materially overstated its operating results during the Core Period by employing a practice internally referred to as "booking backlog."  Pursuant to this practice, U.S. Filter (and thus Vivendi) improperly recognized and reported the entire dollar amount of long-term fixed-price contracts as revenue upon the signing of the contract.  As alleged in the Securities Class Action, the former U.S. Filter officer states that owing to this practice, U.S. Filter's revenue on major contracts was overstated by as much as ten times.  Vivendi Environnement, in fact, accounted for approximately 51% of Vivendi's reported revenues and operating income during 2001, and its U.S. Filter subsidiary reported €1.32 billion in total revenue in 2000.

107.    U.S. GAAP, in APB No. 22, ¶ 7, provides that the usefulness of financial statements in making investment decisions depends significantly upon the reader's understanding of the accounting policies followed by a company, and further states that information about the accounting policies adopted by a reporting company is "essential" to readers.  APB No. 22, ¶ 8.  Accordingly, U.S. GAAP requires that financial statements identify and describe important judgments as to the appropriateness of principles relating to the recognition of revenue.  APB No. 22, ¶ 12.

108.    During the Core Period, Vivendi materially inflated its operating results and violated its stated policy of revenue recognition and U.S. GAAP when it recognized and reported revenue on such transactions because the "revenue" was not earned, services were not rendered and the Company had not yet substantially performed the obligations which entitled it to the benefits represented by the revenue.  In so doing, investors were uninformed about actual accounting policies that were "essential" to an informed investment decision.

109.    Indeed, as alleged in the Securities Class Action, Vivendi's management directed or knowingly condoned and encouraged the process in which employees would improperly record revenue, thereby inflating reported revenue.  Moreover, the term "booking to backlog" was a phrase that was widely used among U.S. Filter personnel, and the phrase was even included in monthly reports given to the Executive Board of Vivendi Environnement.

### 5.    Defendants' Improper Inflation of Canal Plus's Assets

110.    In addition to the failure to timely write down Canal Plus's impaired goodwill as alleged above, the reported value of Canal Plus's assets on Vivendi's balance sheet was materially and improperly inflated in other respects.  Vivendi's balance sheet reported, as an asset, €250 million in "marketing rights" that Canal Plus purportedly acquired through contracts Canal Plus entered into in 1999 with five French football (soccer) league clubs: Monaco, Lyon, Lens, Bordeaux and Paris-St. Germain.  These purported "marketing rights," however, provided no economic benefit to Canal Plus and, therefore, could not properly be recorded as an asset.

111.    According to the Securities Class Action, after Vivendi acquired Canal Plus, Hannezo reviewed a memorandum dated January 29, 2001 that stated that the "marketing rights" that Vivendi was recording on its balance sheet as an asset actually belonged to the football league, not the five football teams with which Canal Plus had contracted.  Thus, these "marketing rights" gave no economic benefits to Canal Plus.  The memorandum also stated that the contracts had not been properly authorized by Canal Plus's board, and warned that, given the lack of economic benefit that could be documented in connection with these contracts, recording these contracts as assets would put Vivendi in a "difficult" position with respect to U.S. GAAP reporting requirements.  Nonetheless, Defendants caused Vivendi to recognize these "marketing rights" on its financial statements as assets in violation of U.S. GAAP.

112.    Under U.S. GAAP, assets are defined as "probable future economic benefits obtained or controlled by a particular entity as a result of past transactions or events." *See* Concepts Statement No. 6. *Elements of Financial Statements,* ¶ 25.  As described above, however, these "marketing rights" belonged to the football league, not the individual teams that signed contracts with Canal Plus.  Thus, the "marketing rights" did not provide "probable future economic benefits" to Canal Plus and were not "assets" under Concept Statement No. 6.  Vivendi, in violation of U.S. GAAP, recorded these "marketing rights" as assets in its year-end financial statements for 2000, filed with the SEC on Form 20-F on July 2, 2001.  Instead, under GAAP, these "assets" should have been written-off and charged to expenses in the 2000 financial statements.

### 6.    Defendants' Improper Manipulations of Vivendi's Reported EBITDA

113.    In addition to the accounting improprieties alleged above, Vivendi, in violation of GAAP, improperly adjusted certain of its subsidiaries' reserve accounts and made accounting entries without supporting documentation in order to meet aggressive earning targets.  As alleged in the SEC Action, during the Core Period, Vivendi, Messier and Hannezo referred to these improper efforts to meet or exceed earnings targets as "stretching."

114.    At the time of the Merger, Vivendi and Messier predicted that the Company would generate annual EBITDA growth of 35% during 2001 and 2002.  According to the complaint in the SEC Action, Defendants ensured that Vivendi would meet that target by, during 2001, improperly adjusting various reserve accounts and prematurely recognizing revenue in a manner that violated U.S. GAAP, and in particular SFAS No. 5, *Accounting for Contingencies*.

115.    As the SEC Action alleged, in late June 2001, Messier, Hannezo and other Vivendi executives became concerned that Vivendi's EBITDA growth for the quarter ended June 30, 2001 might not meet or exceed market expectations.  As a result, Vivendi, at the direction of its senior executives, made various improper adjustments that artificially inflated Vivendi's EBITDA by almost €59 million, or

42

5% of the total EBITDA of €1.12 billion that Vivendi reported (excluding the results of the recently acquired Maroc Telecom) for that quarter.

a.    <u>Second Quarter of 2001 (Cegetel)</u>

116.    As alleged by the SEC, Defendants increased Vivendi's EBITDA primarily by causing Cegetel, in the weeks leading up to Vivendi's earnings release for the second quarter of 2001, to depart from its historical methodology for determining the level of its reserve for bad debts (accounts receivable) during the second quarter of 2001. That departure resulted in Cegetel's taking a lower provision for bad debts during that quarter than its historical methodology required. This departure caused Cegetel's bad debts reserve for the second quarter of 2001 to be €45 million less than it should have been; Vivendi's overall EBITDA for that quarter was overstated by the same amount.

117.    Under U.S. GAAP, SFAS No. 5 precludes the use of reserves, including excess reserves, for general or unknown business risks, and the systemic or time release of reserves into income. Paragraph 23 of SFAS No. 5 further states than an estimate of losses on accounts receivable "normally depend[s] on, among other things, the experience of the enterprise . . . and appraisal of the receivables in light of the current economic environment."

118.    As alleged by the SEC, Cegetel reduced its provision for bad debts during the second quarter of 2001 without the level of documentation and analysis that was required. Further, the decision to take a lower provision for bad debts in the second quarter of 2001 occurred at a time when Cegetel was actually having more difficulty collecting on its bad debts.

119.    In addition to taking a lesser bad debt position in the second quarter of 2001, according to the SEC Action, Cegetel also, at the direction of Vivendi's senior executives, improperly deferred to the third quarter of 2001 approximately €14 million in provisions for potential future payments and potential liabilities that Cegetel properly should have booked in the second quarter of 2001. Together,

the adjustments at Cegetel totaled €59 million and enabled Vivendi to report overall EBITDA growth of 35% for the second quarter of 2001.

120.    These accounting adjustments at Cegetel were made without proper supporting documentation and, as a result, Vivendi's reconciled U.S. GAAP financial statements, which incorporated Cegetel's results, were not in conformity with the requirements of SFAS No. 5.

### b.    Third Quarter of 2001 (UMG)

121.    As alleged in the SEC Action, various improper adjustments to Vivendi's EBITDA also occurred in the third quarter of 2001, and principally affected the results of its music division, UMG. These improper adjustments increased UMG's reported results for the quarter ended September 30, 2001 by at least €10.125 million, or approximately 4% of UMG's total EBITDA for that quarter of €250 million.

122.    The SEC Action alleged that Vivendi improperly increased UMG's results in order to reach a pre-determined EBITDA figure at UMG for the quarter ended September 30, 2001 of €250 million.  At that level, UMG would have been able to show EBITDA growth of approximately 6% versus the third quarter of 2000, and to outperform its competitors in the industry.

123.    Defendants, according to the SEC Action, made at least two improper adjustments to UMG's reported results in order to reach their €250 million EBITDA target.  First, Defendants caused UMG to prematurely recognize approximately €3 million in revenue in connection with a contract between UMG and other parties that UMG itself had deferred recognizing.  UMG deferred recognizing the revenue because, under the terms of this contract, the €3 million payment would need to be refunded if the parties to the contract failed to meet certain conditions by mid-December 2001.  Because those conditions were not met during the third quarter of 2001, the €3 million payment remained refundable by UMG, and Vivendi's recognition of this amount as income in that quarter was in violation of U.S. GAAP.

124.    Second, in late October 2001, Vivendi temporarily reduced the amount of corporate overhead charges it allocated to UMG by €7 million. According to the SEC Action, this reduction in corporate overhead charges equaled the exact amount of additional earnings that Vivendi's senior executives determined that UMG would need in order to reach €250 million in EBITDA for the third quarter of 2001.

125.    This allocation of overhead charges violated U.S. GAAP, specifically Concept Statement No. 6, *Elements of Financial Statements,* which provides that allocations should be assigned and distributed "according to a plan or formula." Moreover, SFAS No. 131, *Disclosures about Segments of an Enterprise and Related Information,* provides that amounts allocated to reported segment profit or loss "shall be allocated on a reasonable basis." According to the SEC Action, during the third quarter of 2001, Defendants based the overhead allocation charged to UMG not on a plan or formula, but rather on a desire to reach a predetermined, specific EBITDA target. This was inconsistent with Concept Statement No. 6 and SFAS No. 131.

126.    The SEC Action also alleged that both the corporate overhead adjustment and the premature recognition of the contract revenue occurred after UMG had submitted its accounts to Vivendi for that quarter. Additionally, these accounting adjustments to UMG's EBITDA were made without proper documentation and violated U.S. GAAP. Vivendi incorporated these inflated financial results into its own financial statements, causing Vivendi's third quarter 2001 financial reports, press releases, and other market communications to be materially false and misleading as alleged in Section VI below.

### 7.    Defendants' Failure to Properly Report Pro Forma Accounting Metrics

127.    In addition to the manipulations of EBITDA described above, Vivendi violated GAAP by failing to report pro forma metrics properly. Vivendi's unique definition of EBITDA, which served as the basis for calculating both its operating income and operating free cash flow, enabled the Company

to include all amounts from consolidated subsidiaries, including Cegetel and Maroc Telecom which were not 100% owned. Contrary to this approach, EBITDA does not normally include earnings from consolidated subsidiaries attributable to minority shareholdings.

128.    GAAP not only governs the accurate accounting of transactions, but also encompasses the meaningful disclosure of all matters accompanying the financial statements. Concepts Statement No. 1 provides that one of the primary focuses of financial reporting is information about an enterprise's performance as measured by earnings and its components. Under GAAP, pro forma amounts, such as EBITDA, are considered to be supplemental disclosures designed to assist readers to understand certain transactions that relate generally to the effect of accounting changes (APB No. 20) and business acquisitions (APB No. 16 and SFAS No. 141). Article 11 of SEC Regulation S-X, titled *Pro Forma Business Information,* requires pro forma disclosures in connection with business combinations and for other transactions or events for which disclosure of pro forma financial information would be helpful to investors. The SEC further requires that pro forma amounts be reconciled with the most directly comparable GAAP amount. EBITDA, in particular, is reconciled to Net Income.

129.    Vivendi misstated its EBITDA by consolidating the results of Cegetel and Maroc Telecom, and accordingly, in violation of GAAP, failed to report pro forma metrics properly.

### 8.    Defendants' Failure to Disclose Vivendi's 2% Interest in Elektrim Telekomunikacja

130.    In 1999, Vivendi made a €1.198 billion investment in a joint venture with Elektrim Telekomunikacja ("Elektrim") that gave the Company a 49% interest in a company that controlled Polish mobile telephone operator PTC and Polish cable operator Bresnan. On June 28, 2001, Vivendi announced a memorandum of understanding pursuant to which it would increase this stake from 49% to 51% via an additional €100 million investment.

131.    According to the SEC Action, after this announcement, Vivendi learned that Poland's antitrust authorities would have to approve the June 2001 deal, a process that could have taken several

months.  Vivendi also learned that the market in general, and the credit rating agencies in particular, might react negatively to Vivendi's acquisition of additional Elektrim shares.  The SEC alleged that Vivendi, as a result, rather than directly purchase the additional 2% interest in Elektrim as Vivendi had planned, instead deposited €100 million into an investment fund administered by Société Générale Bank & Trust Luxembourg.  That investment fund then purchased a 2% stake in Elektrim in September 2001.

132.    Vivendi did not disclose all of the material details about this transaction until 2003.  Vivendi's 2001 Form 20-F limited its disclosure about its interest in Elektrim to the following:

> Participation in Elektrim—In September 2001, Elektrim Telekomunikacja, in which Vivendi Universal has a 49% interest, acquired all of Elektrim SA's landline telecommunications and Internet assets.

133.    Vivendi failed to consolidate 51% of Elektrim's results into its own financial results in violation of ARB No. 51, *Consolidated Financial Statements*, SFAS No. 94, *Consolidation of All Majority-Owned Subsidiaries*, and APB No. 18, *The Equity Method of Accounting for Investments in Common Stock*.  Notably, APB No. 18 required Vivendi to apply the equity method of accounting to its Elektrim investment.  Under APB No. 18, Vivendi was required to recognize its share of Elektrim's earnings or losses in its financial statements.

134.    Elektrim, which Vivendi was required to consolidate under GAAP, was losing money during this period; according to Vivendi's own Form 20-F reports, Elektrim's net income for 2000 and 2001 were net losses of €31 million and €28 million, respectively.  To avoid having to record Elektrim's losses on its own financial statements, Vivendi simply decided not to consolidate Elektrim.  By not consolidating Elektrim in violation of GAAP, Vivendi overstated its own income.

**D.    Defendants' Concealment of
Vivendi's Growing Liquidity Crisis**

135.    In implementing its growth-by-acquisition strategy, Vivendi spent enormous sums to acquire companies, often overpaying, and leaving the Company strapped for cash until it faced a

potentially devastating liquidity crisis.  In addition to the improper accounting practices alleged above, Defendants affirmatively took steps to conceal the Company's growing liquidity crisis in order to ensure continued access to financing and prop up the stock price.

### 1.    Defendants' Failure to Disclose Vivendi's Inability to Generate Expected Cash Flows From Acquired Companies

136.    Certain of Vivendi's most significant acquisitions, including Canal Plus as set forth in detail above, fell dramatically short—by billions of euros—of generating the expected revenue that would have been required to justify Vivendi's publicly reported goodwill.  Defendants engaged in the improper accounting alleged above in an effort to conceal from Plaintiff and the investing public that cash flows from these massive, costly acquisitions were not coming close to meeting expectations.

### 2.    Defendants' Failure to Disclose the Insufficiency of Vivendi's Working Capital

137.    Defendants also failed to disclose the insufficiency of Vivendi's working capital.  Item 5B of the Instructions to Form 20-F required Vivendi to include "a statement by the company that, in its opinion, the working capital is sufficient for the company's present requirements, or, if not, how it proposes to provide the additional working capital needed."  In addition, Paragraph 49 of Concept Statement No. 1, *Objectives of Financial Reporting by Business Enterprises,* provides:

> Financial reporting should provide information about how an enterprise obtains and spends cash, about its borrowing and repayment of borrowing, about its capital transactions, including cash dividends and other distributions of enterprise resources to owners, and about other factors that may affect an enterprise's liquidity or solvency.

Concept Statement No. 1, ¶ 49.

138.    Defendants failed to comply with the Instructions for completing Form 20-F, and violated Concept Statement No. 1, by failing to disclose that (i) as alleged above, Vivendi could not readily access Cegetel's and Maroc Telecom's cash, despite the fact that these entities' financial results

were consolidated in the Company's financial results, and (ii) the Cegetel current account, as described below, severely impacted the Company's liquidity.

### 3. Defendants' Failure to Disclose Certain Off-Balance Sheet Liabilities

139.    During the Core Period, Defendants misled investors about an off-balance sheet liability that further threatened Vivendi's liquidity and ultimately cost Vivendi hundreds of millions of dollars and impaired Vivendi's liquidity.  In late 2000 and 2001, Defendants wagered on the future success of the Company by selling put options to raise cash to fund executive compensation.  These put options obligated Vivendi to purchase in the future at least 22.8 million of its own shares, or approximately 2% of all outstanding Vivendi stock, at an average price of €69.  Even as Vivendi's share price dropped during 2001 and the first half of 2002, making it increasingly likely that the Company would take a large loss on the options, Defendants continued to conceal the true nature and extent of these liabilities, and to misrepresent Vivendi's true liquidity condition.  Moreover, even when Defendants finally made limited disclosures of its put obligations in the spring of 2002, the disclosures were woefully inadequate.

140.    For example, after being criticized by the French press for concealing the risk connected to the options, Vivendi claimed that Hannezo went over the put options with analysts at an accounting workshop on March 6, 2002 in Paris.  However, as the May 1, 2002 edition of *The Wall Street Journal* reported, "analysts who were present or listened in said Vivendi glossed over the issue," and Vivendi admitted that discussion of the puts was "easy to miss" at the accounting workshop.  Moreover, the slide presentation from this workshop, belatedly filed with the SEC as an exhibit to Vivendi's May 2, 2002 Form 6-K, made no mention of Vivendi's put obligations.

141.    On April 15, 2002, Vivendi filed a current report on Form 6-K which included an English translation of the Company's 2001 year-end financial statements.  This translation made only vague reference to Vivendi's put obligations:

> In connection with the sale of puts on its shares, Vivendi Universal had a commitment, at December 31, 2001, to buy 19.7 million shares at exercise prices ranging from €60.40 to €80.00 in 2002 and 3.1 million shares at an exercise price of €50.50 in January 2003.

This report did little to clarify the details of Vivendi's risks and obligations in connection with the put options. For example, other than specifying that Vivendi could be forced to purchase 3.1 million shares in January 2003, the report failed to inform investors of the scope, if any, of the Company's obligations with respect to the puts after December 31, 2001. The report also failed to comment on whether the options were likely to be exercised given the decline in Vivendi's stock price, or their potential adverse impact on Vivendi's liquidity.

142.    On April 18, 2002 (as later reported on May 1, 2002 by *The Wall Street Journal*), Laura Martin, who headed Vivendi's investor relations department, sent an e-mail to selected analysts that purported to clarify Vivendi's obligations with respect to the put options:

> In a sign that Vivendi itself was conscious it hadn't made clear enough the consequences of the put options, Laura Martin, who heads the company's investor-relations department, sent an e-mail to four analysts on April 18 spelling the put options out clearly.
>
> In the e-mail, Ms. Martin said Vivendi had 18 million put options outstanding that the company sold to undisclosed parties for €12 each and that carry an exercise price of €69. She estimated the impact on the company's balance sheet at €50 million to €1.2 billion. The e-mail went on to say that, though previously raised at the [March 6, 2002] accounting workshop, the put options "were easy to miss."

143.    Still, Ms. Martin's "selective disclosure" failed to state the timetable for Vivendi's future obligations, preventing analysts and investors from making a reasonable assessment with regard to Vivendi's cash flow for the immediate future. In addition, Ms. Martin's range of potential liability was rendered meaningless by its impossibly large scope and failure to reference when the obligation would come due.

144.    It was not until May 28, 2002, in Vivendi's 2001 Form 20-F, that the Company began to inform investors about the true potential adverse effects ensuing from the put options:

> Except for one put sold in 1998, Vivendi Universal in 2001 sold puts to banks on 19.7 million ordinary shares at exercise prices ranging from €60.40 to €80.00 in 2002 and 3.1 million ordinary shares at an exercise price of €50.50 in January 2003. As of April 30, 2002, approximately 16 million of these puts remain outstanding. Vivendi Universal's contingent liability relating to these puts is approximately €1.1 billion to settle the 16 million puts outstanding for cash at an average of €69 per put and approximately €540 million to settle the 16 million puts outstanding for cash by paying the banks the difference between the average of €69 per put and the market price per ordinary share of Vivendi Universal as of April 30, 2002.

A June 7, 2002 article in *The Economist* reported that Hannezo had confirmed that Vivendi was using cash each month to buy out the costly put options.

145.    In a Form 6-K filed on September 25, 2002, announcing the revenue figures for the first half of 2002 as submitted to the French regulators, Vivendi disclosed the impact its put obligations had during the first six months of 2002 alone:

> As at June 30, 2002 and December 31, 2001, Vivendi Universal had outstanding obligations on 13.9 million and 22.8 million shares respectively. The average exercise prices were €69 and €70 respectively, giving a potential commitment of €953 million and €1,597 million respectively. These put options are only exercisable on the specific date of the option and expire at various dates during 2002 and the first quarter of 2003.
>
> *          *          *
>
> The cost to Vivendi Universal during the first half of 2002 by option holders exercising their rights amounted to €239 million[.]

### 4.    Defendants' Failure to Disclose Material Commitments Concerning Cegetel and Maroc Telecom

146.    As alleged in the SEC Action, in key meetings with analysts from Moody's Investor Services ("Moody's") and Standard & Poor's in December 2001, and in its Forms 20-F for 2000 and 2001, Defendants failed to disclose future commitments regarding Cegetel and Maroc Telecom that would have revealed serious doubts about Vivendi's ability to meet its cash needs.

### a.    The Cegetel Current Account

147.    During the summer of 2001, Defendants caused Vivendi to enter into an undisclosed "current account" with Cegetel, its most profitable and cash flow-positive subsidiary. Under this current account, which operated much like a loan, Cegetel delivered excess cash to Vivendi on a short-term basis beginning in August 2001. Vivendi paid Cegetel a market rate of interest and agreed to return the funds upon the expiration of the current account agreement on December 31, 2001.

148.    As alleged by the SEC, Vivendi maintained cash pooling arrangements with most of its subsidiaries, but it treated the funds received from Cegetel differently than it treated the other pooling arrangements. In addition to the specific December 31, 2001 expiration date, the Cegetel current accounts contained an "on demand" clause that entitled Cegetel to demand immediate reimbursement of the funds it deposited with Vivendi at any time.

149.    According to the SEC Action, Cegetel gave Vivendi approximately €520 million pursuant to the current account in August 2001. This account balance ballooned between September 2001 and June 2002, and at times exceeded €1 billion. Vivendi used this money to pay for ordinary operating expenses.

150.    Cegetel's right to demand immediate reimbursement of the funds it provided to Vivendi under the current account had a direct impact on the Company's liquidity. Vivendi, however, declined to disclose the existence of this account in its 2001 Form 20-F. Item 5B(1)(b) of the Instructions for filing Form 20-F, *Liquidity and Capital Resources,* required Vivendi to include in its financial statements the nature and extent of any legal or economic restrictions on the ability of subsidiaries to transfer funds to the Company and to disclose the impact such restrictions have had or are expected to have on its ability to meet its cash obligations. Vivendi failed to make the required disclosure in violation of Item 5B(1)(b).

151.    Vivendi's failure to disclose the current account also violated Item 303 of SEC Regulation S-K. Item 303 requires issuers to identify any known "demands, commitments, events or

uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in a material way." By failing to disclose the Cegetel current account, Vivendi violated Item 303.

152. Vivendi's failure to disclose the Cegetel current account not only violated SEC regulations, but also U.S. GAAP. Paragraphs 2 and 3 of SFAS No. 57, *Related Party Disclosures,* provide:

> 2. Financial statements shall include disclosures of material related party transactions, other than compensation arrangements, expense allowances, and other similar items in the ordinary course of business . . . . The disclosures shall include:
>
> a. The nature of the relationship(s) involved
>
> b. A description of the transactions, including transactions to which no amounts or nominal amounts were ascribed, for each of the periods for which income statements are presented, and such other information deemed necessary to an understanding of the effects of the transactions on the financial statements
>
> c. The dollar amounts of transactions for each of the periods for which income statements are presented and the effects of any change in the method of establishing the terms from that used in the preceding period
>
> d. Amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement.
>
> 3. Transactions involving related parties cannot be presumed to be carried out on an arm's-length basis, as the requisite conditions of competitive, free-market dealings may not exist. Representations about transactions with related parties, if made, shall not imply that the related party transactions were consummated on terms equivalent to those that prevail in arm's-length transactions unless such representations can be substantiated.

153. Vivendi violated SFAS No. 57 by failing to disclose the Cegetel current account.

### b. The Maroc Telecom Side Agreement

154. In February 2001, Vivendi entered into a side agreement with Maroc Telecom to purchase an additional €1.1 billion stake in that entity. Defendants failed to disclose this side agreement.

155.    As discussed in Section IV.C.3 above, Vivendi acquired a 35% stake in Maroc Telecom in December 2000.  As alleged in the SEC Action, in February 2001, Vivendi entered into a side agreement with the Moroccan government that required the Company to purchase an additional 16% of Maroc Telecom's shares in February 2002 for approximately €1.1 billion.  In return, the Moroccan government granted Vivendi certain management rights over Maroc Telecom's operations that Vivendi used to justify its consolidation in the Company's financial statements.

156.    This side agreement was not disclosed in Vivendi's public filings in 2001 and early 2002. By failing to disclose this €1.1 billion liability, Defendants were able to conceal Vivendi's burgeoning cash crunch and were able to keep the Company's stock prices and credit ratings at artificially high levels during the Core Period.

### 5.    Defendant's Failure to Disclose Vivendi's 2001 Stock Buy-Backs

157.    Further exacerbating Vivendi's cash flow situation was Messier's massive, undisclosed stock buy-back program, in which Vivendi spent approximately **$6.3 billion** of the Company's cash in acquiring Vivendi shares.  As later reported in *The Wall Street Journal* on October 31, 2002:

> Mr. Messier, a former top investment banker with Lazard LLC, was famously fond of deal making.  But now it turns out he pursued many more deals than has been publicly known.  ***More important, he spent billions of dollars buying back Vivendi stock on the market last year without consulting his CFO or the board, according to people familiar with the situation.  Trying to prop up the stock price, he instead only sent Vivendi's debt soaring.***
>
> *        *        *
>
> The board signed off on Mr. Messier's acquisitions.  But it did so without knowing the full extent of his spending spree, current and former board members say.  That is because Mr. Messier didn't tell the board about his single biggest expenditure: the purchase of 104 million Vivendi shares, or nearly 10% of the company's equity, on the stock market during 2001.  His purpose was to prop up the share price.  The cost: $6.3 billion.

Shareholders had earlier approved a resolution allowing Vivendi to buy back up to 10% of its shares. But current and former directors say they expected to hear beforehand about such massive purchases.

\*       \*       \*

Mr. Hannezo opposed the stock purchases as a waste of cash . . . . This resulted in Mr. Messier trying to circumvent his CFO on the buybacks. The ex-chairman placed his stock orders by phone with two mid-level employees in the finance department, Hubert Dupont Lhotelain and Francois Blondet, according to a person familiar with the matter.

In early December 2001, the CFO finally intervened by forbidding his subordinates to take Mr. Messier's phone calls, the person familiar with the situation says. Mr. Hannezo set up a formal process to slow Mr. Messier down, requiring that the chairman request buybacks in writing, along with some justification.

\*       \*       \*

By December, the buybacks had taken their toll: Vivendi was running out of cash, according to Mr. Hannezo's memo to the COB. [Emphasis added.]

### 6.    The Magnitude of the Undisclosed Liquidity Crunch

158.    As subsequently reported by *The Wall Street Journal* in a Pulitzer Prize-winning October 31, 2002 article, Vivendi's acquisition spree, together with the other factors referenced in the preceding paragraphs, had put Vivendi on the brink of utter collapse:

On Dec. 13, [2001], Guillaume Hannezo sent Jean-Marie Messier, chairman of Vivendi Universal SA, a desperate handwritten plea.

"I've got the unpleasant feeling of being in a car whose driver is accelerating in the turns and that I'm in the death seat," wrote Mr. Hannezo, the company's chief financial officer. "All I ask is that all of this not end in shame."

That very day, unknown to investors and the Vivendi board, the company had narrowly averted a downgrade by credit-rating agencies, which would have made it difficult to borrow money and plunged the company into a cash crisis. Mr. Hannezo (pronounced AN-ZO) implored his boss and longtime friend to take serious steps to reduce Vivendi's ballooning debt.

When the company's board met the next day to consider whether to approve a roughly $10 billion acquisition of USA Networks Inc.'s TV and film businesses, Mr. Messier made no mention of the close call with the rating agencies.  Instead, when a director asked about Vivendi's financial profile, Mr. Messier said the company had no problem, according to two directors who were there.

The board endorsed the USA Networks deal, buying Mr. Messier's pitch that it would help complete Vivendi's transformation from a onetime water utility into an entertainment giant.  He boasted that the company would be able to distribute the movies and music made by its Universal Studios and Universal Music units by means of cellular devices, as well as by satellite, cable and pay television.

But Vivendi was already in dire financial straits.  The USA Networks deal, along with a $1.5 billion investment in satellite-TV operator EchoStar Communications Corp., in fact signaled the beginning of the end for Mr. Messier.  The boy wonder of the French business establishment was ousted seven months later, in July, after directors discovered the company was skirting close to a bankruptcy filing.

As new management struggles to salvage the French conglomerate, it has become clear that Vivendi came close to financial disaster far earlier than previously thought.  That picture is starkly at odds with the one repeatedly presented by Mr. Messier to investors and his board.

159.    Similarly, citing an article first appearing in *Le Monde*, Bloomberg News reported on May 14, 2002 that Vivendi was close to insolvency at the end of 2001:

Vivendi Universal SA, the world's second-largest media company, was close to insolvency at the end of 2001 after delays in planned asset sales, French daily Le Monde said, without citing anyone.

Delays in the sale of the Seagram liquor unit and a French magazine business caused a "serious cash crisis" at the Paris-based company, which faced payments of about 10 billion euros ($9 billion) at the end of last year, the paper said.  Today, Vivendi's businesses "barely produce the cash needed to pay the bills," according to the report . . . .

Vivendi's cash woes help explain why the company sold 55 million of its own shares in January, 9 percent of Vivendi Environnement SA, as well as its stake in AOL Europe and British Sky Broadcasting Plc, Le Monde said.  Since the beginning of the year, Vivendi shares have lost half their value.

160.    Although Defendants denied any pending liquidity crisis in response to the *Le Monde* report and reassured investors during the spring and early summer of 2002 that Vivendi could meet its obligations for the next 12 months, in reality the Company continued to teeter on the edge of bankruptcy.

161.    Similarly, on September 27, 2002, *AFX News* reported:

> Vivendi Universal chairman Jean-Rene Fourtou said the company would have been forced to declare bankruptcy within 10 days if Jean-Marie Messier had not resigned, according to a report in Le Figaro.

162.    On December 13, 2002, the Associated Press reported, based on an article first appearing in *Le Monde*, that Defendant Hannezo admitted that 2001 was marked by a series of errors, including underestimating the debt problem:

> Electronic mail seized in an investigation of alleged financial irregularities at Vivendi Universal and other documents show escalating tension amid a growing debt crisis that led to the fall of flamboyant Chairman Jean-Marie Messier.
>
> Board member Edgar Bronfman Jr. of Canada's Seagrams empire, which was purchased by Vivendi in 2000, warned Messier in an e-mail that he could be courting danger with his "very costly personal shows," according to Friday's edition of the newspaper Le Monde.
>
> And former Financial Director Guillaume Hannezo, in a note to France's stock exchange watchdog, said Messier had turned Vivendi into a "permanent deal machine," while an "urban guerrilla atmosphere" gripped a divided board, the newspaper said.
>
> *        *        *
>
> Hannezo, the former finance director, said in his 20-page report to the COB that 2001 was marked by the "accumulation of a series of errors," including underestimating the debt problem, according to Le Monde.
>
> *        *        *
>
> Hannezo, a key figure in the COB investigation, speculated that Vivendi could have been spared its debt mountain in 2001 "had it resolved to sell before buying . . . . Unfortunately, it oriented itself toward the inverse choice, satisfying itself with potential riches," he wrote. Vivendi's shares have tumbled around 75 percent this year.

## V.    THE TRUTH EMERGES, CAUSING HARM TO PLAINTIFF AND OTHER VIVENDI INVESTORS

163.    On May 3, 2002, Moody's downgraded Vivendi's long-term debt rating to Baa3, just one level above the "junk" status assigned to speculative investments.  Moody's attributed the ratings drop to concerns that Vivendi might not be able to reduce its debt load as quickly and comprehensively as the Company had planned.

164.    In response to the ratings downgrade, Vivendi issued a press release which contended that Moody's purportedly failed to consider the poor market conditions or the full extent of Vivendi's debt reduction program.  In a Form 6-K that Vivendi issued that same day, Defendants tried to assure the market that Moody's downgrade would have no adverse affect on Vivendi, stating:

> This decision has no impact on Vivendi Universal's cash situation.  It does not trigger any renegotiation clauses or advance repayments of bank credit lines.  In addition, Vivendi Universal's use of commercial paper in the current amount of 1.6 billion euros is well covered by back-up lines of more than 3 billion euros, the availability of which will not be affected by the rating change.

> Vivendi Universal affirms that it has every confidence in its ability to meet its operating targets for 2002, as proved by its first-quarter results.  The company is totally determined to carry through its debt reduction program in order to make a rapid return to a comfortable position with a Baa2 rating.

165.    Despite the Company's effort to reassure the market, Vivendi's ADSs dropped $1.60, from $30.67 to $29.07, in response to Moody's rating downgrade.  The Company's ordinary shares dropped €2.25, from €33.77 to €31.52.

166.    As Vivendi's stock fell rapidly, Messier's personal stock had fallen considerably with the Board and investors.  On or about May 29, 2002, Vivendi's Board established a corporate governance committee to monitor Messier's strategic and financial decisions.  As reported in the British newspaper *Independent* on May 31, 2002, "[t]he move is an embarrassing comedown for Mr. Messier, who once

boasted he did not have to answer to anyone. He will now answer to the very person he has attempted
to sideline since Vivendi's mega-merger two years ago."

167.    By May 29, 2002, with Vivendi's ADSs trading in the $29 to $30 range and its ordinary
shares trading in the €31 to €33 range in response to concerns about its debt levels, Defendants sought
to reassure the financial markets by issuing a press release (also filed on a Form 6-K) reflecting a May 29,
2002 meeting of the Company's Board of Directors. The press release stated that the Board had
"carried out a detailed examination of Vivendi Universal's operating and financial targets for 2002."
According to the press release, the Board stated that their strategy was "based on the active continuation
of the debt reduction program and the internal growth of the company's businesses." Messier was
quoted as follows:

> Our Board of Directors and management are proceeding together,
> deliberately and decisively, to execute a plan that, in meeting our
> financial targets and operating objectives, will deliver increased value
> and solid growth to our Company. I look forward to the
> recommendations of our newly created governance committee, which, I
> believe, will have an added contribution by continuing to improve the
> structures and procedures that insure an absolute and impartial focus on
> the Board's fiduciary duty to stakeholders.

168.    While the Company sought to assure investors that it was not facing a liquidity crisis,
rumors that Vivendi was in danger of default on its credit facilities persisted. On July 2, 2002, Vivendi's
debt was downgraded for a second time. This announcement caused Vivendi's ADSs to plummet nearly
21%, falling from $22.45 to $17.76, while its ordinary shares fell more than 25%, from €23.90 to €17.80.
The Company's shares dropped so rapidly that the Paris Bourse repeatedly suspended trading of the
ordinary shares.

169.    Vivendi swiftly ousted Messier the following day, and admitted that the Company was
facing a "short-term liquidity issue." Vivendi disclosed that it would be required to repay creditors €1.8
billion by the end of July 2002 and that €3.8 billion in credit lines were up for renegotiation. Further,
credit analysts estimated that Vivendi could face a cash shortfall of €2.7 billion by the end of 2002—an

amount they feared could expand to €5.5 billion by the middle of 2003 if the Company failed quickly to secure new multibillion-euro lines of credit. These announcements caused the Company's ADSs and ordinary shares to fall even further, dropping nearly another 12% on July 3, 2002 from $17.76 to $15.66 and nearly another 22% from €17.80 to €13.90, respectively. All told, the Company's ADSs and ordinary shares fell a stunning 30% and 41.8%, respectively, in the two days following the second credit rating downgrade.

170.    On July 5, 2002, *The Globe and Mail*, a Canadian newspaper, reported that Vivendi "finally admitted what its ousted chairman and chief executive officer, Jean-Marie Messier, had strenuously denied in recent weeks: The media-and-utility conglomerate is in danger of a cash crunch." *The Globe and Mail* further stated:

> Based on a detailed liquidity statement Vivendi put out late Wednesday, credit analysts estimate that Vivendi could face a cash shortfall of 2.7 billion euros ($2.64-billion U.S.) by the end of the year, expanding to as much as 5.5 billion euros by the middle of 2003, unless it can quickly secure a new multibillion-euro credit line from its lenders.

> \*        \*        \*

> In its statement, Vivendi said it must repay 1.8 billion euros this month and said the payment would be financed from 2.4 billion euros in existing cash and credit lines. It also has a 3.8-billion-euro credit line that will roll over this month unless the banks determine there has been a "material adverse change" with the company.

> This grim outlook contrasts with Mr. Messier's recent assurance that the "treasury situation" at Vivendi—owner of Universal Studios, Universal Music Group, USA Networks and minority stakes in a host of other assets—was "comfortable even in the most pessimistic market hypotheses."

171.    On July 10, 2002, *The Wall Street Journal* reported that the COB had raided Vivendi's Paris headquarters as part of a formal investigation into the Company's financial disclosures going back to 2001. The French investigation had been opened to look into alleged "publication of false balance

sheets for the tax years closing December 31, 2001 and December 31, 2002" and the publication of false and misleading information concerning the Company's financial outlook for those years.

172.    On July 16, 2002, Vivendi announced that Hannezo was relieved of his duties as CFO and would stay with Vivendi for six months as an advisor to the new chairman.  A July 17, 2002 research report by BNP Paribas Equities stated:

> This is no surprise.  Guillaume Hannezo was very close to Jean-Marie Messier.  The group's financing packages and strategy were as much his as Messier's.

173.    Unfortunately for Vivendi's investors, the stunning collapses of early July 2002 only foreshadowed drops still to come.

174.    On August 14, 2002, the Company's new management held a conference call and issued three press releases (filed with the SEC on Forms 6-K) informing the public of just how dire Vivendi's financial situation had become.

175.    The first press release memorialized the August 14 conference call.  In it, Fourtou stated that:

> In the short term, due to the structure of our debt, we are facing a liquidity problem . . . in spite of the value of our assets.  That's why the first thing I did upon my arrival was to negotiate . . . a new bank facility of 1 billion euros.  This new money has not yet been used.  As announced in July, we are presently negotiating a new facility of 3 billion euros which will include the first 1 billion euros.  We have reached a framework for agreement with the same seven banks and we expect this new facility to be signed by the end of August.  This will allow Vivendi to buy the time necessary to implement the best conditions for the necessary sale of the businesses.

176.    The second August 14 press release reported on a August 13, 2002 Board meeting and announced that the Board had, among other things, approved a plan to dispose of at least €10 billion worth of assets, including €5 billion in the next nine months; voted to sell Houghton Mifflin; and authorized the cancellation of 20,865,167 treasury shares linked to certain stock option plans.

177.    The final August 14 press release and Form 6-K announced Vivendi's results for the first half of 2002, and reported that "[n]et income was a loss of 12.3 billion euros, representing negative 11.32 euros per basic share, for the first half of 2002." Further, the press release highlighted the €11 billion goodwill impairment charge and the "financial provisions of 3.4 billion euros" that were recorded at June 30, 2002. Net income was negative €66 million, "or negative 0.06 euros per basic share in the first half of 2002 compared with positive 0.27 euros earnings per basic share in the 2001 period." Debt under French GAAP was approximately €35 billion. The Board also laid out its commitment to "raising at least 10 billion euros through asset sales during the next two years, 5 billion euros of which will be completed during the next 9 months."

178.    In response to this news, debt-rating agency Standard & Poor's slashed Vivendi's long-term corporate credit that same day and warned of a further downgrade if Vivendi could not secure new funding within a month. Fourtou was quoted by the Associated Press on August 14, 2002 as stating: "We are facing a liquidity problem, [and I will] try to avoid any fire sale, but we have negotiations that could be concluded very soon if the price was lowered." The news report also stated:

> Vivendi Universal, the teetering French media conglomerate, reported a massive loss of $12 billion for the first half of the year and said it will pare debt by selling $10 billion in assets, including the U.S. publisher Houghton Mifflin.
>
> Adding insult to injury, a ratings agency downgraded the company's debt to junk.
>
> Investors punished Vivendi's shares yesterday on the Paris Exchange and on the New York Stock Exchange, where shares plummeted 23.9 percent to close at $11.66.
>
> The sale of Houghton Mifflin, which the company only bought last year for $1.7 billion, appeared to mark a first step toward breaking up the entertainment and media empire built up by Vivendi's former chairman, Jean-Marie Messier, in a whirlwind of costly acquisitions.
>
> In all, Vivendi said it hopes to dispose of at least $9.8 billion worth of assets—half of them within nine months, the rest within two years.

179.    In response to these developments, on August 14, 2002, Vivendi ordinary shares closed at €11.89, down more than €4.00 (or approximately 25%) from its close the previous day.  Vivendi's ADSs suffered a similar decline, closing down $3.67 at $11.66.

180.    In the wake of the public admission that the Company was facing a cash crunch, Vivendi's new management set about the process of raising revenue by jettisoning some of the conglomerate's major assets.  Media reports indicated that the Company had enough cash to last only until October 2002, putting Vivendi in a dire position.  In response, Vivendi announced an ambitious plan to unload €16 billion in assets between July 2002 and the end of 2004.  The fire sale included the following dispositions:

| Date | Asset | Price |
|------|-------|-------|
| July 2002 | B2B/Health | €150 million |
| July 2002 | Lagardére | €44 million |
| July 2002 | Vinci | €291 million |
| December 2002 | Vizzavi | €143 million |
| December 2002 | Houghton Mifflin | €1.567 billion |
| December 2002 | VUP publishing activities in Europe | €1.138 billion |
| December 2002 | Veolia Environment | €1.865 billion |
| December 2002 | EchoStar | €1.037 billion |
| December 2002 | Sithe Energies, Inc. | €319 million |
| February 2003 | Consumer Press division | €200 million |
| February 2003 | Canal+ Technologies | €191 million |
| April 2003 | Telepiur | €831 million |
| May 2003 | Fixed-line telecommunication in Hungary | €315 million |
| May 2003 | Comareg | €135 million |
| May 2003 | Interest in Vodafone Egypt | €43 million |
| June 2003 | InterActive Corp. warrants | €600 million |
| June 2003 | Interest in Sithe International | €40 million |
| June 2003 | VUE real estate | €276 million |
| October 2003 | Canal+ Nordic | €48 million |
| February 2004 | Atica & Scipione | €31 million |
| March 2004 | Sportfive | €274 million |
| May 2004 | Vivendi Universal Entertainment | €2.312 billion |
| May 2004 | Kencell | €190 million |
| June 2004 | Monaco Telecom | €169 million |
| June 2004 | Egée and Cédre Towers | €84 million |
| August 2004 | Interests in VIVA Media | €47 million |

| September 2004 | Canal+ Group headquarters | €108 million |
|---|---|---|
| October 2004 | UCI Cinemas | €170 million |
| December 2004 | 15% of Veolia Entertainment | €1.497 billion |

In total, Vivendi dumped more than €15 billion in assets between July 2002 and December 2004.

181.    On October 30, 2002, Vivendi announced that the Paris Public Prosecutor's office had opened an investigation into the veracity of the Company's financial disclosures.  A few days later, the Company announced that a separate investigation had been opened by the U.S. Attorney's Office for the Southern District of New York.  The U.S. Attorney announced that it planned to coordinate its efforts with the SEC, which had already begun to conduct an informal inquiry into Vivendi.

182.    On November 20, 2002, the SEC announced that it had upgraded its inquiry into Vivendi from an informal inquiry to a formal investigation.  The SEC made clear that it intended to review Vivendi's accounting and the veracity of its public disclosures.  In connection with these enforcement efforts, the SEC obtained a court order on September 24, 2003 forcing Vivendi to place in escrow $23 million (€21 million) it had earmarked to pay a severance package Messier negotiated just before his ouster.  Messier was similarly barred from executing a judgment he had obtained via an arbitration in New York State court concerning this severance package.

183.    On December 12, 2002, *Bloomberg* reported that a police team from the Finance Brigade of the Paris Public Prosecutor's office raided Vivendi's headquarters in Paris and Messier's home.  The Finance Brigade also raided Canal Plus's headquarters the next day, as well as the homes or offices of various Vivendi directors.  Messier was held in custody for two days, during which he was interrogated regarding claims of securities fraud and a $2 billion share buyback by Vivendi in 2001.  Hannezo had also been placed under formal investigation.

184.    On September 15, 2003, the COB—following a fourteen month investigation— announced its conclusion that Vivendi had made false financial disclosures.  Among the Company's failures, the COB found that Vivendi had not disclosed to investors the growing cash problems it faced

during the end of Messier's tenure. The COB had charged that Messier had "deceived the public" and had "'deliberately issued in the company name inexact and falsely optimistic information on the consolidation of Telco [Elektrim] and Vivendi's debts, cash flow and outlook between October 2000 and April 2002.'"[4]

185.    The United States-based investigations into the crisis caused by Messier's $77 billion acquisition spree concluded on December 24, 2003. That day, the SEC filed and simultaneously settled securities fraud charges against Vivendi, Messier and Hannezo, imposing fines totaling $51 million. The SEC charged Vivendi, Messier and Hannezo with multiple violations of the federal securities laws committed between December 2000 and July 2002. Specially, the SEC contended that these parties had engaged in a course of fraudulent conduct that disguised the Company's cash flow and liquidity problems, improperly adjusted accounting reserves to meet predetermined EBITDA targets, and failed to disclose material commitments at Cegetel and Maroc Telecom.

186.    In addition to the massive fines imposed against them, Messier and Hannezo both entered into consent decrees permanently enjoining them from further violations of the federal securities laws and barring them from service as officers or directors of any public companies for ten and five year periods, respectively. Messier further agreed to relinquish his claim to the €21 million severance package he had negotiated before he was forced to resign.

187.    On December 8, 2004, French regulators imposed fines of €1 million on each of Vivendi and Messier. This was only the second time the AMF had imposed fines so close to its maximum fine of €1.5 million.

---

[4] *Corporate Ethics and Governance*, Dec. 7, 2004 <http://www.icego.org/details/vivendi and its former boss fined.html>.

## VI.    DEFENDANTS' MATERIALLY FALSE
##         AND MISLEADING STATEMENTS

188.    On October 30, 2000, Vivendi filed a Form F-4 (the "Form F-4") with the SEC, which Defendants Messier and Hannezo signed, in connection with the Merger.  The Form F-4 presented Vivendi's historical financial statements for fiscal year ended December 31, 1999 and the first half of the fiscal year 2000, ended June 30, 2000.  Vivendi reported revenue (sales) of $16.427 billion and net income of $509.1 million for the first half of the fiscal year ended December 31, 2000, and revenue of $17.487 billion and net income of $254.6 million for the comparable period in 1999.  Vivendi also reported shareholders' equity of $11.957 billion and total assets of $73.611 billion as of June 30, 2000.

189.    For the reasons set forth in greater detail in Section IV.C above, Vivendi's historical financial statements and balance sheets contained in its Form F-4 were materially false and misleading and omitted to state material facts required therein or necessary to make the statements therein not misleading because, *inter alia,* the Company was engaged in improper accounting practices that had the effect of materially overstating Vivendi's reported revenue and net income, including (a) improperly consolidating into its financial statements revenue from its Cegetel subsidiary (in which the Company had less than 50% ownership); (b) failing to write down impaired goodwill from previous corporate investments and acquisitions, including U.S. Filter; and (c) overstating the Company's revenue from its Environmental division on certain multi-year contracts.  In addition, the Form F-4 contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants did not disclose that Vivendi was suffering from a burgeoning liquidity crisis, as set forth in Section IV.D above.

190.    On November 1, 2000, Defendants caused Vivendi to file a Form 6-K with the SEC reporting Vivendi's financial results for first half of 2000, ended June 30, 2000 (the "November 1, 2000 6-K").  The November 1, 2000 6-K stated in pertinent part:

> For the first six months of 2000, Vivendi generated net sales of 19.4 billion euros compared with 18.1 billion euros for first-half 1999, representing growth of 7.4%. This amount takes into account the disposals of Vinci and Nexity with effect from January 1, 2000. It also includes a full six months' impact from the major acquisitions made in 999, notably U.S. Filter and Canal+. [Footnote omitted.]

> \*       \*       \*

> The communications and Environmental services businesses accounted for 18.6 billion euros, an increase of 46% which includes internal growth of over 15%. Net sales outside France rose 74% to 8.6 billion euros.

191. On November 17, 2000, Defendants caused Vivendi to file a Form 6-K announcing Vivendi's revenue for the first nine months of 2000 (the "November 17, 2000 6-K"). The filing reported that:

> Vivendi's revenues for the first nine months of 2000 totaled 29.1 billion euros, with environmental services and communications accounting for 28.2 billion euros, a 41.5% increase over the 19.9 billion euros as at September 30, 1999. Internal growth was close to 14% (19% in communications and 11% in environmental services).

192. The November 1, 2000 6-K and the November 17, 2000 6-K contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because, *inter alia,* the Company was engaged in improper accounting practices that had the effect of materially overstating Vivendi's reported earnings (as particularized in Section IV.C above), including: (a) failing to timely write down certain overvalued assets from previous corporate investments and acquisitions; (b) improperly consolidating into its financials revenue from its Cegetel subsidiary in which the Company had less than 50% ownership; (c) failing to consolidate revenue from Elektrim; and (d) overstating the Company's revenue from certain multi-year contracts. In addition, the November 1, 2000 6-K and the November 17, 2000 6-K contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements

therein not misleading because Defendants failed to disclose that Vivendi was suffering from a burgeoning liquidity crisis, as set forth in Section IV.D above.

193.    On December 22, 2000, Vivendi issued a press release announcing that it had purchased a 35% stake in Maroc Telecom for approximately €2.3 billion.  The press release stated that the purchase would "have a positive effect on net income before goodwill from 2001, taken that the company is consolidated."  This statement contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that the consolidation of Maroc Telecom was improper, for the reasons set forth in Section IV.C.3 above.

194.    On January 12, 2001, Defendants caused the text of a December 5, 2000 speech to shareholders to be memorialized in a January 12, 2001 Form 6-K filed with the SEC (the "January 12, 2001 6-K").  In the speech, Messier touted Vivendi's quadrupled share price, sevenfold increase in market capitalization and tenfold increase in operating income.  He also reported Vivendi's pro forma revenues of "almost 25 billion euros at the end of 2000, and pro forma EBITDA of 3.2 billion euros in the consolidated businesses alone."  Calling the figures "reliable and concrete," Messier projected an additional €220 million of EBITDA in 2002 and more than €400 million in 2003.  He went on to state that "[w]e are therefore very comfortable with our business and financial performance forecasts, irrespective of the economic climate in the next two years."  Messier's December 5, 2000 speech, and the January 12, 2001 6-K on which it was filed with the SEC, contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because the financial results reported therein, rather than being "reliable and concrete," were achieved as a result of the fraudulent accounting scheme described in Section IV.C above.  Further, the revenue and EBITDA results reported in the December 5, 2000 speech, and the January 12, 2001 6-K on which it was filed, were materially false and misleading because Defendants' improper consolidation

of the results of Cegetel and Maroc Telecom into Vivendi's own results caused these reported financial results to be materially misstated, for the reasons set forth in Section IV.C.3 above.

195.    On February 2, 2001, Vivendi announced in a press release that Vivendi Environnement's total revenue in 2000 was €26.4 billion. Vivendi cited "internal growth of 10.5% and major acquisitions in 1999" as the primary catalysts behind the 25.7% increase over its 1999 revenues. The press release stated that "[c]hanges in the scope of consolidation had a positive impact of 2 billion euros. External growth was mainly due to the full-year effect of acquisitions made in 1999, principally US Filter and Superior Services." These statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Vivendi's reported revenue was overstated as a result of the accounting fraud discussed in Section IV.C above.

196.    On February 14, 2001, Vivendi issued a press release in Paris and New York, memorialized in a February 15, 2001 Form 6-K filing with the SEC (the "February 15, 2001 6-K"). The February 15, 2001 6-K announced preliminary results for the fiscal year ended December 31, 2000 as follows:

> Vivendi Universal's preliminary total revenues for 2000 totaled 41.7 billion Euros with media and communications and environmental services, accounting for 40.0 billion Euros, a global 36.5% increase over 1999.

> [Messier said:] "Vivendi Universal was created on December 8, 2000. The 2000 Vivendi figures are showing the considerable burst of growth of our communications activities in 2000 both in global growth and even more important with a near 20% internal growth. Vivendi Universal enters its first full year of operations with strong growth prospects and a very strong balance sheet. This new company is off to a fast start and we are very confident that we will meet the very aggressive growth targets we have set for ourselves both at the revenues and EBITDA levels."

197.    The February 15, 2001 6-K contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because

Defendants failed to disclose that Vivendi's reported revenues and purported growth were overstated as a result of the accounting fraud discussed in Section IV.C above.

198.    In a March 8, 2001 Form 6-K (the "March 8, 2001 6-K"), Defendants caused Vivendi to report on a Supervisory Board meeting held the same day and chaired by Messier, wherein Vivendi Environnement's financial statements were discussed.  The release stated in part that "[n]et debt was reduced from 16.6 billion euros to 13.2 billion euros, and shareholders' equity—including minority interests—was increased from 1.5 billion euros to 8.2 billion euros."  Vivendi further announced that net income was €615 million, including non-recurring items after tax.

199.    In a March 9, 2001 Form 6-K (the "March 9, 2001 6-K"), Vivendi reported "better than expected" fourth quarter and fiscal year 2000 results.  Vivendi announced actual revenues of €41.8 billion for fiscal year 2000, including Media and Communications revenues of €13.6 billion and Environmental Services revenues of €26.5 billion.  The 6-K further stated:

> Vivendi Universal announced today that on a PRO FORMA basis for calendar 2000, the Company reported 7.2 billion euros in EBITDA . . . for the period ending December 31, 2000, up 48 percent from 1999. Results reflect strong performance across the Company's business units—Media and Communications and Environmental Services. Actual EBITDA for the 12 months ended December 31, 2000, was 6 billion euros versus 4.3 billion euros in 1999.

200.    Vivendi claimed that "the PRO FORMA results were driven by growth in all business segments with the exception of Internet" and further pointed out that "[n]et income climbed 44 percent, before goodwill, to 2.8 billion euros[.]"  Messier further stated:

> The strong results that Vivendi Universal has generated for calendar 2000 provide a very solid foundation for the Company's growth prospects in 2001.  The robust performance of Vivendi Universal's business segments clearly reflects the fast pace and clear momentum that we have established as Vivendi Universal enters 2001.  The Company's unique combination of content and distribution assets paves the way for enormous growth opportunities. We have our management teams and plans in place as we moves [sic] to execute the growth strategies.  The management team, in particular, has been focused on the day-to-day operational performance and increased productivity of

> each of the Company's business units.  I am very confident that, for Media and Communications, we will reach our revenue growth target of 10 percent and our aggressive EBITDA growth target of 35 percent for the period 2000-2002 and achieve superior returns for Vivendi Universal shareholders. . . .  Our businesses are strong, our management is focused and growth prospects are real and immediate.

201.    The March 9, 2001 6-K contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that the reported results were not attributable to the stated causes but, rather, to the accounting fraud set forth in Section IV.C above.

202.    In addition to the reasons discussed above, the January 12, 2001 6-K; the February 15, 2001 6-K; the March 8, 2001 6-K; and the March 9, 2001 6-K contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because, *inter alia,* the Company was engaged in improper accounting practices that had the effect of materially overstating Vivendi's reported earnings (as particularized in Section IV.C above), including: (a) failing to timely write down certain overvalued assets from previous corporate investments and acquisitions; (b) improperly consolidating into its financials revenue from its Cegetel and Maroc subsidiaries in which the Company had less than 50% ownership; (c) improperly recognizing revenue from its U.S. Filter and Canal Plus acquisitions; and (d) failing properly to report pro forma accounting metrics.  Further, these statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that Vivendi was suffering from a burgeoning liquidity crisis, as set forth in Section IV.D above.

203.    In a March 30, 2001 Chairman's Statement and Shareholder Newsletter, filed with the SEC on a Form 6-K on the same date (the "March 30, 2001 6-K"), Messier stated that 2000 pro forma results showed an increase of almost 20% in revenues and an EBITDA increase of 48%, and that "[t]he EBITDA rise for the media and communications businesses alone is stronger still, reaching 76%."

Messier also pointed out that Vivendi was "ahead of our targets for 2000" and that he could "confirm the ambitious growth targets that we set for media and communications in October 2000: increases of 10% for revenues and 35% for EBITDA."  He further stated:

> Since the merger [with Seagram and Canal Plus], the integration of our teams has progressed well, enabling us to identify and develop synergies. Consumers will soon be seeing the first concrete results.  In addition, we are in exceptionally fine financial health—our communications activities are nearly debt free.

These statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Messier failed to disclose that Vivendi was neither "in exceptionally fine financial health" nor "nearly debt free."  Further, these statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Messier failed to disclose that Vivendi was in a precarious financial condition due to the fraudulent accounting scheme and Defendants' active effort to conceal Vivendi's liquidity crisis, set forth in Sections IV.C and IV.D above.

204.    On April 24, 2001, Vivendi issued a press release and filed a Form 6-K (collectively, the "April 24, 2001 6-K") announcing "very strong" first quarter 2001 results.  The April 24, 2001 6-K announced that Media and Communications revenues were up 10% to €5.9 billion and that Telecom revenues were up 30% to €1.5 billion.  The April 24, 2001 6-K further reported that Media and Communications EBITDA increased 112% to €900 million and that Telecom's EBITDA more than tripled to €433 million.  The April 24, 2001 6-K quoted Messier as follows:

> I am very pleased with Vivendi Universal's outstanding performance in our first quarter as a new company.  All our results meet or exceed our key operating targets.  We created significant momentum by delivering solid first quarter 2001 results in EBITDA, which more than doubled, and by generating double digit revenue growth.
>
> These results show the focus and dedication of all our management teams, in executing the unique promise of Vivendi Universal around its global strategy.  This is a great beginning.  With our momentum, our targets and the drive of our executive team, I am extremely confident

> that, for Media and Communications, we will reach our annual
> EBITDA and revenue growth targets of 35% and 10%, respectively in
> 2001 and 2002 and achieve superior returns for Vivendi Universal
> shareholders.
>
> Finally . . . We are also ahead of targets for the synergies which indicate
> that the path of integration between our teams is great. My only focus
> is and remains execution of this compelling media merger.

These statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that the results reported were not attributable to the stated causes but, rather, to the fraudulent accounting scheme as particularized in Section IV.C above.

205.    On April 24, 2001, Messier addressed Vivendi's shareholders at the Company's shareholders' meeting, the transcript of which was subsequently filed on the June 26, 2001 Form 6-K (collectively, the "June 26, 2001 6-K"):

> The foundations of our communications-related businesses are
> particularly healthy and strong. I would just like to emphasize a few
> points:
>
> -       A HEALTHY BALANCE SHEET with total equity reaching
> 66 billion euros;
>
> -       A PRO FORMA NET DEBT THAT IS PRACTICALLY
> NON-EXISTENT—around three billion euros;
>
> -       Vivendi Universal posted RECORD-HIGH NET INCOME,
> and has cash available for investing (participation in BskyB, etc.);
>
> -       Vivendi has RAPIDLY GROWING revenue, which reach the
> double digits annually, spread out through all the European and
> American markets (60% and 40%); extraordinarily large customer bases,
> several dozen million subscribers; business models often based on
> subscription—meaning loyalty, recurrence, predictable revenues, and
> very little dependence on the advertising market.
>
> Financially, Vivendi Universal, concerning the communications sectors,
> is rock solid—very stable with high growth.
>
> *          *          *

> In my role as the Chairman and as an employee of the company, I owe you the company's results. Here they are. They are good.
>
> *       *       *
>
> Vivendi Universal, our company, your company, is solid. Today, we are a leader, strong, dynamic, and profitable.

206.    On May 18, 2001, Vivendi filed a Form 6-K with the SEC and issued a press release providing total revenue information for first quarter 2001 (collectively, the "May 18, 2001 6-K"). The May 18, 2001 6-K stated in part:

> Vivendi Universal revenue for first quarter of 2001 totaled 12.6 billion euros, a global 34.5% increase over the first quarter of the prior year. Vivendi Universal's media and communications businesses accounted for 5.9 billion euros and environmental services businesses accounted for 6.7 billion euros.

207.    The March 30, 2001 6-K; the April 24, 2001 6-K; the June 26, 2001 6-K; and the May 18, 2001 6-K contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because, *inter alia,* the Company was engaged in improper accounting practices that had the effect of materially overstating Vivendi's reported earnings (as particularized in Section IV.C above), including: (a) failing to timely write down overvalued assets from previous corporate investments and acquisitions; (b) improperly consolidating into its financials revenue from its Cegetel subsidiary in which the Company had less than 50% ownership; and (c) overstating the Company's revenue from certain multi-year contracts. In addition, these statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that Vivendi was suffering from a liquidity crisis (as particularized in Section IV.D above) and that Vivendi would need to restructure its debt obligations in order to remain solvent and avoid bankruptcy.

208.    On July 2, 2001, Vivendi filed its Form 20-F with the SEC, signed by Defendant Hannezo, for the fiscal year ended December 31, 2000 (the "2000 Form 20-F"). The 2000 Form 20-F

contained Vivendi's consolidated financial statements for the years ended December 31, 2000, 1999, and

1998 and as at December 31, 2000 and 1999.  The 2000 Form 20-F stated as follows:

> For the years ended December 31, 2000, 1999 and 1998, we had a net
> income under U.S. GAAP of €1,907.8 million, €246.1 million and
> €565.2 million, respectively, compared to €2,229.0 million, €1,431.4
> million and €1,120.8 million under French GAAP.  Under U.S. GAAP,
> shareholders' equity was €64,729.4 million and €16,954.5 million for
> 2000 and 1999, respectively, compared to €56,671.1 million and
> €10,892.2 million under French GAAP.

209.     The 2000 Form 20-F further reported on marketing rights, stating:

> As of January 1, 2000, the following new accounting principles were
> adopted:
>
> *          *          *
>
> Sports broadcasting rights acquired by Canal Plus are now capitalized as
> intangible assets and are amortized over the period of the agreement.
> The cumulative effect of this change had no impact on net income in
> 2000 and 1999.  Total assets increased by €2.0 billion (most of which
> related to intangible assets) and total liabilities and shareholders' equity
> increased by the same amount.

210.     When discussing Accounting Policies, the 2000 Form 20-F stated that revenues and

costs for the music segment were recognized upon shipment to third parties and that revenue relating to

public service contracts was recognized when the services were rendered.

211.     For the reasons set forth in Section IV.C above, Vivendi's historical financial statements

and balance sheets contained in its 2000 Form 20-F contained untrue statements of material fact and

omitted to state material facts required therein or necessary to make the statements therein not

misleading because, *inter alia,* Defendants failed to disclose that the Company improperly consolidated

into its financials revenue from its Cegetel subsidiary (in which the Company had less than 50%

ownership), improperly manipulated EBITDA, failed to timely write down impaired goodwill from

previous corporate investments and acquisitions, including Canal Plus and U.S. Filter, overstated the

Company's revenue from its Environmement division on certain multi-year contracts in violation of

75

GAAP, and inflated the value of certain Canal Plus assets.  Further, these statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that Vivendi was suffering from a burgeoning liquidity crisis, as set forth in Section IV.D above.

212.    On July 23, 2001, Vivendi issued a press release and filed a Form 6-K (collectively, the "July 23, 2001 6-K") announcing its "very strong" second quarter and first half 2001 Media and Communications results.  Vivendi reported that Media and Communications revenues were up 16% (excluding Universal Studios Group) to €6.6 billion, and EBITDA grew 57% to €1.3 billion. Concerning Vivendi's first half 2001 results for the Media and Communications businesses, the press release stated in part:

> In the course of the first half of 2001, Vivendi Universal achieved three quarters of its full-year target of incremental EBITDA (nearly 800 million euros excluding Maroc Telecom, relative to the company's target of slightly more than 1 billion euros).
>
> In the first half of 2001, revenues increased to 12.4 billion euros (up 15% [excluding USG]), and EBITDA grew to 2.2 billion euros (up 77% over 2000 comparable period).
>
> During a strong second quarter, revenues increased 16% [excluding USG] to 6.6 billion euros, and EBITDA grew 57% to 1.3 billion euros.
>
> Excluding Maroc Telecom, revenue growth was 8%, and EBITDA growth was 35% for the second quarter.  For the first half of 2001, revenues were up 11% and EBITDA was up 62%.  [Footnotes omitted.]

213.    The July 23, 2001 6-K also reported on the Telecom segment, reporting Telecom EBITDA of €703 million for the quarter ended June 30, 2001 and €1.136 billion for the first half ended June 30, 2001, and stating:

> Telecoms has registered an excellent second quarter and half year.  In the second quarter of 2001, revenues increased by 51%, and EBITDA grew by 70% versus the second quarter 2000.

214.    Messier commented on the results, stating in part as follows:

The results produced by Vivendi Universal in the second quarter are well ahead of market consensus. . . . They confirm the robustness of our businesses . . . and the fast progress of the reorganization and implementation of our recent merger.

With three quarters of the 'aggressive' incremental EBITDA target for the full year 2001 [(1.12 billion euros of incremental EBITDA, or 35%, over the pro forma 2000 guidance provided last October and slightly above 1 billion euros of incremental EBITDA over the final 2000 results)] already achieved in the first half of the year, I can only re-emphasize our confidence. We will at least meet our stated targets.

Obviously, our current stock price does not fully reflect this situation in terms of EBITDA multiples or Enterprise Value to EBITDA to growth. With the highest growth rates of the industry and the lowest multiples, our stock is definitely an attractive investment today.

The first half has been a period of total operational focus in each of our businesses, while completing significant achievements in the implementation of the merger, reorganization and execution of our strategy.

215.    Following the July 23, 2001 press release, Vivendi hosted a conference call to discuss the second quarter 2001 results and the Company's business and prospects. A July 26, 2001 analyst report by Commerzebank reported that "Messier is confident the company will reach its own targets." As the plaintiffs in the Securities Class Action allege, during the conference call, Messier and others in Vivendi management stated:

Vivendi was able to achieve strong results even in a down market and was in fact gaining market share.

The Company was still on track to achieve strong growth in revenues and earnings in 2001, including EBITDA growth of 35%.

The statements made by Vivendi management during the conference call contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because they failed to disclose that Vivendi was able to achieve the purportedly "strong results" reported only as a result of the accounting fraud as set forth in Section IV.C above, and

Defendants' active concealment of the Company's burgeoning liquidity crisis, as discussed in Section IV.D above.

216.    On August 10, 2001, Vivendi issued a press release and filed a Form 6-K (collectively, the "August 10, 2001 6-K") announcing its total revenue for the first half of 2001, including the second quarter.  Second quarter 2001 revenue totaled €13.9 billion, "comprised of 6.6 billion euros for media and communications businesses and 7.3 billion euros for environmental services businesses."  The first half of 2001 total revenue for Vivendi was €26.4 billion, "comprised of 12.4 billion euros for media and communications businesses and 13.9 billion euros for environmental services businesses."

217.    In early September 2001, Vivendi's ADSs declined from the mid-$50s to the mid-$40s per share, and its ordinary shares declined from the mid-€50s to the mid-€40s.  In response, Defendants categorically denied any problems.  Vivendi, after the market closed on September 5, 2001, reiterated its targets for 2001 and 2002.  Messier stated in an interview with Reuters that evening that "no profit warning of any kind needs to be feared coming from Vivendi Universal."  Messier's statement contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because he failed to disclose that Vivendi's security in its targets and in the fact that it would not have to issue any profit warning was attributable to the accounting fraud as set forth at Section IV.C above, and to its active concealment of the Company's liquidity crisis, as discussed in Section IV.D above.

218.    On September 25, 2001, Vivendi issued a press release and filed a Form 6-K (collectively, the "September 25, 2001 6-K") announcing "Strong First Half 2001" results and a "Solid Outlook for 2002."  The press release reported that revenues increased 11% to €26.4 billion, that EBITDA grew 42% to nearly €4 billion, that operating income grew 65% to €1.9 billion, and that net income, before goodwill amortization, reached €1.1 billion or €0.97 per share.  With respect to Media and Communications, the release reported that first half 2001 revenues reached €12.4 billion, up 15%,

EBITDA reached €2.2 billion, up 77%, and that operating income nearly tripled to €946 million, up

184%.  Concerning Vivendi's environment business, the release reported that revenues were up 11% to

€13.9 billion, that EBITDA was up 12% to €1.76 billion, and that operating income was up 13% to

€0.97 billion.  In the filing, Messier commented:

> Despite the current environment, we will reach all our previously stated revenue/EBITDA objectives for the 2001 year.  I continue to express my confidence in achieving our more than 10% revenue growth targets for 2001 and our more than 35% EBITDA growth (versus the company's October 2000 guidance) at a constant asset base.  This, combined with some extensions in the company's asset base (i.e., Maroc Telecom and Houghton Mifflin), should result in full-year Media and Communications EBITDA slightly north of 5 billion euros.  In the current environment, giving a 2002 target would not be meaningful, and we have yet to complete our 2002 budget and plan process.  Before the recent tragedy [of September 11, 2001], market consensus for 2002 EBITDA was not far from 6 billion euros.  Despite the events, looking at the trends of our businesses and our defensive qualities, we are currently very comfortable with this expectation.  [Footnote omitted.]

219.    On October 17, 2001, Vivendi filed a Form 6-K (the "October 17, 2001 6-K")

announcing its consolidated half-year financial statements as filed with regulatory authorities in France.

The October 17, 2001 6-K reported:

> In the first half of 2001, Vivendi Universal's revenues increased to €26.4 billion from €19.4 billion in the comparable period of 2000.  On a pro forma basis the revenue increase was 11.5%.
>
> The parent company recorded revenues of €64.1 million and net income of €149.7 million in first half 2001.

Media and Communications reported a revenue increase to "€12.4 billion, up 12.4% over the pro forma

first half of 2000.  Excluding Maroc Telecom and Universal Studios Group (USG) Filmed

Entertainment, revenue growth was 11%."  Environmental Services reported revenues of "€13.9 billion

compared to €12.5 billion in the first half 2000, an 11.3% increase."

220.    The July 23, 2001 6-K; the August 10, 2001 6-K; the September 25, 2001 6-K; and the

October 17, 2001 6-K contained untrue statements of material fact and omitted to state material facts

required therein or necessary to make the statements therein not misleading because, *inter alia,* the Company was engaged in improper accounting practices that had the effect of materially overstating Vivendi's reported earnings (as particularized in Section IV.C above), including: (a) failing timely to write down overvalued assets from previous corporate investments and acquisitions; (b) improperly consolidating into its financials revenue from its Cegetel and Maroc subsidiaries in which the Company had less than 50% ownership; (c) overstating the Company's revenue from certain multi-year contracts, (d) improper EBITDA manipulation; and (e) the inflation of certain Canal Plus assets.  In addition, these statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that Vivendi was suffering from a liquidity crisis (as particularized in Section IV.D above) and that Vivendi would necessarily need to restructure its debt obligations in order to remain solvent and avoid bankruptcy.  Further, these statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that Vivendi was not adhering to the "Significant Accounting Policies" listed in its 2000 Form 20-F but, rather, was preparing its financial statements using accounting policies that violated GAAP.

221.    On October 30, 2001, Vivendi issued a press release and filed a Form 6-K (collectively, the "October 30, 2001 6-K") announcing its third quarter 2001 Media and Communications results. The October 30, 2001 6-K announced that Media and Communications revenues were up 24% to €7.3 billion, and that EBITDA was up 90% to €1.5 billion.  This 6-K further reported that Telecom revenues increased by 17%, and EBITDA grew by 31% versus pro forma results for the third quarter of 2000. Music EBITDA was €250 million for the quarter ended September 30, 2001 and €702 million for the nine months ended September 30, 2001.  UMG reported a 6% increase in EBITDA to €250 million. The 6-K also stated in pertinent part:

On a pro forma basis, third quarter revenue growth was 8%, and EBITDA growth was 30%. Year-to-date revenues increased 9%, and EBITDA increased 46%.

Company reaffirms confidence in achieving its growth targets: 10% revenue growth and 35% organic EBITDA growth in 2001. [Footnotes omitted.]

222.    Messier was quoted in the October 30, 2001 6-K as follows:

Our third quarter results for the media and communications businesses, with 24% revenue and 90% EBITDA growth, including organic growth of 8% and 36% respectively, are obviously strong despite the tough environment. . . .  They reflect both our higher potential for growth and greater resiliency to recessionary environments compared to many of our peers.

*       *       *

Additionally, Vivendi Universal's media and communications businesses are presently less vulnerable to recessionary environments than many of our peers because of our strong defensive qualities[.]

*       *       *

Having the highest resiliency and lowest sensitivity to a recessionary environment explains our ability to outperform most of our peers.

*       *       *

An early look at the fourth quarter indicates that we are on track to meet our targets.  I continue to express my confidence in achieving 10% revenue growth and 35% EBITDA growth in 2001 at a constant asset base.  This, combined with some expansions in the company's asset base (i.e., Maroc Telecom and Houghton Mifflin), should result in full-year Media and Communications EBITDA slightly above 5 billion euros.  [Footnotes omitted.]

Messier's statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because he failed to disclose that the results reported were not attributable to the stated causes but, rather, to the accounting fraud particularized in Section IV.C above, and to Defendants' concealment of the liquidity crisis discussed in Section IV.D above.

223.    Following the release of the October 30, 2001 6-K, Vivendi hosted a conference call to discuss the third quarter 2001 results and the Company's business and prospects.  As reported in the complaint in the Securities Class Action, during the call, Messier and others in Vivendi management stated:

> Vivendi was able to achieve strong results even in a down market and was in fact gaining market share;
>
> The Company was still on track to achieve strong growth in revenues and earnings in 2001.

224.    The statements made by Vivendi management during the conference call contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because they failed to disclose that the Company was only able to achieve the results reported through the accounting fraud discussed in Section IV.C above, and through their concealment of the liquidity crisis the Company was facing, as set forth in Section IV.D above.

225.    Based on Defendants' statements, including those made during the conference call, securities analysts that followed Vivendi securities reacted positively to the Company's reported financial results.  For example, on October 31, 2001, ING Barings issued a "Strong Buy" recommendation, stating:

> Vivendi Universal is one of the few media groups not to have issued a profit warning since the beginning of the year.  Management has stressed its confidence once again and remains comfortable with the consensus forecasts (FY02F EBITDA of around €6bn).

226.    On November 14, 2001, Vivendi filed a Form 6-K (the "November 14, 2001 6-K") incorporating Messier's shareholder newsletter.  Messier trumpeted Vivendi's first-half 2001 earnings as "good" and stated that "we are in a position to confirm our annual targets with confidence despite the economic climate."  He further stated:

> For the company as a whole, revenues are up 11%, generating a 42% increase in EBITDA to almost 4 billion euros. The Media and Communications businesses posted a 77% increase in EBITDA and a 184% increase in EBIT, while Environmental Services businesses have continued to grow steadily in terms of both revenues (11%) and EBITDA (12%). Vivendi Universal's primary strength is its operational strength, which comes from the quality of its people and products.

227.    On December 6, 2001, Vivendi issued a press release and filed a Form 6-K announcing the decision of Edgar Bronfman, Jr. ("Bronfman") to resign from his position as Executive Vice Chairman of Vivendi. Bronfman remained as "Vice-Chairman of the Board and a close advisor to Mr. Messier." Commenting on Bronfman's resignation, Messier assured the investing public that Vivendi "is in a very strong position, with solid performance in virtually every business." Messier's statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because he failed to disclose that Vivendi was not in a "very strong position" but, rather, was in a precarious financial position as a result of the accounting fraud discussed in Section IV.C above, and was suffering from a liquidity crisis, as more particularized in Section IV.D above. Further, these statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Messier failed to disclose that Vivendi's purportedly "solid performance" was attributable to the accounting fraud discussed in Section IV.C above, and to Defendants' active concealment of the liquidity crisis the Company was facing, as more particularized in Section IV.D above.

228.    The October 30, 2001 6-K and November 14, 2001 6-K contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because, *inter alia,* the Company was engaged in improper accounting practices that had the effect of materially overstating Vivendi's reported earnings (as particularized in Section IV.C above), including: (a) failing to timely write down overvalued assets from previous corporate

investments and acquisitions; (b) improperly consolidating into its financials revenue from its Cegetel and Maroc Telecom subsidiaries in which the Company had less than 50% ownership; (c) overstating the Company's revenue from certain multi-year contracts; (d) improper EBITDA manipulation; and (e) the inflation of certain Canal Plus assets. In addition, these statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that Vivendi was suffering from a liquidity crisis (as particularized in Section IV.D above) and that Vivendi would necessarily need to restructure its debt obligations in order to remain solvent and avoid bankruptcy. Further, these statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that Vivendi was not adhering to the "Significant Accounting Policies" listed in its 2000 Form 20-F but, rather, was preparing its financial statements using accounting policies that violated GAAP.

229.    In a December 13, 2001 press release, the Company announced that it had "authorized Goldman Sachs and Deutsche Bank to carry out a [$1.5 billion] placement of BSkyB share certificates that must be converted in October 2002." The press release went on to state:

> Following last week's sale of 9.3% of Vivendi Environnement and with this transaction, Vivendi Universal will then be in a position to cover any needs that may arise from various opportunities for strategic partnerships in the U.S. television and distribution segments. Such opportunities may or may not be taken up.

These statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that Vivendi was suffering from a liquidity crisis, as discussed in Section IV.D above.

230.    The next day, on December 14, 2001, the *Financial Times* (London) reported on the announced sale of Vivendi's $1.5 billion interest in BSkyB and the sale of a $1.06 billion interest in Vivendi Environnement. The article quoted Vivendi as stating that these asset sales would give Vivendi

"room to manoeuvre" for additional acquisitions, and enable it "to cover any eventual needs from different opportunities for strategic partnerships." These statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that Vivendi was suffering from a liquidity crisis, as discussed in Section IV.D above.

231. On December 17, 2001, Vivendi issued a press release in Paris and New York and filed a Form 6-K announcing the acquisition of USA Networks for $10.3 billion in combined stock and cash. The acquisition was financed by an exchange of securities and "limited" cash outlay by Vivendi. Commenting on the acquisition, Messier stated in pertinent part:

> Our strategy is clearly coming together. Combining within the same operational entity, VUE, USG and the entertainment assets of USA creates a new U.S. major, which will benefit from the full integration of TV and movies activities with production and distribution.

> \*    \*    \*

> In addition, this strategic move will significantly benefit Vivendi Universal shareholders, because of its significant value-accretion at every level—EBITDA, net income and free cash flow. By using mainly non-core, consolidated assets to acquire this control, we are strongly positioned to enhance performance and value to Vivendi Universal shareholders.

> \*    \*    \*

> At the end of just one year following our merger with Seagram and Canal+, we have put the pieces together in fulfilling our strategy. In one short year, we have focused on integration and addressing our relative distribution weakness in the U.S.—and here we are today. We expect that 2002 will be a year of growth, without further change in perimeter.

Messier's statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because he failed to disclose that the Company was not "strongly positioned to enhance performance and value to Vivendi Universal

shareholders" but, rather, was in a precarious financial condition due to the Defendants' concealment of Vivendi's liquidity crisis from the investing public.

232.    As alleged in the Securities Class Action, Messier held a press conference on December 17, 2001 with Barry Diller, Chairman and CEO of USA Networks, at the St. Regis Hotel in New York City to discuss the acquisition of USA Networks, the creation of Vivendi Universal Entertainment ("VUE"), and Vivendi's prospects for 2002:

> At the end of the day, this transaction is not putting pressure on Vivendi Universal.  On the reverse, what it allows us to do is to increase our [EBITDA] target for 2002 by more than ten percent.  It's to increase our net income in 2002 by roughly 200 million dollars.  It's to increase the net free cash flow of the group in 2002 by, let's say three hundred and fifty million dollars.  At every level of the [P&L] and of the cash flow that you may look at, this transaction is very positive to VUE shareholders year one.

> \*          \*          \*

> As far as the global [debt] ratio of the group is concerned, our target is to have in '02 a debt to [EBITDA] ratio well below three times and especially we are focusing to reach that target ahead of the end of the first half of 2002, which means that Vivendi Universal will end up its program of selling its non core asset in the first half of '02; it will give us very comfortable triple B credit rating targets that we are very comfortable with. . . .  So, no cleaning of balance sheet because the balance sheet is clean. . . .  [W]e are committed to issue full U.S. [GAAP] earnings starting Q1 of '02.  We already, in fact, worked on the basis of U.S. [GAAP] accounting methods in '01 in order to build our track record at the time of this year, at the time of the release of our first full quarterly U.S. [GAAP] in '02.  So we are already applying all U.S. [GAAP] methodologies, including those relating to amortization.

These statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Messier failed to disclose that Vivendi was not applying "U.S. [GAAP] methodologies" but, rather, was engaging in accounting fraud as discussed in Section IV.C above.

233.    As alleged in the Securities Class Action, on February 6, 2002, *AFX News Limited* reported that in an attempt to dispel concern about the Company's debt levels and accounting practices, a letter was distributed to the Company's employees stating that no profit warnings were forthcoming:

> Vivendi Universal CEO Jean-Marie Messier said the media company will not make any change in its guidance for 2001 earnings due for release on March 5, although the fourth quarter was a difficult period. Messier made the comment in a letter to Vivendi's staff, addressing the recent volatility and losses in the company's share price.  "As a result of the 9/11 attacks, the fourth quarter of 2001 was indeed difficult.  Some global markets, including the music market, declined during this period. But despite the difficulties, we are the only media company not to have issued a profit warning on its operating results and there's no change to that situation," said Messier.

> *        *        *

> "There are no hidden risks and no speculative instruments," he said.

Messier's statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because, contrary to his assertions, there were "hidden risks" associated with Vivendi—the accounting fraud and liquidity crisis discussed in Sections IV.C and IV.D above.

234.    On February 11, 2002, Vivendi issued a press release (the "February 11, 2002 Press Release") announcing its year-end 2001 Media and Communications results.  Vivendi announced Media and Communications "pro forma revenue growth of 9% for the year ended December 31, 2001, reaching 28.9 billion euros."   The press release further reported that Vivendi's Telecom segment achieved 24% revenue growth in 2001, and that "[r]evenue growth was 10% using the 2000 perimeter excluding Universal Film, exactly in line with management estimates given 12 months ago."

235.    Commenting on the results, Messier stated:

> I am pleased that we achieved our ambitious target of 10% organic revenue growth in 2001, for the businesses resulting from Vivendi's merger with Seagram and Canal+.  Organic growth is, more than ever in today's markets, the most important strength of Vivendi Universal. Achieving the highest level of growth in our industry is a big

differentiation of Vivendi Universal, and the operating management deserves recognition for fulfilling their growth objectives and outperforming their peers in a difficult year. Our 2001 results give us confidence that we can achieve our growth targets again in 2002.

236.    The February 11, 2002 Press Release contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because, *inter alia,* the Company was engaged in improper accounting practices that had the effect of materially overstating Vivendi's reported earnings (as particularized in Section IV.C above), including: (a) failing to timely write down overvalued assets from previous corporate investments and acquisitions; (b) improperly consolidating into its financials revenue from its Cegetel and Maroc Telecom subsidiaries, in which the Company had less than 50% ownership; and (c) overstating the Company's revenue from certain multi-year contracts. In addition, the February 11, 2002 Press Release contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that the Company was suffering from a liquidity crisis (as particularized in Section IV.D above), and that Vivendi would need to restructure its debt obligations in order to remain solvent and avoid bankruptcy.

237.    On March 4, 2002, Messier was quoted in the *Financial Times* as stating that Vivendi had only two significant off-balance sheet structures, one relating to shares it is selling in BSkyB and another relating to four buildings: "There are no hidden risks and no speculative instruments." Messier's statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because, contrary to his assertions, there were "hidden risks" associated with Vivendi—the accounting fraud and liquidity crisis set forth in Sections IV.C and IV.D above.

238.    On March 5, 2002, Vivendi issued a press release and filed a Form 6-K (collectively, the "March 5, 2002 6-K") proclaiming its year-end 2001 results. Vivendi announced that revenues of €57.36

billion reflected a 10% increase and that operating income of €3.795 billion reflected a 47% increase, on

a pro forma basis.

239.    The March 5, 2002 6-K included financial information by business segment. The release

further reported Media and Communications revenues of €28.1 billion, representing 10% pro forma

revenue growth; EBITDA of €5 billion, representing 34% pro forma EBITDA growth; and operating

income of €1.8 billion, representing 89% pro forma growth. In addition, Telecom's pro forma revenue

was up 24% to €8 billion and its EBITDA increased 49% to €2.5 billion. Further, the March 5, 2002

Form 6-K listed Telecom EBITDA of €2.3 billion as 46% of Media and Communications EBITDA of

€5 billion.    Telecom's operating income was €1.3 billion, which was 72% of Media and

Communications' operating income of €1.8 billion. The Telecom pro forma EBITDA was reported as

growing by 49%, with Maroc Telecom reporting a pro forma EBITDA gain of 33%. EBITDA was

discussed as follows:

> EBITDA consists of operating income before depreciation,
> amortization (including film amortization at CANAL+ Group and book
> plate amortization at VUP), restructuring charges and other one-time
> items (principally reorganization costs at CANAL+ Group), and does
> not reflect adjustment for any minority interests in fully consolidated
> subsidiaries. EBITDA is presented and discussed because Vivendi
> Universal management considers it an important indicator of the
> operational strength and performance of its Media and Communications
> businesses, including the ability to provide cash flows to service debt
> and fund capital expenditures.
>
>                     *        *        *
>
> US GAAP requires consolidation by whatever company manages the
> assets, controls the board of directors and possesses majority voting
> control. VU is required under US (and French) GAAP to consolidate
> Cegetel and Maroc Telecom, since they meet these criteria.

These statements contained untrue statements of material fact and omitted to state material facts

required therein or necessary to make the statements therein not misleading because the consolidation

of Cegetel and Maroc Telecom was not "required" under U.S. GAAP but, rather, violated GAAP as set forth in Section IV.C.3 above.

240.    In discussing off-balance sheet transactions, Vivendi stated that there were "no off-balance sheet loans that have not been disclosed or any such items that would create accounting benefits" and that Vivendi regards "cash as 'king'." Vivendi attached a document to its March 5, 2002 Form 6-K that would "provide full disclosure of our off balance sheet financing as well as other matters" for the Media and Communications division. Here, Vivendi stated that "[p]hilosophically, VU prefers to keep its obligations on the balance sheet." Only two off-balance sheet financing vehicles were reported: "two qualifying special purpose entities (QSPEs) associated with the sale of 400 million BSkyB shares." These statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Vivendi failed to disclose the existence of two significant obligations, the Cegetel current account and the Maroc Telecom side agreement, set forth in Section IV.D.4 above.

241.    Vivendi also reported a charge for impairment to goodwill under French GAAP of €12.6 billion, including €6 billion for Canal Plus. Debt in French GAAP was listed as €14.6 billion for the Media and Communications activities; under U.S. GAAP, debt was €19.1 billion. The press release also stated in part:

> After having been the only large media company not to modify any of its guidance for the year 2001, Vivendi Universal reiterates its confidence in the strength of its businesses and their performance and their ability to grow. For 2002, no other new guidance will be expressed, apart from the company's full confidence to reach for its Media and Communications businesses.

These statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants, despite their alleged "confidence" in the strength of Vivendi's business, were concealing both the accounting fraud discussed in Section IV.C above, and the liquidity crisis discussed in Section IV.D above.

242.    The March 5, 2002 6-K also touted the Company's "Operating Free Cash Flow" as being "ahead of guidance" and announced Media and Communications operating free cash flow of €2.026 billion, "up 2 billion euros over 2000." Commenting on the results, Messier stated in part as follows:

> I am very pleased with the excellent operating results that have been achieved. These results confirm the strength of Vivendi Universal's businesses across the board despite a very difficult global economic environment.
>
> Most of our businesses improved market share, EBITDA and free cash flow during this period of global economic slowing. Even more important, those operational performances are showing improvement at every level of our P&L. The good EBITDA to EBIT transformation ratio: 68% of incremental EBITDA translating in incremental EBIT, is a strong and positive sign. The improvement of operational free cash-flow (FCF) at a higher rate than EBITDA indicates the clear focus given in 2001 to cash management. We will continue this effort.
>
> *        *        *
>
> We stay fully committed to conveying full transparency in our financial results. Vivendi Universal is not only transparent but is the only media and communications company not to change its numbers and targets; it underscores its commitment to accurate, conservative and consistent reporting in every area of its operations.

These statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that the results reported were not attributable to the reasons stated but, rather, to the accounting fraud discussed in Section IV.C above, and their active concealment of the liquidity crisis discussed in Section IV.D above. Further, these statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants were not "fully committed to conveying full transparency" in Vivendi's financial results but, rather, were employing fraudulent accounting to burnish the Company's actual performance, as set forth in Section IV.C above.

243.    The March 5, 2002 6-K contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because, *inter alia,* the Company was engaged in improper accounting practices that had the effect of materially overstating Vivendi's reported earnings (as particularized in Section IV.C above), including: (a) failing to timely write down overvalued assets from previous corporate investments and acquisitions; (b) improperly consolidating into its financials revenue from its Cegetel and Maroc Telecom subsidiaries, in which the Company had less than 50% ownership; and (c) overstating the Company's revenue from certain multi-year contracts. In addition, the March 5, 2002 6-K contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that the Company was suffering from a liquidity crisis (as particularized in Section IV.D above) and that Vivendi would need to restructure its debt obligations in order to remain solvent and avoid bankruptcy.

244.    On March 5, 2002, during an investor conference call, Messier discussed the Company's fiscal year 2001 results and fiscal year 2002 expectations and attempted to minimize the importance of the $12.6 billion write down in goodwill as follows:

> I just want to say a very quick points before going to your questions. And I—the first point here based on the fact that we experienced excellent operating results in the '01 and obviously that's very fortunate because this excellent operating results in '01 are also in the captive of the future and then we'll drive our future. I think that we build our operational reserve but what I want to point out is that if we continue or renewed on the EBITDA growth target results and add to our main in the quarter ' 01. We did all of this. Our operating pre cash flow target, we average Euro 2 million instead of the guidance of Euro 1.2-1.5 million. Obviously the fact that the more you go to cash the more we over this—the guidance that we gave to the market is a strong sign of the quality of the casual management in working above the requirements and CAPEX management in '01. That goes to the same direction is that we did overcome largely all targets in terms of cash service. We save Euro 200 million EBITDA, we reach 300 EBITDA 100 more, and close to Euro 600 million total cash savings. The operations and these business achievements, I think that we owed them to our competitive advantages that were evident in '01. That: (1) the

> excellent quality of management; (2) the fact the we gain market share in about every single of our business.  Those gains of market shares coming from [scale and scope]; (3) the assets mix, maximize our ability to go to digitalization for delivery on the mobile devices; and (4) to our global footprint minimizes of earnings volatility.  That's the business achievement.

Messier also attempted to downplay the impairment charges as a choice of switching from French GAAP to U.S. GAAP in order "to be even more transparent."  Messier stressed the non-cash nature of the impairment charge.

245.    As alleged in the Securities Class Action, Lehman Brothers issued a report on March 6, 2002 based, in part, on the statements made by Vivendi's management in the March 5, 2002 conference call:

> In its post results conference call, management confirmed that the value adjustments to the U.S. assets . . . reflected largely a change in accounting treatment and did not signal a negative outlook for the U.S. water business.

These statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that the goodwill write-down was not attributable to a change in accounting but, rather, to the fact that the Company had been overstating goodwill all along, as set forth in Section IV.C.2 above.

246.    Bear Stearns issued a report on March 6, 2002, based on the March 5, 2002 conference call, stating in pertinent part as follows:

> For '02, Management reiterated their guidance of 10% organic sales growth for all the Media Communications businesses and expects EBITDA of close to €6 billion (pre-USA Networks and pre-Stream).
>
> *       *       *
>
> A list of ten accounting "issues" relating to off-balance sheet financing was published in conjunction with the results and the group is today holding an accounting workshop to clarify the impact of moving to US GAAP when it reports Q1'02 results this year.
>
> *       *       *

> The company disclosed that the €19 billion of net debt has an average maturity of 4-years and an average cost of 4.1%. Management pointed out that the strength of the group's finances is underlined by a recently negotiated 5-year credit facility at 45 basis points over LIBOR.

The statements made by Vivendi management contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that they expected to reach the reported goals by employing fraudulent accounting, as discussed in Section IV.C above, and by continuing to conceal the Company's liquidity crisis, as discussed in Section IV.D above.

247.    On April 4, 2002, Messier filed another shareholder newsletter on Form 6-K (the "April 4, 2002 6-K"). In it, he confirmed that "Vivendi Universal has met its targets in 2001." He went on to state:

> Our media and communications businesses posted EBITDA . . . of 5 billion euros (a 34% pro forma growth), an operating income of 1.8 billion euros (an 89% pro forma growth) and operating free cash flow of 2 billion euros, which is above projections. These results were achieved with a 10% pro forma revenue growth to 28.9 billion euros. If we include our subsidiary Vivendi Environnement, total pro forma revenues amount to 58.2 billion euros.
>
> Our businesses in media and communications have improved their performance, with strong EBITDA growth for Cegetel, TV and Film . . . , and Vivendi Universal Publishing . . . .
>
> Achieving these results during the general economic downturn of recent months was no easy task. But it is in tough situations like this that we can demonstrate our capacity. The proof is there, thanks to the quality of our teams and our products.

Messier's statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because he failed to disclose that Vivendi was able to meet its target and posts the results reported only by employing fraudulent accounting, as discussed in Section IV.C above, and by continuing to conceal to Company's liquidity crisis, as discussed in Section IV.D above.

94

248.    When addressing the reported accounting losses of €13.6 billion, Messier pointed out that "this loss results from a write-down of the value of certain assets taken purely for accounting purposes. There is no actual cash disbursement." He went on to blame the losses on "our anticipated application of U.S. GAAP," stating:

> The change involves several technical modifications, the most significant being the re-evaluation of acquired assets at current market values. Taking into account the stock market decline, the following companies have been reduced on our balance sheet. The value of Canal+ is reduced by 6 billion euros, that of Universal Music by 3.1 billion euros, and the value of USG (studios) and Vivendi Telecom International by 1.3 billion euros each. I would like to repeat this move does not represent any operating loss—it is an accounting loss that has no cash impact whatsoever.
>
> By making this adjustment now in our financial statements, . . . we are keeping one step ahead of market expectations. We are also giving ourselves the opportunity to present first quarter 2002 figures that are understandable to all investors.
>
> This will also enable us, in the future, to improve our net income by significantly reducing charges relating to amortization.
>
> These factors allow us to propose to the shareholders' meeting that the dividend for 2001 be maintained at 1 euro per share.

These statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that the goodwill write-down was not attributable to a change in accounting but, rather, to the fact that the Company had been overstating goodwill all along, as set forth in Section IV.C.2 above.

249.    On April 15, 2002, Defendants caused Vivendi to file a Form 6-K (the "April 15, 2002 6-K") containing a translation of financial information provided to the French financial regulators. In discussing the goodwill impairment of Vivendi's assets, the Form 6-K stated:

> Vivendi Universal reviews the carrying of long-lived assets, including goodwill and other intangible assets, for impairment at least annually or whenever facts, events or changes in circumstances, both internally and externally, indicate that the carrying amount may not be recoverable. Measurement of any impairment is based on fair value. In 2001,

following the recent market decline, our annual review resulted in a non-cash, non-recurring goodwill impairment charge of €12.9 billion (€12.6 billion after €0.3 billion minority interest related to Vivendi Environnement). The charge was comprised of €6 billion for CANAL+ Group, €3.1 billion for Universal Music Group, €1.3 billion for Universal Studios Group, €1.3 billion for international Telecoms businesses, €0.6 billion for Vivendi Environnement (net of €0.3 billion minority interest) and €0.3 billion for Internet businesses. Of the total charge, €12.1 billion related to consolidated subsidiaries and €0.8 billion related to investments accounted for using the equity method.

250.     The financial statements contained in the April 15, 2002 6-K indicated that "[t]otal revenues were €57.4 billion." The revenues generated by Vivendi's "core businesses" were €57.2 billion, which was an increase of 43%. Twenty-seven percent of the revenue was due to the "inclusion of a full twelve-month results of the acquired Seagram's operations in 2001 . . . 4% resulted from the 2001 acquisitions of Maroc Telecom, Houghton Mifflin and MP3.com, and the remaining 12% was generated by a combination of organic growth and the impact of less significant acquisitions and disposals." The April 15, 2002 6-K further stated:

>   Revenues generated by our Media and Communications businesses increased 107% to €28.1 billion, accounting for 49% of our total revenues compared to 33% in 2000 . . . . On a pro forma basis, which includes twelve months of comparable operations both for Seagram and the above 2001 acquisitions, revenues increased 9% to €28.9 billion (10% excluding Universal Studios Group filmed entertainment). Double-digit revenue growth of 24% and 36% respectively, were generated by our Telecom and Internet businesses. Our TV & Film and Publishing businesses generated revenue growth of 8% and 5%, respectively. In our Music business, revenues declined 1%, however, this was a strong performance in a down market.
>
>   Revenues generated by our Environnemental Services businesses, at €29.1 billion, increased 11%, 8% of which was generated by organic growth and 3% of which was due to the implementation of the Dalkia-EDF agreement and other acquisitions. . . .
>
>                    *          *          *
>
>   . . . In the U.S., revenues increased 81% to €12.7 billion.

251.     In discussing Vivendi's operating income, the April 15, 2002 6-K noted that operating income had "more than" doubled to €3.8 billion, an increase of 145% in Vivendi's "core businesses." The Media and Communications businesses generated €2.2 billion in operating income "before holding and corporate expenses." The 2001 €2.2 billion operating income was an extraordinary increase from €174 million in 2000. Environmental Services operating income increased 24% to €2 billion.

252.     On April 24, 2002, Vivendi filed a Form 6-K (the "April 24, 2002 6-K") announcing its "strong" first quarter 2002 Media and Communications results. Vivendi reported a "strong surge of operational free cash flow, up 159% to 1.4 billion euros, well ahead of expectations." The release, issued in New York, further reported that "[n]et debt fell from approximately 19 billion euros to approximately 17 billion euros." The release also reported Media and Communications "revenue organic growth of 13% to 6.8 billion euros; strong EBITDA growth, up 18% to 1.1 billion euros; and solid operating income growth, up 37% to 408 million euros." Messier commented on these results as follows:

> The hard numbers in the first quarter show that Vivendi Universal has a winning strategy, and demonstrate our commitment to excellent management and delivering operating results quarter after quarter. In the first quarter, each operating segment delivered its revenue targets, and most segments over-delivered EBITDA and operating free cash flow compared with their budgets.

> *       *       *

> In a difficult environment, Vivendi Universal's businesses gained market share. Cash management improved dramatically. Finally, the revenue and cost synergies achieved in the quarter were significant. Further gains will be driven by improving businesses that currently have negative operating free cash flow: Canal+ and Internet operations.

253.     On April 30, 2002, Vivendi filed a Form 6-K (the "April 30, 2002 6-K") announcing "strong" results for the first quarter of 2002, including a 12% increase in pro forma consolidated revenue to €13.2 billion. The release, issued in New York, also reported that consolidated operating income grew 11% pro forma to €781 million, excluding goodwill amortization. In the release, Messier commented on the results as follows:

The consolidated financial results for the quarter demonstrate that Vivendi Universal is delivering on the strategy, goals and targets that we have articulated to our shareholders. In the first quarter of 2002, both Media & Communications and Vivendi Environnement delivered their targets.

The Media & Communications financial results released last week, coupled with our consolidated results issued today, are testimony to our ability and conviction to deliver strong results in operations, cash flow, EBITDA and net income. As I said last week, because of our strong performance in the quarter, we are lowering our estimate of Media & Communications year-end Debt/EBITDA ratio to less than 3x by December 31, 2002.

In a very difficult economic environment, characterized by many market uncertainties, Vivendi Universal's global businesses gained market share. In addition, strong improvement was achieved in cash management, debt reduction, synergies, management development and revenue growth.

254. The April 30, 2002 6-K further touted the Company's allegedly strong cash flow position:

On a pro forma basis, excluding Vivendi Universal's publishing businesses to be disposed of (including the B-to-B and Health businesses whose sale is expected to be completed in the second quarter), Media and Communications reported:

- A strong surge of operational free cash flow, up 159% to 1.4 billion euros, well ahead of expectations;

- Strong operating results in the first quarter: revenue organic growth of 13% to 6.8 billion euros; EBITDA growth, up 18% to 1.1 billion euros; and solid operating income growth, up 37% to 408 million euros. All were significantly ahead of budget[.]

255. The April 4, 2002 6-K; the April 15, 2002 6-K; the April 24, 2002 6-K; and the April 30, 2002 6-K contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because, *inter alia,* the Company was engaged in improper accounting practices that had the effect of materially overstating Vivendi's reported earnings (as particularized in Section IV.C above), including: (a) failing to timely write down overvalued assets from previous corporate investments and acquisitions; (b) improperly consolidating into its

financials revenue from its Cegetel and Maroc Telecom subsidiaries, in which the Company had less than 50% ownership; and (c) overstating the Company's revenue from certain multi-year contracts. In addition, these statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that the Company was suffering from a liquidity crisis (as particularized in Section IV.D above) and that Vivendi would need to restructure its debt obligations in order to remain solvent and avoid bankruptcy.

256.     On May 3, 2002, Moody's lowered the Company's long-term debt rating to Baa3. According to Moody's, the ratings downgrade reflected Moody's concern that Vivendi "might not be able to reduce debt as quickly and comprehensively as planned."

257.     That same day, Vivendi issued a press release, filed on a Form 6-K, criticizing Moody's decision and attempting to downplay its significance:

> The company believes that this decision does not fully take into consideration the currently poor market conditions and the fact that the agency does not take into account immediately the whole of the debt reduction program planned by Vivendi Universal.
>
> This decision has no impact on Vivendi Universal's cash situation. It does not trigger any renegotiation clauses or advance repayments of bank credit lines. In addition, Vivendi Universal's use of commercial paper in the current amount of 1.6 billion euros is well covered by back-up lines of more than 3 billion euros, the availability of which will not be affected by the rating change.
>
> Vivendi Universal affirms that it has every confidence in its ability to meet its operating targets for 2002, as proved by its first-quarter results. The company is totally determined to carry through its debt reduction program in order to make a rapid return to a comfortable position with a Baa2 rating.

These statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that Vivendi's "confidence" in its ability to meet its targets for 2002 was based on the

accounting fraud discussed in Section IV.C above, and on their continued concealment of the Company's burgeoning liquidity crisis discussed in Section IV.D above.

258.    On May 28, 2002, Vivendi filed its Form 20-F for the fiscal year ended December 31, 2001 (the "2001 Form 20-F"). The 2001 Form 20-F, signed by Defendant Hannezo, reported total revenues of €57.4 billion in 2001, which was an increase of 43% over 2000. Vivendi's Media and Communications revenues increased 107% to €28.1 billion over 2000, accounting for 49% of its total revenues. The Environmental Services businesses generated €29.1 billion, an increase of 11% over 2000. In discussing 2001 financial results versus the 2000 results, Vivendi reported that "EBITDA more than doubled to €2.3 billion and operating income almost tripled to €1.3 billion." Excluding Maroc Telecom's results, "revenue growth was 26%, EBITDA increased 56% and operating income increased 103%." In discussing 2000 financial results versus 1999 results, Defendants reported that "EBITDA grew 164% to €1.3 billion and operating income of €486 million was earned compared to an operating loss of €60 million."

259.    According to the 2001 Form 20-F, Vivendi's total operating income "more than doubled to €3.8 billion." The Media & Communications businesses "generated operating income before holding and corporate expenses of €2.2 billion in 2001." Environmental Services' operating income increased 24% to €2 billion.

260.    Vivendi listed its liquidity and capital resources at December 31, 2001 as follows:

> €41.8 billion of debt, €4.7 billion of cash and cash equivalents and €36.7 billion of shareholders equity compared to €38.8 billion of debt, €3.3 billion of cash and equivalents and €65.7 billion of shareholders' equity at December 31, 2000.

261.    The Consolidated Balance Sheet listed cash at €4.7 billion and €3.2 billion as of December 31, 2001 and December 31, 2000, respectively. Net cash provided by operating activities was presented in the Consolidated Statement of Cash Flows as being €4.5 billion and €2.5 billion as of December 31, 2001 and December 31, 2000, respectively.

262.    In discussing goodwill, Defendants stated:

Recurring goodwill amortization increased to almost €1.7 billion, primarily due to the inclusion of a full twelve-months of goodwill amortization related to the merger with Seagram and Canal Plus. Additionally, as previously discussed, our 2001 annual review for impairment of the carrying value of long-lived assets resulted in a non-recurring, non-cash charge of €12.9 billion to goodwill amortization. The impact of the charge on future results will be to reduce goodwill amortization by approximately €380 million per year.

263.    Defendants also reported cash flow in the 2001 Form 20-F as follows:

*Net Cash Flow from Operating Activities*—Net cash flow provided by operating activities totaled €4.5 billion in 2001, an increase of €2 billion from 2000. The increase was attributed to operating earnings generating incremental cash flow of €1.1 billion and improvements in working capital of €1.5 billion, partially offset by approximately €600 million of cash payments made for the settlement of restructuring and merger-related liabilities. Of the improvements in working capital, €0.8 billion was generated by Vivendi Environnement primarily due to the implementation of a receivables securitization program. In 2000, operating activities provided net cash of €2.5 billion compared to €0.8 billion in 1999. The significant improvement was primarily due to increased earnings generated by our Telecoms, Publishing and Environmental Services businesses.

*Net Cash Flow from Investing Activities*—Net cash flow provided by investing activities was €4.3 billion in 2001 compared to net cash flow used for investing activities of €1.5 billion in 2000. Contributing to cash from investing activities was €9.4 billion from the sale of our spirits and wine business and €4 billion from the disposal of our investment in BSkyB, partially offset by capital expenditures for tangible and intangible assets net of sales proceeds of €4.9 billion and the acquisitions of Houghton Mifflin for €2.0 billion and Maroc Telecom for €2.4 billion. In 2000, net cash used for investing activities was €1.5 billion compared to €12.9 billion in 1999. The significant decrease primarily reflects fewer strategic acquisitions paid for in cash in 2000 compared to 1999. . . . Proceeds from the disposal of investments and fixed assets were €6.9 billion in 2000 compared to €4.5 billion in 1999, mainly attributable to the divestiture of non-core real estate, construction assets and GPU power generation plants.

*Net Cash Flow from Financing Activities*—In 2001, net cash flow used for financing activities was €7.5 billion, the principal components of which included; a €5.9 billion repayment of long-term borrowings and other liabilities, a €1.7 billion decrease in short-term borrowings, the purchase of treasury stock for €4.3 billion and cash dividends paid of €1.4 billion,

partially offset by €5.2 billion proceeds from the issuance of long-term borrowings and other liabilities and €0.6 billion net proceeds from the issuance of common stock. In 2000, net cash flow used for financing activities was €0.6 billion compared to net cash provided by financing activities of €13.7 billion in 1999. The year-on-year variance was primarily due to the Merger Transactions. In July 2000, the sale of 37% of Vivendi Environnement through an IPO contributed to an increase in financing transactions of €3.8 billion.

264.    In discussing the Maroc Telecom and Cegetel consolidation in Footnote 11 to the Consolidated Financial Statements, Defendants reported:

> [Cegetel and Maroc Telecom are] consolidated because, through a shareholders' agreement, Vivendi Universal has a majority of the shareholder voting rights and no other shareholder or groups of shareholders exercise substantive participating rights, which would allow them to veto or block decisions taken by Vivendi Universal.

265.    In reporting on its investment into Elektrim, Defendants disclosed only that Vivendi had entered into an Investment Agreement with Elektrim, acquiring 49% of Elektrim. It further stated:

> In March 2002, Vivendi Universal announced that it had signed a non-binding Memorandum of Understanding with a group [of] financial investors led by Citigroup Investments to sell its 49% interest in Elektrim Telekomunikacja. As part of the agreement, Vivendi Universal will retain a minority interest in the Citigroup-led consortium and will be granted a put option and the investors a call option on this interest. The exercise of the two options will ensure that Vivendi Universal is able to completely withdraw from its investment in Elektrim Telekomunikacja in due course.

266.    In discussing Vivendi's accounting policies, Defendants again stated that Vivendi recognized revenues from the sale of recorded music, "net of a provision for estimated returns and allowances, . . . upon shipment to third parties" and recognized revenues in Environnemental Services when services were provided, stating:

> Amounts billed and collected prior to services being performed are included in deferred revenues. Fees incurred to obtain a contract and paid upfront are capitalized and amortized on a straight-line basis over the duration of the contract. Revenues from long-term contracts involving a substantial construction component are recorded on the percentage-of-completion basis.

267.    For the reasons set forth in greater detail in Section IV.C above, Vivendi's historical financial statements and balance sheets contained in Vivendi's 2001 Form 20-F contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because, inter alia, the Company (a) failed to report pro forma financial results properly; (b) improperly consolidated into its financials revenue from its Cegetel subsidiary (in which the Company had less than 50% ownership); (c) failed timely to write down impaired goodwill from previous corporate investments and acquisitions, including Canal Plus; and (d) overstated the Company's revenue from its environmental division on certain multi-year contracts in violation of GAAP.  In addition, the 2001 Form 20-F contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that Vivendi was suffering from a liquidity crisis, as set forth in Section IV.D above.

268.    Defendants further attempted to address concerns about debt levels by issuing a press release on May 30, 2002, subsequently filed on a Form 6-K (collectively, the "May 30, 2002 6-K").  The May 30, 2002 6-K disclosed that Vivendi had negotiated some debt relief by obtaining an "agreement from the banks to delete the clauses that linked the availability of credit lines to a rating level."  This action decoupled Vivendi's bank credit lines from rating agencies' decisions.  Investors were further reassured that "the Company has no reason to anticipate or fear any further deterioration in its credit rating."  The May 30, 2002 6-K further stated:

> Vivendi Universal has also confirmed that, after payment of the dividend and the acquisition of USA Networks, its available credit lines that have not been used to date amount to almost 3.5 billion euros. Also, its use of commercial paper is limited to about 1 billion euros, and the reimbursement of expected debts during the coming months is limited.
>
> This cash situation, which, the Company believes, is comfortable—even assuming an extremely pessimistic market—will enable the Company to

continue its debt reduction program with confidence and with a view to creating the best possible value for its shareholders.

269. The May 30, 2002 6-K contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that Vivendi was facing a liquidity crisis, as discussed in Section IV.D above. Unbeknownst to investors, Vivendi's cash situation was dire and a further deterioration in its credit rating was all but certain. Defendants were offering false reassurances that had their intended effect—on May 31, 2002, Vivendi ADSs closed up $1.23, at $31.05.

270. On June 13, 2002, Defendants caused Vivendi to file a Form 6-K (the "June 13, 2002 6-K") containing Vivendi's first quarter 2002 unaudited consolidated financial results reporting numbers in line with its April 30, 2002 6-K, as set forth above.

271. The statements contained in the June 13, 2002 6-K contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading for the same reasons the statements in the April 30, 2002 6-K contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading, as set forth in Sections IV.C and IV.D above.

272. Defendants continued their efforts to counteract the stream of bad news. On June 25, 2002, Vivendi issued a press release (and filed a Form 6-K) (collectively, the "June 25, 2002 6-K") titled "Vivendi Universal to Lower Debt by €4 billion in 2002," reiterating the positive steps it had taken to reduce debt and announcing that the Company's cash position was not precarious.

273. The statement in the June 25, 2002 6-K that the Company's cash position was not precarious contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that the Company was facing a liquidity crisis, as set forth in Section IV.D above.

274.    On June 26, 2002, Vivendi issued yet another press release and Form 6-K (collectively, the "June 26, 2002 6-K") outlining additional details about Vivendi's "deleveraging and liquidity." The June 26, 2002 6-K first outlined that "[a]ccording to the U.S. definition of net debt (gross debt less cash), Vivendi Universal's net debt (excluding Vivendi Environnement) fell from around €19 billion at December 31, 2001 to approximately €17 billion at March 31, 2002, (and from €14.6 billion to €12.8 billion under French GAAP)." The June 26, 2002 6-K stated that "[t]he main factors that will impact debt under U.S. practices in the second quarter were or will be [cash inflows and cash outflows]."

275.    Further, the June 26, 2002 6-K stated that Vivendi's new debt target was €15 billion by December 31, 2002, stating that "[t]his target represents a ratio of debt-to-estimated 2002 EBITDA of below 2.5 times, including Cegetel and Maroc Telecom, as is required by both U.S. and French accounting standards. Using 'proportional' levels of estimated 2002 EBITDA and debt adjusted for the minority interests of Telecoms, the debt target ratio is around 3 times EBITDA." According to the press release, the lowered debt target, "which is lower than that so far announced, has been made possible by the rapid progress made in the debt-reduction plan during the first half of the year."

276.    The June 26, 2002 6-K also lauded Vivendi's high levels of available credit, stating that "[a]t this point in time, Vivendi Universal has available around €3.3 billion in unused credit lines. This is available to back up its commercial paper outstanding of nearly €1 billion." This Form 6-K extolled Vivendi's strong free cash flow, stating:

> Owing to its strong free cash flow, combined with the execution of the disposals program and potential bond issues, Vivendi Universal is confident of its capacity to meet its anticipated obligations over the next 12 months.

277.    According to the June 26, 2002 6-K, to aid its cash situation, Vivendi had also "renegotiated a number of bank clauses, in particular those that placed it in the situation of certain loans being called if its credit ratings fell below BBB-/Baa3."

278.    The June 26, 2002 6-K contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that the Company was facing a liquidity crisis, as set forth in Section IV.D above.

279.    On June 26, 2002, Messier discussed the Company's debt and liquidity during an investor conference call as follows:

> I have read, I held in the markets all certainties, question, rumors in the current environment relating to views, view for yourselves, views for your accounting and I seen that in those circumstance. The best that we can do is to show you that's there is no hidden liability that's you have all the information to come back.

Messier's statement that there was no "hidden liability" contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because he failed to disclose that Vivendi was engaging in a fraudulent accounting scheme, as discussed in Section IV.C above, and that it was facing a liquidity crisis, as set forth in Section IV.D above.

280.    As alleged in the Securities Class Action, Dow Jones International News reported on June 26, 2002:

> Chairman Jean-Marie Messier said late Wednesday that he plans to stay in charge of the embattled media company despite criticism of his strategy and a crumbling share price.
>
> Messier sought to counter those doubts, opening the call with a comment that the company has no hidden, off-balance sheet liabilities and adding, "we feel very confident looking to our debt and cash analysis with all our commitments of the group for the coming 12 months."

Messier's statement that there was no "hidden liability" contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because he failed to disclose that Vivendi was engaging in a fraudulent accounting scheme, as

discussed in Section IV.C above, and that it was facing a liquidity crisis, as discussed in Section IV.D above.

281.    On July 2, 2002, Vivendi's debt was downgraded again amid reports that the Company was in danger of default. Also on July 2, 2002, *Bloomberg* reported that Messier "told employees in an e-mail that while he may have gone 'too fast, too far,' there are 'no hidden risks' in the company's accounting." Messier's statement that there were no hidden risks in the Company's accounting contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because he failed to disclose that Vivendi was engaging in a fraudulent accounting scheme, as discussed in Section IV.C above, and that it was facing a liquidity crisis, as discussed in Section IV.D above.

282.    The next day, July 3, 2002, *The Columbian* (Vancouver, Washington) reported that Messier continued to defend Vivendi's financial statements: "There are no underestimated liabilities. There are no overvalued assets," Messier said. "Our results are true, genuine and complete."

283.    Messier's contention that the Company's results were "true, genuine and complete" contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because he failed to disclose that Vivendi was engaging in a fraudulent accounting scheme, as discussed in Section IV.C above, and that it was facing a liquidity crisis, as discussed in Section IV.D above.

## VII.    ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER

284.    Throughout the Core Period, as alleged herein, Defendants intentionally, or at least recklessly, made materially false and misleading statements and concealed material information concerning Vivendi's financial condition. Many of these misrepresentations and omissions were the

result of intentional deception and intentional violations of GAAP by Defendants done for the purpose of boosting Vivendi's ordinary share and ADS prices.

285.    As set forth above in detail, Messier and Hannezo, by virtue of their receipt of information reflecting the true facts regarding Vivendi, their control over, and/or receipt and/or modification of Vivendi's materially misleading statements, financial statements and/or their associations with the Company that made them privy to confidential proprietary information concerning Vivendi, were active and culpable participants in the fraudulent scheme.  Messier and Hannezo knew and/or recklessly disregarded the false and misleading nature of the information they caused to be disseminated to Plaintiff and the investing public.

286.    Vivendi is charged with the knowledge possessed by its senior officers, including Messier (the former Chairman and CEO) and Hannezo (the former CFO).

287.    Messier's and Hannezo's intentional misconduct included, among other things, authorizing improper accounting practices and directing Vivendi employees to misapply GAAP in order to conceal the Company's actual, serious liquidity and cash flow problems.

288.    No later than mid-December 2001, Defendants knew that Vivendi had just narrowly avoided a downgrade in its investment status by the credit rating agencies that, had a downgrade occurred, would have nearly wiped out Vivendi's cash and would have harmed the Company's ability to borrow additional funds from its credit facilities to finance further acquisitions.  It was this near-downgrade that gave Hannezo, as alleged above, the "unpleasant feeling of being in a car whose driver is accelerating in the turns" with him in the "death seat," and led him to pray that "all of this not end in shame."  Nevertheless, Messier chose to not mention the narrowly averted credit rating downgrade when he urged Vivendi's Board of Directors to approve the $10 billion acquisition of USA Networks' television and film business just two days later, and both he and Hannezo continued to sign off on Vivendi's false disclosures about, *inter alia,* the Company's cash and liquidity situation.

289.    Further, as alleged above in Section IV.C.5, Hannezo knew from a memorandum dated January 29, 2001, written shortly after Vivendi acquired Canal Plus, that the football marketing rights that originally had been believed to be an asset of Canal Plus actually belonged to the football league rather than the football teams.  Hannezo knew or should have known, but recklessly disregarded, the fact that Vivendi took no impairment charge in fiscal year 2001, resulting in Vivendi's overstating the value of this subsidiary.

290.    Although Vivendi claimed in its March 5, 2002 earnings release that, based on the company's "excellent" operating results, it would pay a dividend of €1 per share, Vivendi had to borrow against credit facilities to pay the dividend, which cost more than €1.3 billion after French corporate taxes on dividends.  Similarly, despite stating in Vivendi's June 26, 2002 press release that the Company had "around €3.3 billion in unused credit lines to back up its commercial paper outstanding of nearly €1 billion" and that the cash situation had greatly improved since the beginning of the year, just one day before Vivendi issued that press release, at least €900 million of the €3.3 billion in Vivendi's credit lines had expired, and Vivendi's cash situation had in fact worsened as a result of a demand made weeks earlier by Cegetel's minority shareholders for the repayment of a current account pursuant to which Cegetel made its excess cash available to Vivendi.

291.    The magnitude of the impact of Defendants' fraud also strongly evidences Defendants' intentional or reckless conduct.  The revelation of Vivendi's precarious liquidity situation—including a €19 billion debt burden—caused it to teeter on the edge of bankruptcy, dried up its credit lines, caused its credit ratings to crater, triggered its credit facility covenants' ratings thresholds, and led its lenders to refuse to extend to Vivendi desperately needed fresh credit.  Vivendi itself admitted that it faced having to reduce its debt by billions of euros in order to achieve an acceptable capital structure.  This cash and liquidity crisis did not happen overnight.  Rather, it was the direct result of Defendants' deliberate, steady collision course driven by their insatiable appetite for more acquisitions and the associated

prestige, power and money that come with being (or appearing to be) the world's leading media and entertainment company. The extent of the crushing debt load, that Vivendi only first started to publicly acknowledge in July 2002, directly contradicted the financial picture that Defendants presented to the securities markets during the Core Period.

292.    Defendants' scienter is further evidenced by the fact that, commencing immediately on the heels of the disclosure that the Company's continued viability was at risk absent a "fire sale" of assets, new management rapidly downsized the Company, sold off major assets and restructured it. Those actions demonstrate the extent of the bloat, waste and excess caused by Defendants' burning desire for a global empire that they built by misleading investors about Vivendi's financial condition.

293.    In the arbitration proceedings brought by Messier to enforce the terms of his termination agreement with Vivendi, Vivendi itself stated that Messier caused Vivendi's near collapse. In addition, as reported by the Associated Press on December 12, 2002, Hannezo admitted that "2001 was marked by a series of errors, including underestimating the debt problem." Further, Vivendi's new CEO also admitted at a French parliamentary hearing in September 2002 that had Messier remained CEO of Vivendi beyond July 3, 2002, Vivendi invariably would have gone bankrupt "within 10 days."

294.    Messier and Hannezo had the motive and opportunity to commit fraud because they had the means and the likely prospect of obtaining concrete benefits from their fraudulent conduct. Messier wanted Vivendi to be a worldwide empire and Vivendi was on an unrelenting quest to maintain and expand its business enterprises. Vivendi spent more than $75 billion overall in pursuit of Messier's ambition to create the world's No. 1 entertainment company through rapid acquisitions of companies in the United States and abroad, using Vivendi's securities as consideration. Defendants achieved that objective by artificially maintaining the value of Vivendi's ordinary shares and ADSs and by propping up their price through the dissemination of the materially false and misleading statements described in detail above. In addition, Vivendi's ability to maintain positive credit ratings and thereby to obtain additional

financing for further acquisitions depended on Defendants' fraudulent scheme.  Vivendi's global reach

could not have been achieved without Defendants' fraudulent inflation of the Company's share prices.

295.    Defendants were further motivated to boost Vivendi's share price because Messier made

a huge bet that Vivendi shares would rise by selling put options to banks in late 2000 and 2001.  The

options committed Vivendi to buy back tens of millions of its shares at fixed prices in the future.  On

October 31, 2002, *The Wall Street Journal* discussed Messier's stock buy-backs and sales of put options:

> Mr. Messier had a special incentive to boost Vivendi's share price with
> the buybacks: He had made a massive bet on the company's behalf that
> Vivendi shares would rise by selling "put options" to banks in late 2000.
> The options committed Vivendi to buy back tens of millions of its
> shares at fixed prices in the future.  If Vivendi's share price were to fall,
> the company could lose as much as $1.4 billion on the options.  Even
> with the buy backs, the share price fell in the end.  So far, the put
> options have cost Vivendi $900 million.

296.    Messier had an even greater motive for falsifying the appearance of Vivendi's finances

from which he derived concrete benefit: his bonus was pegged to Vivendi's achieving specific earnings

targets.  Messier's compensation included a base salary, plus lucrative bonuses based on earnings results,

stock options and other perks such as a personal assistant, security guards and the use of a $17 million

Park Avenue penthouse at a below-market rate.  As reported in Vivendi's Form 20-F for 2001, Messier

received 835,000 stock options and earned $4.8 million in compensation that year.  Of that amount,

more than $3 million—two-and-a-half times his salary—comprised his bonus, which he received

because Vivendi's EBITDA had increased that year by more than 30%.  Had Vivendi's earnings

increased by more than 35%, Messier would have received three times his base salary as a bonus.

Hannezo likewise received lucrative compensation and remuneration that was dependent upon the

Company's achievement of certain financial targets.  As *The Economist* reported on June 8, 2002, "[t]he

company even bases its bonus scheme for top management on ebitda."  By manipulating the Company's

accounting to create the illusion that those targets had been achieved, Messier and Hannezo created an

entitlement to bonuses they would not have received if the Company's financial results had been accurately reported.

297.    As CEO, Messier was the public voice of Vivendi and was therefore in a position to communicate, as he did during conference calls and in press releases and other public documents, false and misleading statements concerning the Company's financial condition, its compliance with GAAP and the veracity of its financials. Messier signed or authorized all of the Company's SEC filings, Annual Reports and press releases during the Core Period. Indeed, Messier was an intensely hands-on manager, as he expressed at a Goldman Sachs conference in London on December 6, 2000: "We are an Old World conglomerate that has grown by five times. You don't do that without concentrating on margins day by day. At the same time we have reshaped the group and managed it on a day-to-day basis."

298.    Hannezo signed certain of the Company's SEC filings and Annual Reports as alleged herein. Further, Hannezo oversaw the Company's accounting and financial reporting, was responsible for creating and approving accounting policies and procedures, and was directly involved in the preparation of the Company's financial statements. Thus, Messier and Hannezo had the ability to control the Company's accounting as well as the content of its financial statements and disclosures. Both had the motive and the opportunity to commit fraud, and took it.

299.    Vivendi had an obvious opportunity to commit fraud, because it published and controlled the content of its own financial statements and other public statements, and because it controlled its own accounting and financial reporting functions, by which the fraud was perpetrated.

300.    Messier's and Hannezo's scienter is further evidenced by their insider trading during the Core Period. According to an article in *The Wall Street Journal* dated January 24, 2003, Messier and Hannezo (and other senior executives of Vivendi that were part of Messier's "dream team") exercised options and sold stock days before an abrupt, huge share placement in the first weeks of 2002 by Vivendi that Messier had arranged to raise desperately needed cash. That transaction sent Vivendi's

ordinary share and ADS price precipitously downward. Specifically, as reported by *The Wall Street Journal,* on or about December 28, 2001, just days after writing the "death seat" memorandum and before the stock sale transaction, Hannezo exercised stock options that earned him a profit of €1.3 million ($1.4 million). An April 11, 2003 article in *The Wall Street Journal* reported that Vivendi acknowledged that Messier also sold 152,000 shares on December 21, 2001 and 106,669 shares on December 27, 2001. In addition, Agnes Touraine, head of Vivendi Universal Publishing, and Catherine Gros, chief of Vivendi's communications department, also exercised stock options at or around the same time. Shortly thereafter, on or about January 7, 2002, Vivendi unexpectedly sold 55 million shares of treasury stock in a €3.3 billion deal. Given their top positions at the Company, Messier and Hannezo and these other executives knew or were in a position to know about that transaction. The market reaction to the sale caused the Company's share price to tumble, but not before Messier, Hannezo had the chance to exercise stock options at a profit. It was not until April 2003 when Messier admitted for the first time that in late 2001 he had sold a huge number of Vivendi shares, worth at least €15 million.

301. Finally, criminal, civil and regulatory authorities in both the United States and France, including the SEC, the Department of Justice, public prosecutors in Paris, and the COB, that investigated or instituted proceedings against Defendants all focused on the same question: whether Vivendi and Messier, Hannezo and other Vivendi executives misled investors with false and inflated assessments of the Company's financial health and position. The SEC found as a result of its investigation that Vivendi, Messier and Hannezo violated Section 10(b) of the Exchange Act and other provisions of the federal securities laws. The COB found that Vivendi's financial disclosures had material irregularities and fined Vivendi and Messier €1 million each for issuing misleading financial disclosures between 2000 and 2002.

## VIII.  PRESUMPTION OF RELIANCE

302.    In connection with their claims asserted under Section 10(b) of the Exchange Act and Rule 10b-5 thereunder and under common law, Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine because the securities purchased and acquired by Plaintiff traded in an open and efficient market.

303.    As alleged herein, Defendants made material misrepresentations or failed to disclose material facts.  These misrepresentations and omissions would tend to induce a reasonable investor to misjudge the value of Vivendi securities.  Plaintiff purchased or acquired Vivendi securities between the time that Defendants misrepresented or omitted material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

304.    The Company's ordinary shares are listed and trade on the Paris Bourse and its ADSs were listed and traded on the NYSE during the Core Period.  Both the Paris Bourse and the NYSE are highly efficient markets.

305.    As a regulated issuer, Vivendi filed periodic reports publicly with the SEC and the COB (now AMF).  Additionally, Vivendi was followed by analysts employed by major securities firms who wrote reports that entered the public marketplace.  Further, Vivendi issued press releases that were carried by national and international newswire services and were publicly available and entered the public marketplace.

306.    As a result, the market for Vivendi securities promptly digested current information from all publicly available sources and reflected such information in the price of Vivendi securities. Under these circumstances, all purchasers of Vivendi's ordinary shares during the Core Period, including Plaintiff, suffered similar injury through their purchases of Vivendi's securities at artificially inflated prices, and a presumption of reliance applies.

## IX.    <u>INAPPLICABILITY OF STATUTORY SAFE HARBOR</u>

307.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded herein.  The allegedly false statements all relate to historical facts or existing conditions and were not identified as forward-looking statements.  To the extent any of the false statements alleged herein were forward-looking statements, they were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from the forward-looking statement.  To the extent that the statutory safe harbor would otherwise apply to any statement pleaded herein, Defendants are liable for those materially false forward-looking statements because at the time each of those statements was made, the speaker knew that the statement was false.

## X.    <u>LOSS CAUSATION</u>

308.    The material misrepresentations and omissions alleged herein directly or proximately caused the damages sustained by Plaintiff.  As alleged herein, Defendants made or caused to be made a series of materially false or misleading statements during the Core Period concerning Vivendi's business, prospects, operations and financial condition.  These misrepresentations and omissions had the purpose and effect of creating in the market an unrealistically positive assessment of Vivendi and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated.  Defendants' material misstatements during the Core Period resulted in Plaintiff purchasing or acquiring Vivendi securities at artificially inflated prices.  But for Defendants' misstatements and misconduct, Plaintiff would not have purchased Vivendi securities, or would not have purchased them at the artificially inflated prices at which they traded during the Core Period.  As the truth about Vivendi's actual business, prospects, operations and financial condition was revealed, the artificial inflation caused by Defendants' material misstatements was removed from the price of Vivendi's securities, causing damages to Plaintiff.

309.   Vivendi's stock price began to drop starting on May 3, 2002 when, citing concerns about the Company's debt load, Moody's lowered the Company's long-term debt rating to just one notch above "junk" status.  Despite Defendants' attempt to reassure the market that Moody's was wrong, on May 3, 2002, in response to Moody's rating downgrade, Vivendi ADSs declined $1.60, from a close of $30.67 on May 2, 2002 to a close of $29.07 on May 3, 2002.  Vivendi ordinary shares suffered similar declines, falling from €33.77 on May 2, 2002 to €31.52 on May 3, 2002.

310.   On July 2, 2002, Vivendi's debt was downgraded for a second time.  This announcement caused Vivendi's ADSs to fall nearly 21%, from a closing price on July 1, 2002 of $22.45 to a closing price on July 2, 2002 of $17.76.  The Company's ordinary shares fell more than 25%, from a closing price on July 1, 2002 of €23.90 to a closing price on July 2, 2002 of €17.80.  The Company's ordinary shares plunged so fast that the Paris Bourse temporarily suspended trading in those shares.

311.   The following day, Vivendi finally disclosed to the public that the Company was facing a "short-term liquidity issue" and ousted Messier.  Vivendi disclosed that it would be required to repay creditors €1.8 billion by the end of July 2002 and that €3.8 billion in credit lines were up for renegotiation.  Further, credit analysts estimated that Vivendi could face a cash shortfall of €2.7 billion by the end of 2002—an amount they feared could expand to €5.5 billion by the middle of 2003 if the Company failed to secure new multi-billion euro lines of credit quickly.  These announcements caused the Company's ADSs and ordinary shares to fall even further, dropping nearly another 12% from its July 2, 2002 close of $17.76 to a July 3, 2002 closing price of $15.66 and nearly another 22% from its July 2, 2002 close of €17.80 to a July 3, 2002 close of €13.90, respectively.  In total, the Company's ADSs and ordinary shares fell 30% and 41.8%, respectively, in the two days following the second credit rating downgrade.

312.   On July 10, 2002, *The Wall Street Journal* reported that the COB had raided Vivendi's Paris headquarters as part of a formal investigation into the Company's financial disclosures going back to

2001. Notably, the French investigation had been opened to look into alleged "publication of false balance sheets for the tax years closing December 31, 2001 and December 31, 2002" and the publication of false and misleading information concerning the Company's financial outlook for those years.

313.    On August 14, 2002, Vivendi announced that it had suffered a €12 billion net loss for the first half of 2002 and that it would take a further €11 billion goodwill write-down for depreciated assets. Following this announcement, Standard & Poor's dropped Vivendi's debt to junk status. Vivendi's ADSs and ordinary shares tanked, dropping 23.9% (from $15.33 to $11.66) and 25.2% (from €15.90 to €11.89) respectively, in a single day.

314.    Between July 2, 2002 and August 14, 2002, Vivendi lost an astonishing €6.4 billion in market capitalization.

315.    In sum, Messier's $75 billion-plus acquisition spree caused investors in Vivendi ADSs to suffer an 85% decline from their Core Period high of $75.50, and investors in its ordinary shares to suffer an 83.9% decline from their Core Period high of €86.50.

## XI.    TOLLING OF THE STATUTE OF LIMITATIONS

316.    Plaintiff did not know, and could not reasonably have discovered before, at the earliest, July 2, 2002 that Vivendi's financial statements and Defendants' other public statements regarding the Company's financial condition were materially false and misleading. On that date, Vivendi's debt was downgraded, spurring near-panic selling in Paris. This massive sell-off caused Vivendi's ordinary share prices to plummet 25% to a new 15-year low of €17.80. Following his July 3, 2002 ouster from the Company, Defendant Messier continued to deny all wrongdoing and maintained instead that the Company's financial results were all "true, genuine, and complete."

317.    Despite Messier's attempts to reassure the market, on August 14, 2002, Vivendi finally was forced to reveal its precarious financial condition, announcing that it suffered a massive $12 billion

loss in the first half of 2002 and that it would have to sell $10 billion in assets to reduce its debt. Jean-René Fourtou, who succeeded Messier, admitted that "[w]e are facing a liquidity problem."

318.    Prior to July 2, 2002 at the earliest, the statutes of limitations on Plaintiff's claims were tolled by Defendants' active and continuing concealment of the falsity of their statements. The statutes of limitations on Plaintiff's claims were further tolled beginning on July 18, 2002, owing to the filing of a securities class action complaint on that date which is now pending as the Securities Class Action. The Securities Class Action asserts claims against Vivendi, Messier and Hannezo pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act, and Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 thereunder. Those claims arise out of the same facts and circumstances as the claims asserted herein.

319.    By Memorandum Opinion and Order entered March 26, 2007, subsequently corrected by a Revised Memorandum Opinion and Order entered May 24, 2007, this Court ruled on the plaintiffs' motion for class certification in the Securities Class Action. *In re Vivendi Universal, S.A. Sec. Litig.,* 242 F.R.D. 76 (S.D.N.Y. 2007) (Holwell, J.). The Court certified a class of all persons from the United States, France, England, and the Netherlands who purchased or otherwise acquired Vivendi ordinary shares or ADSs between October 30, 2000 and August 14, 2002. On April 6, 2007, Plaintiff Capital Invest, die Kapitalanlagegesellschaft der Bank Austria Creditanstalt Gruppe GmbH ("Capital Invest"), an Austrian investor, filed a petition with the United States Court of Appeals for the Second Circuit pursuant to Rule 23(f) of the Federal Rules of Civil Procedure, seeking leave to appeal from the Memorandum Opinion and Order. On April 9, 2007, Vivendi filed a Rule 23(f) petition with the Court of Appeals seeking leave to appeal from the Memorandum Opinion and Order. By Order filed on May 8, 2007, the Court of Appeals denied both Capital Invest's and Vivendi's petitions. On August 8, 2007, Vivendi filed a petition for writ of certiorari with the Supreme Court of the United States, seeking review of the Memorandum Opinion and Order. On October 9, 2007, the Supreme Court denied the

petition for certiorari. *Vivendi, S.A. v. Gerard,* 128 S. Ct. 391 (2007). Accordingly, the statutes of limitations on Plaintiff's claims were tolled between July 18, 2002 and at least October 9, 2007.

320.    All of Plaintiff's claims have been brought within the applicable statutes of limitations, after giving effect to tolling and the relation-back doctrine.

## XII.    CLAIMS FOR RELIEF

### COUNT I
### Violations of Section 11 of the Securities Act of 1933
### (Asserted Against All Defendants)

321.    Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein, except allegations that Defendants made the untrue statements of material facts and omissions intentionally or recklessly. For purposes of this claim, Plaintiff asserts only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

322.    This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, against all Defendants.

323.    Vivendi issued ordinary shares pursuant to the Registration Statement contained within the Form F-4 for the Merger, and is the registrant for those shares. All purchases of Vivendi ordinary shares are pursuant or traceable to the Registration Statement.

324.    The Registration Statement contained untrue statements of material fact including, but not limited to, the financial statements of Vivendi and other statements regarding Vivendi's business operation and financial results. In addition, the Registration Statement omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading, including the Company's true cash and liquidity position existing at the time the Registration Statement was issued and the violations of GAAP described herein. The facts misstated and omitted would have been material to a reasonable person reviewing the Registration Statement.

325.    Vivendi issued stock pursuant to the Registration Statement, which Defendants Messier and Hannezo signed.  Accordingly, Defendants are strictly liable for the untrue statements of material fact and omissions to state material facts therein.

326.    In connection with the Merger, and pursuant or traceable to the Registration Statement, Plaintiff acquired Vivendi ordinary shares.  Plaintiff suffered damages in connection with these acquisitions of Vivendi securities.

327.    Defendants owed Plaintiff the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement, to ensure that the statements were true and that there was no omission to state a material fact required to be stated therein in order to make the statements contained therein not misleading.

328.    Defendants did not make a reasonable investigation of the statements contained in the Registration Statement, and did not possess reasonable grounds to believe that the Registration Statement did not contain any untrue statements of material fact or omit to state any material facts required to be stated therein or necessary to make the statements, in light of the circumstances under which they were made, not misleading.

329.    Plaintiff did not know, nor in the exercise of reasonable diligence could have known, of the untrue statements of material fact or omissions of material fact in the Registration Statement when Plaintiff purchased or acquired Vivendi's ordinary shares.

330.    As a result of the foregoing, Defendants are liable to Plaintiff for violations of Section 11 of the Securities Act.

## COUNT  II
### Violations of Section 12(a)(2) of the Securities Act of 1933
### (Asserted Against All Defendants)

331.    Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein, except allegations that Defendants made the untrue statements of material facts and omissions

120

intentionally or recklessly. For purposes of this claim, Plaintiff asserts only strict liability and negligence claims and expressly disclaims any claim of fraud or intentional misconduct.

332.    This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77*l*(a)(2), against all Defendants.

333.    Defendants offered to sell, and did sell, in a public offering, Vivendi's ordinary shares by means of the Prospectus contained with the Form F-4 Registration Statement for the Merger. The Prospectus contained untrue statements of material fact and omitted to state material facts required to be stated therein or necessary to make the statements contained therein, in light of the circumstances under which they were made, not misleading. The untrue statements of material fact in the Prospectus included, but were not limited to, the financial statements of Vivendi and other statements concerning Vivendi's business operation and financial results. In addition, the Prospectus omitted to state material facts necessary in order to make the statements contained therein not misleading, including the Company's true cash and liquidity position existing at the time of the Merger. The facts misstated and omitted would have been material to a reasonable person reviewing the Prospectus.

334.    Defendants owed the purchasers of Vivendi shares, including Plaintiff's, the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus, to ensure that the statements were true and that there was no omission to state a material fact required to be stated therein in order to make the statements contained therein, in light of the circumstances under which they were made, not misleading.

335.    Defendants did not make a reasonable investigation of the statements contained in the Prospectus, and did not possess reasonable grounds to believe that the Prospectus did not contain any untrue statements of material fact or omit to state any material facts required to be stated therein or necessary to make the statements, in light of the circumstances under which they were made, not misleading.

336.    Plaintiff did not know, nor in the exercise of reasonable diligence could have known, of the untrue statements of material fact or omissions of material fact in the Prospectus at the time Plaintiff purchased or acquired Vivendi's ordinary shares.

337.    As a result of the foregoing, Defendants are liable to Plaintiff for violations of Section 12(a)(2) of the Securities Act.

338.    Plaintiff hereby tenders their shares of Vivendi securities to Defendants and seek rescission of its purchases to the extent Plaintiff continues to own such securities.

### COUNT  III
### Violations of Section 15 of the Securities Act of 1933
### (Asserted Against Defendants Messier and Hannezo)

339.    Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein, except allegations that Defendants made the untrue statements of material facts and omissions intentionally or recklessly.  For purposes of this claim, Plaintiff asserts only strict liability and negligence claims and expressly disclaims any claims of fraud or intentional misconduct.

340.    This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77$o$, against Defendants Messier and Hannezo.

341.    As alleged herein, Vivendi violated Section 11 of the Securities Act with respect to the Merger by issuing a Registration Statement than included untrue statements of material fact and omitted to state material facts required to be stated therein or necessary in order to make the statements therein not misleading.  The facts misstated and omitted would have been material to a reasonable person reviewing the Registration Statement.

342.    As alleged herein, Vivendi violated Section 12(a)(2) of the Securities Act by soliciting Plaintiff's purchases of Vivendi ordinary shares by means of the Prospectus, which included untrue statements of material fact and omitted to state material facts required to be stated therein or necessary in order to make the statements, in light of the circumstances under which they were made, not

misleading. Vivendi failed to exercise reasonable care regarding the accuracy and completeness of the Prospectus. The facts misstated and omitted would have been material to a reasonable person reviewing the Prospectus.

343. Defendants Messier and Hannezo were control persons of Vivendi when the Registration Statement was filed and became effective and when the Prospectus was disseminated due to (among other reasons alleged herein) their respective positions as Chief Executive Officer and Chairman and Chief Financial Officer of Vivendi; their direct involvement in the Company's day-to-day operations, including its financial reporting and accounting functions; and their signatures on and participation in the preparation and/or dissemination of the Registration Statement and Prospectus. Because of their control and authority over Vivendi, Messier and Hannezo were able to, and did, control the contents of the Registration Statement and Prospectus.

344. By virtue of the foregoing, Messier and Hannezo both had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Vivendi, including the content of its financial statements and of the Registration Statement and Prospectus.

345. Messier and Hannezo acted negligently and without reasonable care regarding the accuracy of the information contained in the Registration Statement and Prospectus and lacked reasonable grounds to believe that such information was accurate and complete in all material respects.

## COUNT IV
### Violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 Promulgated Thereunder
### (Asserted Against All Defendants)

346. Plaintiff's repeat and reallege each of the foregoing paragraphs as if fully set forth herein. This Count is asserted against all Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

347. During the Core Period, Defendants made and disseminated numerous false and misleading statements that were directly attributable to them. Defendants were provided with or had

unlimited access to copies of the Company's financial statements, internal reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to, but did not, prevent the issuance of the statements or cause the statements to be corrected.

348.    As described above, Defendants carried out a fraudulent scheme and course of conduct that was intended to and, throughout the Core Period, did: (i) deceive Plaintiff as well as the investing public; (ii) artificially inflate and maintain the market prices of Vivendi securities; and (iii) cause Plaintiff to purchase Vivendi securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein, which operated as a fraud and deceit upon Plaintiff as a purchaser of Vivendi securities.

349.    As alleged above, Defendants acted with scienter in that they knew, or were reckless in not knowing, that Vivendi's press releases, public statements reported in news articles, investor conferences and analyst reports, Annual Reports, Forms 20-F, Forms 6-K, Registration Statement and other documents filed with the SEC or COB during the Core Period, as well as Defendants' own public statements set forth herein, were materially false and misleading as alleged in detail above; knew that such statements or documents would be issued or disseminated to the investing public, including Plaintiff; and knowingly or recklessly participated in a fraudulent scheme and course of conduct or business as primary violators of the federal securities laws.

350.    As a direct and proximate result of the Defendants' dissemination of materially false and misleading information and failure to disclose material facts, as set forth above, the market prices of Vivendi ordinary shares and ADSs purchased during the Core Period were artificially inflated.  In ignorance of this artificial inflation, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade,

Plaintiff purchased or otherwise acquired Vivendi ordinary shares during the Core Period at artificially high prices.

351.    Had Plaintiff known the truth concerning the misrepresented and omitted facts described above, Plaintiff either would not have purchased or otherwise acquired its Vivendi securities, or would have done so only at substantially lower prices.

352.    Plaintiff was substantially damaged as a result of its purchases and acquisitions of Vivendi securities at artificially inflated prices and the subsequent decline in the price of those securities when the fraud was disclosed.

353.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT V
### Violations of Section 18 of the Securities Exchange Act of 1934
### (Asserted Against All Defendants)

354.    Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein, except allegations that Defendants made the untrue statements of material facts and omissions intentionally or recklessly.  For purposes of this Count, Plaintiff asserts only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

355.    This Count is asserted against all Defendants for violations of Section 18 of the Exchange Act, 15 U.S.C. § 78r.

356.    As set forth above, Defendants made or caused to be made statements that were, at the time and in light of the circumstances under which they were made, false or misleading with respect to material facts, in documents Vivendi filed with the SEC pursuant to the Exchange Act, including the Company's filings on Form 20-F during the Core Period.

357.    In connection with the purchase of Vivendi shares, Plaintiff and/or their agents specifically read and relied upon the Company's SEC filings made pursuant to the Exchange Act, including the Company's filings on Form 20-F during the Core Period.

358.    Specifically, Plaintiff and/or its agents read and relied on the Company's financial statements in those filings and other statements regarding Vivendi's business operation and financial results, including its debt load and cash flow.  Plaintiff and/or its agents further relied on the Company's statements in those filings as being materially complete and as not omitting material information, including information about the Company's financial condition.  Plaintiff and/or its agents relied on these SEC filings not knowing that they were false and misleading.

359.    The reliance by Plaintiff and/or its agents was reasonable.

360.    When the truth began to emerge about the false and misleading statements and omissions in the Company's documents and reports filed with the SEC, Plaintiff was substantially damaged by the resulting decline in the value of Vivendi's ordinary shares.

361.    By virtue of the foregoing, Defendants have violated Section 18 of the Exchange Act.

### COUNT  VI
**Violations of Section 20(a) of the Securities Exchange Act of 1934**
**(Asserted Against Defendants Messier and Hannezo)**

362.    Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein. This Count is brought pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), against Defendants Messier and Hannezo.

363.    Messier and Hannezo, by reason of their executive positions, their direct involvement in the day-to-day operations of Vivendi, including its financial reporting and accounting functions; their signatures on and participation in the preparation and dissemination of Vivendi's false financial statement; their false and misleading press releases and other public statements; and their direction of Vivendi's employees to engage in fraudulent accounting practices that caused the Company's financial

statements to be false and misleading, were each controlling persons within the meaning of Section 20(a) of the Exchange Act. As such, Messier and Hannezo had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.

364. As set forth above, Vivendi participated in a fraudulent scheme and course of conduct or business, and issued false and misleading statements as a primary violator of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. Additionally, Vivendi violated Section 18 of the Exchange Act by filing materially false statements with the SEC, as set forth above. By virtue of their positions as controlling persons of Vivendi and their culpable participation in the Company's fraud, Defendants Messier and Hannezo are liable pursuant to Section 20(a) of the Exchange Act to the same extent as Vivendi for its primary violations of Sections 10(b) and 18 and Rule 10b-5.

365. As a direct and proximate result of Vivendi's primary violations of the Exchange Act, for which Defendants Messier and Hannezo are liable pursuant to Section 20(a), Plaintiff suffered substantial damages in connection with its purchases of Vivendi securities during the Core Period.

## COUNT VII
### For Common Law Fraud and Deceit
### (Asserted Against All Defendants)

366. Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein. This Count is asserted against all Defendants for common law fraud and deceit.

367. As alleged herein, Defendants made material misrepresentations or failed to disclose material facts to Plaintiff regarding Vivendi's financial condition.

368. Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth above, or acted with reckless disregard for the truth of those misrepresentations in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were made knowingly or recklessly and for the purpose and

effect of concealing Vivendi's true financial condition and future business prospects from Plaintiff and supporting the artificially inflated price of Vivendi's securities. If they did not have actual knowledge of the misrepresentations and omissions, Defendants were reckless in failing to obtain such information by deliberately refraining from taking those steps necessary to discover whether those statements were materially false and misleading.

369.    Defendants' misrepresentations and omissions were made intentionally, or at least recklessly, to induce Plaintiff to rely on them when making investment decisions. Certain of the false and misleading statements made by Defendants were set forth in SEC filings, press releases and other public statements that were heard or read directly by Plaintiff. Other false and misleading statements made by these Defendants were heard or read by third parties who subsequently communicated such false and misleading statements to Plaintiff. All of these Defendants' statements were intended by these Defendants to be communicated to members of the investing public, including Plaintiff, and Defendants intended such persons, including Plaintiff, to rely thereon.

370.    Plaintiff reasonably relied, to their detriment, on Defendants' misrepresentations in deciding to purchase or refrain from selling Vivendi securities. Plaintiff read Vivendi's press releases, Form 20-F annual reports, and Form 6-K current reports, and reports by securities analysts. Within such documents, Plaintiff specifically reviewed and relied on the reported revenue, earnings, financial condition, and operating potential of Vivendi. Plaintiff relied on these statements as being materially complete and not omitting material information.

371.    At the time Plaintiff purchased and held Vivendi securities, Plaintiff did not know of the false and/or misleading statements and omissions. Had Plaintiff known the true facts, it would not have purchased Vivendi securities or would have done so at substantially lower prices.

372.    As a direct and proximate result of Defendants' fraud and deceit, Plaintiff suffered damages in connection with its purchases and holding of Vivendi securities.

373. Defendants' fraudulent acts represent an extensive pattern of wrongdoing constituting a wanton and reckless disregard for Plaintiff's rights and were directed at the public generally. Therefore, Plaintiff is entitled to punitive damages in an amount to be established at trial.

## COUNT VIII
### For Common Law Negligent Misrepresentation
### (Asserted Against All Defendants)

374. Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein, except allegations that Defendants made the untrue statements of material facts and omissions intentionally or recklessly. For purposes of this claim, Plaintiff asserts only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

375. This Count is asserted against all Defendants for negligent misrepresentation under common law principles.

376. Throughout the Core Period, Defendants made materially false and misleading statements, as alleged above, concerning Vivendi's financial condition, business operations, and accounting policies and practices.

377. Defendants knew, or should have known in the exercise of reasonable care, that their statements regarding the Company's financial statements and accounting policies and practices during the Core Period were materially false and misleading.

378. Defendants owed Plaintiff a duty of reasonable care in connection with providing information concerning Vivendi's financial condition. Defendants breached this duty by including in Vivendi's financial statements untrue statements of material fact or omitting to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

379. Plaintiff, as investors, were entitled to rely upon, and were justified in relying upon, the representations made by Defendants regarding the Company's financial statements, accounting policies

and practices, and compliance with GAAP. Plaintiff justifiably relied to its detriment upon Defendants' representations when deciding to purchase and refrain from selling Vivendi securities.

380.    Plaintiff had no knowledge of the false and misleading nature of Defendants' statements when purchasing and refraining from selling Vivendi securities, and believed them to be true. Had Plaintiff been aware of the true facts, it would either not have purchased Vivendi's securities, or would not have purchased Vivendi's securities at the inflated prices paid.

381.    As a direct and proximate result of Defendants' dissemination of materially false and misleading information and failure to disclose material facts, the market prices of Vivendi's securities were artificially inflated and Plaintiff sustained damages in connection with its purchases and holding of Vivendi securities when the prices of the securities declined.

## COUNT IX
### For Common Law Unjust Enrichment
### (Asserted Against All Defendants)

382.    Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

383.    Defendants' scheme to conceal the Company's liquidity crisis and artificially inflate the prices of its securities through the use of improper accounting practices unjustly enriched Defendants, at the expense of Plaintiff, by artificially inflating the prices Plaintiff paid for Vivendi securities during the Core Period.

384.    Defendants' possession of these unjustly acquired amounts violates fundamental principles of justice and equity.

385.    Defendants should be ordered to return any funds obtained unjustly and at Plaintiff's 'expense as a result of their scheme.

## XIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A.      Declaring and determining that Defendants violated the Securities Act, Exchange Act, and state law by reason of the acts and omissions alleged herein;

B.      Awarding Plaintiff compensatory damages against all Defendants, jointly and severally, in an amount to be proven at trial, together with prejudgment interest thereon;

C.      Awarding Plaintiff the right to rescind its Vivendi securities to the extent Plaintiff continues to hold such securities;

D.      Awarding Plaintiff an appropriate amount of punitive or exemplary damages against all Defendants, jointly and severally, on the common law claim for fraud and deceit, in an amount to be proven at trial;

E.      Awarding Plaintiff the costs and expenses incurred in this action, including reasonable attorney's fees and fees for Plaintiff's experts; and

F.      Granting Plaintiff such other and further relief as the Court may deem just and proper.

## XIV.  **JURY DEMAND**

Plaintiff demands a trial by jury of all issues so triable.

Dated: New York, New York
       February 29, 2008

                                        LABATON SUCHAROW LLP

                                  By:   _____
                                        Lawrence A. Sucharow (LS-1726)
                                        Eric J. Belfi (EB-8895)
                                        Mark S. Arisohn (MA-2364)
                                        Anthony J. Harwood (AH-1006)
                                        Javier Bleichmar (JB-1104)
                                        Jesse Strauss (JS-0212)
                                        140 Broadway
                                        New York, New York  10005
                                        Telephone:  212-907-0700
                                        Facsimile:   212-818-0477

                                        *Attorneys for Plaintiff Petercam S.A./N.V.*

690563 v1
[1/29/2008 19:34]